BOCA INVESTERINGS
PARTNERSHIP, et
al., Plaintiffs,

v.

The UNITED STATES of
America, Defendant.

Civ. A. No. 97–0602 (PLF).

United States District Court,
District of Columbia.

Oct. 5, 2001.

Melvin White, Diane L. Cafritz, Christopher Kliefoth, William L. Goldman, Karla Palmer, McDermott Will & Emery, Washington, DC, for plaintiffs.

Darren D. Farfante, Michael J. Salem, Samuel Alvin Mitchell, Thomas P. Holderness, U.S. Dept. of Justice, Washington, DC, Richard L. Gilman, Papermaster & Weltmann, Landover, MD, for defendant.

*OPINION, FINDINGS OF FACT AND CONCLUSIONS OF LAW*

PAUL L. FRIEDMAN, District Judge.

TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .302

I. FINDINGS OF FACT ...............................................303

 A. *American Home Products* .........................................303

 1. AHP Generally ............................................303
 2. HP General Business Goals ................................305
 3. AHP General Treasury Function .............................305
 4. AHP General Tax Function .................................307

 B. *American Home Products' Sale of Boyle–Midway* ........................308

 C. *Proposal of Boca Investerings Partnership* ..............................308

 1. Merrill Lynch Proposal ...........................................308

 a. Nature of Investments .........................................312
 b. Potential Partners ...........................................313
 c. Merrill Lynch's Fee ..........................................314
 d. Risks Associated With and Timing and Review of Potential Subsequent Transactions .................................314

 2. AHP Internal Evaluation and Approval of Proposal ....................315
 3. Foreign Partners' Decision to Invest in Partnership ...................318

 D. *Organization of Boca* ...............................................319

 1. Formation of the Partnership in Bermuda ............................319
 2. The Partnership Agreement .........................................323
 3. The Organizational Meeting in Bermuda .............................326

 E. *Boca's Investments and Transactions* .................................328

 1. Purchases of PPNs ...............................................328
 2. Sale of the PPNs for Cash and LIBOR Notes .........................331

 a. May 18, 1990 Partnership Meeting ...............................331
 b. AHP Approval ...............................................332
 c. Sale of PPNs for Cash and LIBOR Notes .........................333
 d. Negotiability of LIBOR Notes ..................................335
 e. Results as of May 31, 1990 ....................................335
 f. Merrill Valuations and the Loss on the LIBOR Notes ..............336
 g. Transaction Costs ............................................337

 3. Purchase of Portion of Syringa's Partnership Interest in Boca ...........337

 a. Syringa's Request and Partnership Meeting .......................337
 b. Effect of Purchase ...........................................339

 4. Distribution of LIBOR Notes to AHP and AHP 10 and Cash to Addiscombe and Syringa ..........................................339
 5. Further Reductions In Syringa's Interest .............................342
 6. Sale of LIBOR Notes .............................................344
 7. Withdrawal Of Syringa from Boca ...................................345
 8. Purchase of Addiscombe's Partnership Interest .......................346

 a. AHP's Request ..............................................346
 b. Effect of Buy–Out ...........................................346

 F. *Economic Relationship Among the Partners* ............................. 348

 G. *Economic Substance of Plaintiffs' Transactions* .......................... 349

 1. The Expert Witnesses ................................................ 349
 2. Boca's Ownership of the PPNs ...................................... 351

 a. Benefits of Ownership ......................................... 351
 b. Risks of Ownership............................................. 351

 3. Boca's Ownership of the LIBOR Notes ............................. 352
 4. Prospects for Profit on Investments ................................. 354
 5. Addiscombe's and Syringa's Profits .................................. 358
 6. Absence of Debtor/Creditor Relationship ............................ 358
 7. The Partners' Capital Accounts and Installment Sale Gain .............. 359

 H. *Activities Outside of the Partnership* .................................... 360

 1. Addiscombe and Syringa Swaps with ABN Bank ...................... 360
 2. ABN Bank–MLCS Swaps ........................................... 361
 3. MLCS Swaps with LIBOR Note Issuers .............................. 361
 4. Effect of Swaps on the Partnership .................................. 362

 I. *Boca's Tax Reporting* ................................................. 362

II. CONCLUSIONS OF LAW ............................................... 363

 A. *The Burden of Proof* ...................................... 365
 B. *Relevant Statutory and Legal Background* ................................ 365
 C. *The Boca Partnership* ................................................ 367

 1. Formation and Operation of the Partnership .......................... 368

 a. AHP's Approval of the Partnership ............................. 368
 b. The Agreement to Enter a Partnership ......................... 369
 c. The Partnership Agreement .................................... 370
 d. Operation as a Partnership .................................... 370
 e. Each Partner's Interest in the Partnership ...................... 371

 2. Conclusions of Law Regarding the Boca Partnership .................. 372

 D. *The Boca Transactions* ............................................... 374

 1. Boca's Investments and Transactions ................................ 377

 a. Initial Investment in Boca and Purchase of PPNs ................. 377
 b. Sale of PPNs and Purchase of LIBOR Notes ...................... 378
 c. Purchase of Syringa's Interest in Boca and Acquisition of LI-
 BOR Notes ................................................ 379
 d. Sale of LIBOR Notes and Purchase of Addiscombe's Interest in
 Boca ..................................................... 379

 2. Conclusions of Law Regarding the Boca Transactions ................. 380

 E. *Alternative Determinations* ........................................... 380

 1. Debtor/Creditor Relationship ....................................... 381
 2. Step Transaction Doctrine .......................................... 383
 3. Creation of Market for LIBOR Notes ................................ 384

4. Allocation of Installment Sale Gain under Section 704(b) ................386
5. Conclusions of Law Regarding the Commissioner's Alternative Determinations ............................................................387

III. CONCLUSION ................................................................388

## INTRODUCTION

Plaintiffs Boca Investerings Partnership ("Boca" or the "Partnership") and its tax matters partner, American Home Products Corporation ("AHP" or the "Company"), brought this action under Section 6226(a) of the Internal Revenue Code of 1986, as amended, 26 U.S.C. § 6226(a) (1994), seeking a judicial readjustment of certain partnership items affected by the Commissioner of Internal Revenue's Notice of Final Partnership Administrative Adjustment ("FPAA"), dated December 30, 1996. As a result of financial transactions entered by the Boca partnership, AHP—one of the partners—enjoyed a significant tax benefit: the ability to declare substantial capital losses on its tax returns for fiscal years ending May 31, 1990, 1991, 1992 and 1993, which in turn would offset a large capital gain it incurred in 1990.

In the FPAA the Commissioner reallocated to AHP much of the capital gain accrued by Boca through the transactions after finding that Boca was a sham partnership created by AHP for the sole purpose of creating the capital loss. Plaintiffs argue that the adjustments made by the Commissioner should be readjusted to the amounts originally reported by Boca on its partnership federal income tax returns because Boca was a bona fide partnership for federal income tax purposes and because the financial transactions entered by Boca that created the capital loss had sufficient economic substance to be recognized for federal income tax purposes. Defendant asserts that the Commissioner's determination must be upheld and judgment must be entered for defendant because plaintiffs failed at trial to show by a preponderance of the evidence that the Commissioner's findings were erroneous.

The case was tried before the Court without a jury over a period of 17 days in June, September and November 2000, and in January and April 2001. At trial, plaintiffs called as witnesses Thomas M. Nee, AHP Vice President, Taxes; Milan Kofol, AHP Deputy Treasurer; Richard J. Walsh, AHP Assistant Vice President, Taxes; John R. Considine, AHP Vice President and Treasurer; E.S. Purander Das, Merrill Lynch Managing Director and then Vice Chairman, Investment Banking; Elizabeth A. Case, an expert in tax accounting with an emphasis on partnership tax accounting; and Leslie Rahl, an expert in risk management, financial engineering, valuation of complex instruments and new securities, and market practices.

Defendant called as witnesses in its case-in-chief David J. Ross an expert in financial economics, corporate finance, and valuation; Alan Tucker, an expert in corporate finance and financial engineering; and Warren D. Matthei, a Merrill Lynch relationship manager at the time of the events at issue.

Plaintiffs called as rebuttal witnesses Harry Gifford Fong, an expert in the areas of corporate finance, valuation, financial engineering, and risk management; Richard Luciano, Merrill Lynch Associate and then Vice President; Mr. Kofol; Mr. Nee; and John DeVora, an AHP administrative assistant in the Payroll Department and later Payroll Manager. Defendant called as a rebuttal witness Richard Leftwich, an expert in finance, financial instruments, corporate finance and investment analysis.

The parties also submitted the deposition testimony of Mr. Das, Mr. Considine, Mr. Nee and Mr. Walsh, as well as the deposition testimony of the following individuals who did not testify at trial: Hans den Baas, Vice President, Derivatives and then Vice President, Financial Engineering at the New York branch of ABN Bank ("ABN"); Robert G. Blount, Executive Vice President and Chief Financial Officer of AHP; John Clark, Comptroller at Sumitomo Bank Capital Markets; Parker Douglas, Vice President, Risk Management at the New York branch of ABN; Claudia Morf, Vice President and Assistant Treasurer at PepsiCo, Inc.; David Oston, Vice President and Manager of the Structured Finance Department at the New York Branch of Banque Fancaise du Commerce Exterieur ("BFCE"); Paul Pepe, Associate and then Vice President of Merrill Lynch Capital Services, Inc.; Mark Rosenbaum, Senior Tax Accountant at Arthur Andersen; John Stafford, Chairman, CEO and President of AHP; Macauley R. Taylor, Merrill Lynch Managing Director; Joel Van Dusen, Financial Analyst and then Associate at Merrill Lynch; and Arshad Zakaria, Merrill Lynch Associate Vice President and then Managing Director.

For reasons expanded upon in the Findings of Fact section, the Court credits the testimony of most of plaintiffs' witnesses, both because of their believability and demeanor as witnesses at trial and the logic of their testimony, and because the exhibits and testimony of other credible witnesses in this case support their testimony. In most instances, and particularly with respect to some of the larger linchpin issues, the only exhibits that contradict plaintiffs' witnesses are ones that were only provisionally admitted at trial, that lack any reference to either of the plaintiffs in this case, and/or were obtained by defendant through discovery in cases unrelated to this one. In most instances, the only testimony offered by defendant to contradict the critical testimony of plaintiffs' witnesses was that of Walter Matthei, to whose testimony the Court gives virtually no weight because of his lack of knowledge of relevant events, the inconsistencies in his testimony, and the fact that much of it was contradicted by other, more credible witnesses, as well as because of Mr. Matthei's general untrustworthiness (including his history of lying and/or making false statements in previous court proceedings), and his bias and animosity towards Merrill Lynch.

## I. FINDINGS OF FACT

Upon a careful consideration and evaluation of the stipulation of facts agreed upon by the parties, the testimony of all the witnesses, the documentary evidence admitted at trial, the post-trial written submissions of counsel and the relevant case law, and making credibility findings as necessary and appropriate to resolve any material discrepancies in the testimony, the Court makes the following findings of fact. On the basis of these findings, the Court concludes that plaintiffs have proven by a preponderance of the evidence that the Commissioner erred. The Court therefore will enter judgment for plaintiffs and reverse the determinations of the Commissioner.

### A. American Home Products

#### 1. AHP Generally

1. AHP, headquartered in Madison, New Jersey, is a large, publicly traded pharmaceutical company whose products include, *inter alia,* Robitussin, Advil, and Premarin. In the late 1980's and early 1990's, AHP's primary lines of business were prescription pharmaceuticals, over-the-counter medicines, medical instruments, foods, and household products.

During this time frame, AHP typically invested excess funds in interest-bearing instruments. Stip. ¶ 7.[1]

2. AHP is the tax matters partner of Boca under Section 6237(a)(7) of the Internal Revenue Code. Stip. ¶ 8.

3. During all relevant times, the following individuals held positions at AHP: John R. Stafford was Chief Executive Officer, Chairman and President; Robert Blount was Executive Vice President and Chief Financial Officer; John R. Considine was Vice President and Treasurer; Thomas M. Nee was Vice President, Taxes; Milan Kofol was Deputy Treasurer; and Richard J. Walsh was Assistant Vice President, Taxes. Stip. ¶ 9; PEX 715; Kofol Tr. (6/21/00 a.m.) 10:2–8.

4. As Vice President and Treasurer of AHP, Mr. Considine was responsible for investing the Company's funds and managing the cash flow from the Company's business operations. With respect to Boca, Mr. Considine was appointed as AHP's representative at the organizational meeting on April 19, 1990. During the relevant period, Mr. Considine was responsible for evaluating potential investments by both AHP and Boca to ascertain whether they would be sound investments, separate and apart from any potential tax benefits. JEX 5; Considine Tr. (9/12/00 a.m.) 7:22–8:25, 22:21–23:1, 60:4–16; Considine Dep. (4/12/99) 26:22–25, 78:25–79:10.

5. As Vice President, Taxes of AHP, Mr. Nee was responsible for the Company's worldwide tax matters. This included providing tax counsel on all transactions the Company might enter into and having responsibility for filing all corporate tax returns. Mr. Nee's responsibilities with respect to Boca included acting as a representative for AHP 10 at the organizational meeting and providing tax counsel to AHP and AHP 10 (the "AHP partners") regarding transactions contemplated by the Partnership. Nee Tr. (6/20/00 a.m.) 15:8–20; Nee Tr. (6/20/00 p.m.) 38:2–13, 49:20–50:2; Nee Dep. (3/17/98) 10:19–11:17, 50:1–15.

6. Mr. Kofol, the Deputy Treasurer of AHP, was the most knowledgeable person within AHP on capital assets. As Deputy Treasurer, Mr. Kofol was responsible for the management of cash, debt and financial investments. This responsibility included monitoring exchange rates and interest rates. With respect to Boca, Mr. Kofol was appointed as alternative representative to represent both AHP and AHP 10 at Partnership Committee meetings. In addition, Mr. Kofol was responsible for reviewing proposed investments, for evaluating whether such investments were potentially in the economic interest of the AHP partners, and for monitoring the performance of Boca's assets. Kofol Tr. (6/21/00 a.m.) 11:20–14:10, 38:18–25, 51:10–53:15; Kofol Tr. (6/21/00 p.m.) 46:13–19, 77:25–78:13, 96:9–14; Considine Tr. (9/12/00 a.m.) 54:22–55:2.

7. As Assistant Vice President, Taxes, Mr. Walsh assisted Mr. Nee in providing tax advice to the Company. With respect to Boca, Mr. Walsh was responsible for advising Mr. Nee and preparing the Part-

1. Citations to the stipulation of facts filed by the parties on May 1, 2000 are referred to throughout this Opinion as "Stip. ¶ __." Plaintiffs' trial exhibits are cited herein as "PEX __," while defendant's trial exhibits are cited as "DEX __." Joint trial exhibits are cited as "JEX __." All references to witness testimony are cited by the witness's name, the date of the testimony and the pages and lines of the transcript on which the testimony is located (e.g., "Considine Tr. (9/12/00) 24:2–10"). Likewise, deposition testimony is cited by the individual or Rule 30(b)(6) deponent's name, the date, and the pages and lines (e.g., "Nee Dep. (3/17/98) 68:5–69:20"). Internal references to findings of fact are cited as "FOF __."

nership's tax returns. Walsh Tr. (9/11/00 a.m.) 22:16–24:2, 38:6–10.

8. AHP 10 was incorporated in Delaware on April 14, 1989. Its offices are located at 1100 North Market Street, Suite 780, Wilmington, DE 19801. AHP 10's certificate of incorporation is Defendant's Exhibit 327. Stip. ¶ 14; DEX 327.

9. During the period in issue, AHP 10 was a wholly owned subsidiary of AHP. The officers of AHP 10 were John R. Stafford, President; Thomas M. Nee, Vice President; Robert Blount, Vice President; John R. Considine, Treasurer; and Carol G. Emerling, Secretary. Stip. ¶ 15.

10. As noted, Mr. Nee represented AHP 10 at the organizational meeting of the Partnership on April 19, 1990. Thereafter, Mr. Kofol represented AHP 10 at the Partnership Committee meetings. FOF 5, 6; JEX 5, JEX 8, JEX 9, JEX 11, JEX 12, JEX 15, JEX 17.

### 2. *AHP General Business Goals*

11. During the late 1980's and early 1990's, AHP was in the process of moving from a conglomerate of various businesses to becoming a health care company. Blount Dep. (4/28/98) 13:13–14:4; Considine Tr. (9/12/00 a.m.) 12:21–13:12; Kofol Tr. (6/21/00 a.m.) 14:17–15:2.

12. AHP engaged in divestitures and acquisitions to facilitate this business plan. For example, in 1986, AHP sold Brach Candy. The Company also sold its foods and instruments divisions during this period. Considine Tr. (9/12/00 a.m.) 12:21–13:12; Kofol Tr. (6/21/00 a.m.) 14:17–15:12; Nee Tr. (6/20/00 a.m.) 12:4–21.

### 3. *AHP General Treasury Function*

13. The primary function of AHP's Treasury Department under the direction of Mr. Considine was to invest the company's excess cash and to manage the cash flow from the Company's business operations. Considine Tr. (9/12/00 a.m.) 12:21–

14:4; Kofol Tr. (6/21/00 a.m.) 26:19–28:5; Nee Tr. (6/20/00 a.m.) 34:16–35:2.

14. The Treasury Department was responsible for ensuring that funds would be available to acquire a particular asset and for investing the proceeds from the sale of assets. Mr. Considine, as a senior officer of the Company and as head of the Treasury Department, was involved in strategic decision-making with regard to sales and acquisitions of assets. Considine Tr. (9/12/00 a.m.) 12:21–14:4; Kofol Tr. (6/21/00 a.m.) 26:19–28:5.

15. In investing the Company's funds, the Treasury Department generally was concerned with: (i) preserving the Company's capital, (ii) ensuring liquidity and ready access to funds, and (iii) receiving a return commensurate with the risk of the investment. Return of principal and liquidity generally were the most important of the three criteria. Considine Tr. (9/12/00 a.m.) 11:9–22; Kofol Tr. (6/21/00 a.m.) 12:21–14:5, 15:13–21, 16:9–19; Nee Tr. (6/20/00 a.m.) 34:16–35:2, 36:1–19.

16. When the Treasury Department considered a potential investment, it generally reviewed rates of return, risk profiles, and the credit quality of the potential investment. Considine Dep. (4/12/99) 18:3–12.

17. AHP generally did not have benchmarks for return on investments since its primary goals were preserving capital and maintaining liquidity. During the relevant period, AHP's return on investments was commensurate with short-term, high quality investments. Considine Tr. (9/12/00 a.m.) 14:18–24; Kofol Tr. (6/21/00 a.m.) 15:13–21.

18. When reviewing potential investments, the Treasury Department would evaluate an investment on a pre-tax basis and consult with the Tax Department as to the tax consequences. AHP generally did

not make investments that it expected would have negative pre-tax returns. Considine Tr. (9/12/00 a.m.) 14:5–17; Kofol Tr. (6/21/00 a.m.) 15:22–16:8.

19. Although the Tax Department advised the Treasury Department on the tax consequences of investments, it was the responsibility of the Treasury Department to satisfy itself regarding the quality of investments and to determine whether a particular investment made sense based on non-tax considerations. Considine Tr. (9/12/00 p.m.) 30:14–31:2; Considine Dep. (4/12/99) 79:4–10; Nee Tr. (6/20/00 a.m.) 29:16–24; Kofol Tr. (6/21/00 a.m.) 15:22–16:8.

20. During the period in issue, the Treasury Department had a practice of maintaining a conservative posture by investing in high quality financial instruments that were primarily short term 30, 60 or 90–day interest bearing instruments. In addition to short-term paper, the Treasury Department also invested in certain tax advantaged investments, such as Puerto Rico municipal securities (Puerto Rico 2–Js) and Voluntary Employee Benefit Association ("VEBA") fund tax-free investments. Of AHP's total investment portfolio of $1.64 billion in October 1991, $556.9 million was invested in Puerto Rico 2–Js, which had a rate of return of 6.79%; and $21.1 million was invested in VEBA fund investments, which had a rate of return of 8.71%. PEX 488; Nee Tr. (6/20/00 a.m.) 25:16–31:11; 36:1–19; Kofol Tr. (6/21/00 a.m.) 16:9–19.

21. The Tax Department advised the Treasury Department on the tax implications of tax advantaged investments, but it generally was left to the Treasury Department to decide whether to invest the Company's funds in these investments. PEX 488; Nee Tr. (6/20/00 a.m.) 25:16–31:11.

22. The Treasury Department had certain guidelines for investing the Company's funds. These guidelines listed permissible types of financial investments and the amount of money that could be invested at any one time. The guidelines ensured that risks were spread across the portfolio and that funds were liquid. Considine Tr. (9/12/00 a.m.) 16:10–23; Kofol Tr. (6/21/00 a.m.) 21:10–22:16; Nee Tr. (6/20/00 a.m.) 36:1–19; Nee Tr. (6/20/00 p.m.) 28:1–3.

23. Periodically, however, AHP sought to invest outside of the Treasury guidelines. On each occasion, the Company would have to evaluate the proposed investment and determine whether the additional risks were warranted given the potential return on the investment. All proposed investments that were outside of the Treasury guidelines could only be pursued after going through such an evaluation and approval process—a process that was formalized at AHP through something called the "AHT process." Considine Tr. (9/12/00 a.m.) 17:16–18:10; Kofol Tr. (6/21/00 a.m.) 22:2–23; Nee Tr. (6/20/00 a.m.) 36:20–37:12; 42:17–43:6.

24. The AHT process ("AHT" is short for American Home Treasury) was described by company witnesses as a strict management system that requires approval in advance at the highest levels of the company for all discretionary spending that is greater than *de minimis* in amount, including investments and contractual relationships entered into by the Company. AHP's Treasury Department was responsible for administering the AHT manual and circulating AHTs to AHP staff departments and to the chairman of the Company to allow for input, review and approval prior to any final decision to invest. Approval of an AHT was required prior to incurring any expense or making any capital outlay that did not fall within the Treasury guidelines. The testimony before the Court was that the AHT system generally

was honored and respected by all who worked at AHP. Stip. ¶ 17; PEX 716; Stafford Dep. (5/11/98) 34:23–37:3; Blount Dep. (4/28/98) 40:15–41:20; Considine Tr. (9/12/00 a.m.) 18:11–19:1; Considine Dep. (3/13/98) 57:19–58:21; Kofol Tr. (6/21/00 a.m.) 22:17–23:8, 25:7–26:18; Nee Tr. (6/20/00 a.m.) 37:2–11, 40:25–41:15. AHP Vice President and Treasurer John Considine described the AHT system as "critically important to American Home.... [I]t was almost the—quote, unquote—bible of American Home. It was the foundation for the control and information system that existed in the company." Considine Tr. (9/12/00 a.m.) 18:13–18.

25. Neither AHP's investment in Boca nor Boca's investments outside of the investment guidelines could be undertaken without the review and control process required under the AHT system. Each transaction by Boca required its own, separate written AHT approval based on the circumstances at the time. Consequently, no transaction was to be or could be committed to in advance. Considine Tr. (9/12/00 a.m.) 58:22–59:6; Considine Tr. (9/12/00 p.m.) 13:5–6; Considine Dep. (3/13/98) 57:19–58:21, 72:15–73:4, 74:22–75:16; Nee Tr. (6/20/00 a.m.) 41:16–42:2; Nee Tr. (6/20/00 p.m.) 27:24–28:14, 34:20–25; Kofol Tr. (6/21/00 a.m.) 37:25–38:6. Under unusual circumstances when a situation required faster action than a written AHT would allow, a "verbal AHT" was permitted. The verbal AHT required the same approvals from the same departments and executives, but such approval would be granted orally, rather than with a signature on a written AHT. Considine Dep. (3/13/98) 57:19–58:21. In all circumstances, according to Mr. Nee, the "AHT system required that all investments that were outside the pre-approved guidelines that the treasury department followed had to be approved by an AHT," whether written or verbal. Nee Tr. (6/20/00 p.m.) 28:1–4.

4. *AHP General Tax Function*

26. AHP's Tax Department is responsible for providing tax advice on all transactions that the Company might enter into and for assuring that all of the Company's tax returns are filed in a timely and accurate manner. Nee Tr. (6/20/00 a.m.) 15:10–16.

27. While the Treasury Department is responsible for investing the Company's funds, the Tax Department advises as to the tax consequences of those investments. Similarly, if a foreign operation were sold, the Treasury Department would consult with the Tax Department on how to bring the cash proceeds back to the United States in a tax efficient manner. Considine Tr. (9/12/00 a.m.) 14:5–17; Considine Dep. (3/13/98) 20:13–21:8; Nee Tr. (6/20/00 a.m.) 17:20–18:13, 24:1–3, 29:15–16.

28. The Tax Department does not decide whether an acquisition or disposition would be made by AHP. Rather, it advises the Company on the tax consequences of proposed business decisions. Nee Tr. (6/20/00 a.m.) 22:25–23:7.

29. During the relevant period, the Tax Department and the Treasury Department worked very closely on a daily basis. Considine Tr. (9/12/00 a.m.) 14:5–17; Nee Tr. (6/20/00 a.m.) 34:6–35:25.

30. AHP is a member of the Internal Revenue Service's Large Case Audit Program. As a result, its tax returns are audited by the Service every year. The Tax Department ensures that the Company's management understands that all transactions are going to be audited. The Tax Department is responsible for engaging in research in order to verify that the transactions are in accordance with the Internal Revenue Code and applicable

Treasury Regulations. Nee Tr. (6/20/00 a.m.) 18:3–8, 21:1–7.

31. The Company paid $461 million in Federal income taxes for 1990. PEX 578; PEX 718; Nee Tr. (6/20/00 a.m.) 32:13–16.

### B. American Home Products' Sale of Boyle–Midway

32. During 1989 and 1990, AHP was negotiating the sale of a major non-pharmaceutical subsidiary, Boyle–Midway Household Products, Inc. ("Boyle–Midway"). Boyle–Midway was a wholly owned subsidiary of AHP that dealt in household products such as Easy Off and Wizard Air Freshener. Stip. ¶ 11; Considine Dep. (3/13/98) 12:13–17.

33. The sale of Boyle–Midway was part of AHP's continuing effort to change the Company to principally a health care and prescription drug business and to move away from non-health care related enterprises. Blount Dep. (4/28/98) 13:13–14:4; Considine Tr. (9/12/00 a.m.) 19:3–17, 21:24–22:5; Considine Tr. (9/12/00 p.m.) 32:5–12; Considine Dep. (3/13/98) 14:12–15:10; Nee Tr. (6/20/00 a.m.) 45:23–46: 1; 46:17–21, 47:6–15, 49:19–50:5.

34. On March 9, 1990, AHP announced an agreement in principle to sell Boyle–Midway for $1.25 billion. At this time, AHP did not know precisely the amount of cash proceeds it would receive from the sale of Boyle–Midway or the amount of gain it would realize from that sale. Nonetheless, AHP anticipated receiving substantial cash proceeds and realizing a significant capital gain. Stip. ¶ 12; Considine Tr. (9/12/00 a.m.) 20:25–21:23; Kofol Tr. (6/21/00 a.m.) 30:1–7; Nee Tr. (6/20/00 a.m.) 51:7–17; Nee Dep. (3/17/98) 57:3–20.

35. The Boyle–Midway negotiations continued throughout the spring of 1990. Negotiations were complicated and lengthy. The allocation of the purchase price and the breakdown between capital assets and non-capital assets were subject to extensive negotiation. These issues were not finally resolved until shortly before the transaction closed in June of 1990. Nee Dep. (4/8/99) 66:16–67:22, 68:11–69:8.

36. Prior to the public announcement of the sale of Boyle–Midway, the potential sale was kept confidential. Nee Tr. (6/20/00 a.m.) 46:7–9; Das Tr. (9/13/00) 22:1–14.

37. Merrill Lynch was not involved in the sale of Boyle–Midway. Considine Tr. (9/12/00 a.m.) 25:20–26:4; Nee Dep. (3/17/98) 55:16–56:4; Das Tr. (9/13/00 a.m.) 22:1–14; Merrill Lynch 30(b)(6) (Das 3/10/98) 27:23–25.

38. The actual sale of Boyle–Midway took place on June 29, 1990, and resulted in a gain of approximately $1 billion; $605,104,183 of the gain was ultimately determined to be capital gain, and the remainder was ordinary income. The proceeds from the sale were later invested in Boca Investerings Partnership. Stip. ¶ 13; Nee Tr. (6/20/00 a.m.) 49:11–18; Considine Tr. (9/12/00 a.m.) 22:6–10.

39. The gain from the sale of Boyle–Midway was reported in the Company's financial statements for 1990. The gain was fully tax affected, that is, AHP reported the gain as being fully taxable on the Company's financial statements. Considine Dep. (4/12/99) 31:25–32:5; Nee Tr. (6/20/00 a.m.) 51:18–54:14; Nee Tr. (4/12/01) 68:16–69:4.

### C. Proposal of Boca Investerings Partnership

#### 1. Merrill Lynch Proposal

40. During the period in issue, Merrill Lynch was a holding company that, through its subsidiaries and affiliates, provided investment, financing, insurance, and related services. Merrill Lynch's principal subsidiary, Merrill Lynch, Pierce, Fenner

& Smith Inc., either directly or through its subsidiaries, was a broker in securities, options contracts, commodity and financial futures contracts, and selected insurance products; a dealer in options and in corporate and municipal securities; and an investment banking firm. Stip. ¶ 18.

41. During the period in issue, Merrill Lynch Capital Services, Inc. ("MLCS") was a wholly owned Merrill Lynch subsidiary and a major derivatives dealer. Stip. ¶ 19.

42. During the period in issue, Merrill Lynch did not have an extensive relationship with AHP. Stafford Dep. (5/11/98) 24:21–25:25; Blount Dep. (4/28/98) 22:11–23:9; Considine Tr. (9/12/00 a.m.) 24:8–13.

43. During the period in issue, the following individuals held the following positions at Merrill Lynch:

| E.S. Purander Das | Managing Director | 1989 |
| | Vice Chairman, Investment Banking | 1990 |
| Arshad Zakaria | Associate Vice President | 1989–1990 |
| | Managing Director | 1991–1992 |
| Richard Luciano | Associate | 1989–1990 |
| | Vice President | 1991 |
| Macauley Taylor | Managing Director | 1989–1991 |
| Paul Pepe | Associate Vice President, MLCS | 1989–1990 |
| Warren Matthei | Relationship Manager | 1989–1990 |

Stip. ¶ 20; Luciano Tr. (4/12/01) 5:8–11.

44. Mr. Das was a Managing Director in Merrill Lynch's Investment Banking Group with regular relationship responsibility for AHP. Mr. Das' role with respect to Boca was threefold: (i) he presented the investment partnership proposal to AHP and answered questions AHP had prior to the formation of the partnership; (ii) he negotiated the $7 million fee Merrill Lynch received from AHP; and (iii) he introduced AHP to its potential partners. After the formation of the Partnership, Mr. Das was no longer involved in the operation of Boca. Das Tr. (9/13/00 a.m.) 15:5–16:15, 23:25–24:4, 25:7–26:9.

45. Mr. Zakaria's role with respect to Boca was to assist Mr. Das and to field questions from AHP regarding the proposal to form an investment partnership. Zakaria Dep. (5/8/98) 12:15–13:9, 25:7–26:3;

Das Tr. (9/13/00 a.m.) 15:25–16:4; Considine Tr. (9/12/00 a.m.) 24:25–25:6.

46. Mr. Luciano helped Mr. Das prepare presentations and perform analyses for client meetings. With respect to Boca, Mr. Luciano attended the organizational meeting in Bermuda on April 19, 1990, and another partnership meeting with Milan Kofol in Bermuda. Luciano Tr. (4/12/01) 6:4–8; 40:12–19.

47. Mr. Taylor and Mr. Pepe were responsible for overseeing and implementing the Partnership's acquisition of financial assets. Merrill Lynch 30(b)(6) Dep. (Taylor 3/10/98) 7:5–16, 9:17–24; Pepe Dep. (5/7/98) 29:5–15, 37:17–38:4.

48. Mr. Matthei was a relationship manager assigned to AHP. He was not substantively involved in presenting the investment partnership proposal to AHP, nor was he significantly involved in the

organization of Boca or the conduct of its business operations. Stafford Dep. (5/11/98) 24:21–28:11; Considine Tr. (9/12/00 p.m.) 51:6–10; Considine Dep. (3/13/98) 40:23–41:5; Nee Tr. (6/20/00 p.m.) 3:16–5:6, 17:18–23; Das Tr. (9/13/00) 15:25–16:11; Matthei Tr. (11/28/00) 18:23–19:10, 66:9–20, 112:24–114:1.[2]

49. Defendant asserts that Mr. Matthei was the first individual to present AHP with the idea to create Boca. Defendant contends that Mr. Matthei first approached John Stafford and Robert Blount at a cocktail party in November 1989, where he explained the partnership concept and intimated that it could be used to shelter capital gains. *See* Matthei Tr. (11/28/00) 27:10–29:4. Defendant offers no testimony, however, to corroborate Mr. Matthei's assertion that the discussion took place. Mr. Stafford testified that he never discussed the partnership concept with Mr. Matthei, let alone in November 1989. Stafford Dep. (5/11/98) 27:20–24; *see also* Considine Tr. (9/12/00 a.m.) 23:6–16 (indicating that Mr. Das was the first individual to propose the partnership concept to AHP in late 1989 or early 1990); Nee Tr. (6/20/00 p.m.) 3:1–4:7 (same); Das Tr. (9/13/00 a.m.) 10:1–17; 15:2–24 (same). Given Mr. Matthei's general lack of credibility, *see* FOF 105, 105a, 105b, 105c, and the fact that all the other evidence relevant to this point contradicts Mr. Matthei's testimony, the Court finds that Mr. Matthei did not present the idea for the Boca partnership to AHP in November 1989.

50. In late 1989 or early 1990, Mr. Das contacted Mr. Considine or Mr. Nee as part of Mr. Das' routine effort to present AHP with potential investment opportunities. During that conversation, Mr. Das indicated that Merrill Lynch had devel-oped a "potentially tax-advantaged investment" that might be of interest to AHP and that Merrill Lynch would like to meet to discuss the idea. Considine Tr. (9/12/00 a.m.) 23:6–16; *see* Nee Tr. (6/20/00 p.m.) 3:1–4:7; Das Tr. (9/13/00 a.m.) 10:1–17; 15:5–12.

51. Soon thereafter, Messrs. Das, Zakaria and Matthei (and perhaps others from Merrill Lynch) met with Messrs. Considine and Nee to present the concept of an investment partnership. The meeting took place at AHP and lasted about 90 minutes. It was general in nature and designed to introduce Merrill Lynch's proposal to AHP. Mr. Das made a formal presentation of the concept using charts to illustrate potential transactions which could lead to a capital loss for AHP. Mr. Das indicated that the concept was being presented to a limited number of other corporations, but he did not reveal the names of those corporations or discuss the details of any proposed transactions that the other companies had entered or might enter. Mr. Zakaria assisted Mr. Das. Mr. Matthei did not have any significant participation in the meeting. Stip. ¶ 21; Considine Tr. (9/12/00 a.m.) 24:25–25:10, 27:25–28:13; Nee Tr. (6/20/00 p.m.) 4:1–24; Das Tr. (9/13/00 a.m.) 16:16–17:3; Merrill Lynch 30(b)(6) Dep. (Das 3/10/98) 30:20–31:6.

52. Mr. Considine attended the meeting at the request of Mr. Nee because any investment in a proposed partnership necessarily would entail the investment of AHP funds. Mr. Nee attended in order to gain an understanding of the tax consequences associated with the potential partnership so that he could do further research and counsel the Company regarding its tax implications. Considine

---

2. The official court transcript incorrectly indicates that Mr. Matthei testified in Court on November 27, 2000. In fact, he testified on November 28, 2000. References to Mr. Matthei's testimony are cited using the latter, correct date.

Tr. (9/12/00 a.m.) 24:14–18; Nee Dep. (3/17/98) 68:20–69:15.

53. As described by Merrill Lynch at the initial meeting, using a flip chart presentation, the investment partnership would involve: (i) the formation of and investment in a partnership, (ii) the partnership's investment in capital assets issued by creditworthy institutions that would likely generate a return satisfactory to AHP, and (iii) certain transactions which, if undertaken, would cause AHP to realize a capital loss for tax purposes pursuant to Section 453 of the Internal Revenue Code. If all of the transactions outlined in the flip chart were undertaken, the results under Section 453 would be an installment gain on the sale of the capital assets and the receipt of other assets in which the partnership would have a high basis in excess of value. If the high basis assets were distributed by the partnership to AHP, AHP's tax basis in its partnership interest would be reduced to zero and AHP would have a tax loss if it subsequently sold the high basis assets. This loss would be counterbalanced by AHP's share of the installment gain and an additional gain if AHP were to sell its interest in the partnership. Considine Tr. (9/12/00 a.m.) 24:25–27:24; Considine Dep. (3/13/98) 38:22–39:10; Nee Tr. (6/20/00 p.m.) 5:9–8:11, 9:23–10:2, 12:2–15:20, 18:17–20; Nee Dep. (3/17/98) 70:19–71:2, 74:18–75:16, 81:18–82:2; Das Tr. (9/13/00 a.m.) 16:16–17:3, 18:4–21:25; Merrill Lynch 30(b)(6) Dep. (Das 3/10/98) 30:20–31:6, 55:3–8.

54. The actual charts used by Merrill Lynch to outline the steps that the partnership could take no longer exist and thus were not presented at trial. Das Tr. (9/13/00) 17:4–15. Those who were present at the meeting and who saw the charts, however, testified that the set of charts attached to a memorandum written by Mr. Nee summarizing the meeting and the pro-

posed steps were very similar to the charts used by Merrill Lynch during the meeting. DEX 167B (Nee Memorandum outlining steps); DEX 1 (charts attached to Nee Memorandum outlining steps); Nee Tr. (6/22/00 p.m.) 90:4–7; Nee Tr. (6/23/00) 17:6–18:22; Considine Tr. (9/12/00 p.m.) 38:23–41:15; Das Tr. (9/13/00) 49:8–61:12; *see also* FOF 75, 76, 77. The potential steps were also summarized orally and in writing by Mr. Nee at trial. PEX 717A and 717B (charts created by Nee during testimony outlining steps); Nee Tr. (6/20/00 p.m.) 12:2–15:20.

54a. In each of these written iterations, the seven proposed steps are generally the same, and are summarized as follows:

(1) Partnership is formed among a United States company, a subsidiary of that United States company (which together would initially own 10% of the partnership) and a foreign financial institution (which would initially own 90% of the partnership);

(2) Partnership purchases corporate bonds/capital assets;

(3) Partnership sells corporate bonds/capital assets in exchange for cash and an installment note;

(4) United States companies increase their partnership interest by purchasing portion of foreign company's interest;

(5) United States companies contribute additional assets to the partnership;

(6) Partners' interests are partially redeemed by distributing installment note to United States companies and cash to foreign company; and

(7) United States companies sell installment note to a third party.

DEX 167B; DEX 1; PEX 717A and 717B.

55. There was no discussion at the initial meeting about: (i) who the potential partners would be or that the partnership would be foreign; (ii) the potential size of

the partnership; (iii) a fee to Merrill Lynch; (iv) transaction costs; (v) timing of transactions; or (vi) any details of other partnerships that may have been created by other corporations to whom Merrill Lynch had made presentations. Considine Tr. (9/12/00 a.m.) 24:25–27:16, 28:16–13; Considine Dep. (3/13/98) 40:19–41:12; Nee Tr. (6/20/00 p.m.) 7:21–16:8; Nee Dep. (3/17/98) 74:6–17; Das Tr. (9/13/00 a.m.) 18:4–7, 18:13–15, 20:6–12, 21:13–25, 27:3–22. Mr. Das did, however, inform AHP that any potential partner would have to be tax neutral with respect to U.S. tax, Das. Tr. (9/13/00) 18:16–19:1, and that the capital assets purchased by the partnership likely would be private placement notes. Das Tr. (9/13/00) 55:7–56:6.

56. Merrill Lynch did not know about the Boyle–Midway transaction at the time of the initial meeting because it had not yet been announced to the public and was being kept confidential. Considine Tr. (9/12/00 a.m.) 25:20–26:4; Nee Tr. (6/20/00 p.m.) 8:18–9:2; Das Tr. (9/13/00 a.m.) 22:1–14; Merrill Lynch 30(b)(6) Dep. (Das 3/10/98) 27:2–25.

57. According to uncontested testimony at trial, the investment partnership proposal did not affect AHP's decision to sell Boyle–Midway. That decision had been made prior to Mr. Das' presentation. Considine Tr. (9/12/00 a.m.) 19:3–22:5; Nee Dep. (4/8/99) 53:20–54:6.

58. After the initial meeting, Mr. Considine and Mr. Nee decided they would continue to look at and further consider the Merrill Lynch partnership proposal. Considine Dep. (3/13/98) 41:13–42:20.

a. *Nature of Investments*

59. After the initial meeting, executives of AHP had meetings and discussions during the winter of 1990—primarily with Messrs. Das and Zakaria—in order to gain a better understanding of the proposal. According to Mr. Nee and Mr. Consi-

dine, Mr. Matthei might have been part of the meetings and discussions, but was not substantively involved in the discussions. These discussions were intended to address AHP's questions regarding the investment partnership proposal. Mr. Considine was concerned with the quality of the investments, the terms of the instruments, and the safety of the Company's funds being invested. Mr. Nee wanted a better understanding from Merrill Lynch regarding the proposal so that he, with assistance from Mr. Walsh, could research the various tax rules that applied to the partnership and the investments the partnership might make. Mr. Blount attended one meeting where the proposal was discussed so that he could understand generally the nature of the potential investments. He also attended a meeting where Merrill Lynch's fee was discussed. He did not involve himself with the details of the proposal or the specifics of the investment, as Messrs. Nee and Considine were charged with gaining a complete understanding of the proposed investment partnership. Considine Tr. (9/12/00 a.m.) 28:17–23; Nee Tr. (6/20/00 p.m.) 16:22–17:23; Nee Dep. (3/17/98) 79:1–84:21; Merrill Lynch 30(b)(6) Dep. (Das 3/10/98) 53:19–54:9; Blount Dep. (4/28/98) 23:10–22, 30:25–32:15.

60. In evaluating the potential purchase of capital assets, Mr. Considine was concerned with credit quality, rates of return, and the risk profile. As a part of his evaluation of the financial aspects of the Merrill Lynch proposal, Mr. Considine asked Mr. Kofol about the yield on AHP's investment portfolio. The purpose of this inquiry was to compare the potential return on the Merrill Lynch proposal with the return on AHP's typical investments. Considine Dep. (4/12/99) 56:15–58:18; Kofol Tr. (6/21/00 a.m.) 31:6–32:3.

61. During its investigation of the proposal, AHP learned that the investment would be in a partnership where the partners would share in the risks of the partnership investments and in the gains and losses of the partnership in accordance with their participation in the partnership. Considine Tr. (9/12/00 a.m.) 27:17–24; Nee Tr. (6/20/00 p.m.) 18:10–14; Merrill Lynch 30(b)(6) Dep. (Das 3/10/98) 55:3–8.

62. In evaluating Merrill Lynch's proposal, AHP considered (i) that the investments would be in high-grade financial instruments with commensurate risk and return, (ii) that the initial investment would be in PPNs, (iii) that the PPNs would be liquid, and (iv) that the yield on the PPNs would be 12 to 24 basis points more than AHP's non-tax-advantaged investments. JEX 2; Considine Tr. (9/12/00 a.m.) 26:5–27:2, 33:7–23, 35:14–17, 53:15–54:1; 58:1–5; Kofol Tr. (6/21/00 a.m.) 36:16–37:12; Nee Tr. (6/20/00 p.m.) 29:18–21, 32:5–33:7.

63. According to Company witnesses, AHP believed that it could make a profit from the partnership's investment in financial instruments. This was an important consideration for AHP in determining whether it would invest in the partnership proposed by Merrill Lynch. There was no contrary testimony at trial. JEX 2; Considine Dep. (4/12/99) 92:19–93:14; Blount Dep. (4/28/98) 130:22–131:9, 131:21–132:5; Considine Dep. (4/12/99) 92:14–93:14.

64. Mr. Considine testified that if the Treasury Department thought AHP would lose money on its investment in Boca, on a pre-tax basis, he would not have recommended the investment. Mr. Considine stated that from a financial earnings perspective, each transaction had to be profitable pre-tax. Considine Dep. (4/12/99) 92:14–93:14; *see* Kofol Tr. (6/21/00 a.m.) 16:5–8; Nee Dep. (4/8/99) 72:21–73:18, 88:11–90:9.

b. *Potential Partners*

65. Prior to the formation of the Partnership, Mr. Considine and Mr. Nee questioned Merrill Lynch about AHP's potential partners. AHP would only enter into a partnership with partners with whom it would be comfortable, who had expertise with respect to the financial instruments that would be involved, who were financially secure, and who were creditworthy. AHP received assurances from Merrill Lynch that any potential partner Merrill Lynch would present would meet those criteria. Considine Tr. (9/12/00 a.m.) 28:24–29:12, 43:18–24; Considine Dep. (4/12/99) 54:6–18; Nee Tr. (6/20/00 p.m.) 18:21–19:2; Merrill Lynch 30(b)(6) Dep. (Das 3/10/98) 56:2–57:14, 75:16–76:7.

66. It is unclear exactly when Merrill Lynch informed AHP that its partners would be foreign, but it is clear that AHP did learn that the partners would be foreign sometime prior to April 17, 1990. *See* JEX 2; FOF 79, 80, 81. While Mr. Nee testified that AHP was not informed that its partners would be foreign until sometime after the initial meeting with Merrill Lynch, Nee Tr. (6/20/00 p.m.) 19:3–11, Mr. Considine said that AHP was so informed at the initial meeting. Considine Tr. (9/12/00 a.m.) 25:14–19.

67. AHP learned for the first time who its potential partners were on April 19, 1990, at a meeting in Bermuda to negotiate the Partnership Agreement and organize the Partnership. Prior to this meeting, AHP did not know who the foreign partners would be or that the foreign partners would be affiliated with ABN Bank. AHP had had no contact with its partners either directly or indirectly through Merrill Lynch prior to April 19, 1990. JEX 229, at ¶ 14; Considine Tr. (9/12/00 a.m.) 28:24–29:5, 43:5–14; Considine Dep. (3/13/98) 84:22–85:2; Nee Tr. (6/20/00 p.m.) 30:16–

31:8; Kofol Tr. (6/21/00 a.m.) 34:23–35:2; den Baas Dep. (3/11/98) 133:8–14; den Baas Dep. (4/6/00) 52:18–53:8, 166:16–167:10; Merrill Lynch 30(b)(6) Dep. (Das 3/10/98) 75:9–15.

### c. *Merrill Lynch's Fee*

68. Sometime after the initial meeting with AHP and prior to the formation of the Partnership, Merrill Lynch explained to AHP that Merrill Lynch expected a fee for its services connected with the Partnership. Das Tr. (9/13/00 a.m.) 23:25–24:4.

69. Merrill Lynch's fee was determined as a fraction of the private equity capital Merrill Lynch would raise from the foreign partners. Das Tr. (9/13/00) 69:8–19; Merrill Lynch 30(b)(6) Dep. (Das 3/10/98) 65:2–66:24; Considine Dep. (4/12/99) 37:13–22.

70. Mr. Considine, Mr. Blount and Mr. Das negotiated the fee arrangement. On May 29, 1990, Merrill Lynch and AHP executed an engagement letter wherein Merrill Lynch agreed to act as AHP's financial adviser with respect to the Partnership. AHP understood that Merrill Lynch's fee included its services in finding a foreign partner or partners, suggesting and bringing transactions to the Partnership, finding buyers and sellers for the Partnership's investments, and providing financial advice to AHP with regard to partnership transactions and investments. For these services, AHP agreed to pay Merrill Lynch $7 million. JEX 21; Considine Tr. (9/12/00 a.m.) 61:19–62:13; Das Tr. (9/13/00 a.m.) 23:25–24:22.

### d. *Risks Associated With and Timing and Review of Potential Subsequent Transactions*

71. It is likely, although not certain, that Merrill Lynch explained to AHP that there were interest rate and credit risks associated with the potential investments by the Partnership. Merrill Lynch 30(b)(6) Dep. (Das 3/10/98) 58:13–60:24.

72. AHP never discussed with Merrill Lynch the timing of any particular transactions. AHP never had and never relayed a schedule to Merrill Lynch for potential transactions, nor did Merrill Lynch suggest a timetable to AHP. Considine Tr. (9/12/00 a.m.) 29:15–18; 47:10–13; Nee Tr. (6/20/00 p.m.) 19:12–20; Nee Dep. (3/17/98) 134:11–136:13; Das Tr. (9/13/00 a.m.) 21:13–19, 26:20–27:2.

73. Defendant argues that an April 10, 1990 memorandum from Mr. den Baas to G. Stroomer, *see* DEX 121A at Boca 437–438, a mostly illegible document ostensibly authored by Mr. den Baas, *see* DEX 190, constitutes proof of ABN's belief that its "investment" in the AHP transaction would be reduced to zero by September 1991, thus implying that a timetable did exist and presumably that that timetable was known to all partners, including AHP. At trial the Court questioned the relevance of Exhibits DEX 121A and DEX 190 but ultimately admitted both exhibits provisionally on the assumption that defendant would present testimony or at least additional documentary evidence that would put these exhibits in context and explain how they related to AHP or to Boca. Trial Tr. (1/25/01) 39:14–67:24; 79:22–23; 75:5–22. Defendant made no attempt to explain either exhibit through testimony at trial, however, and the only deposition testimony it offered in support of its argument—that of Mr. den Baas, *see* den Baas Dep. (3/11/98) 55:14–56:17—was testimony relating specifically to an exhibit, defendant's Exhibit 91, that was excluded by the Court in a written opinion during trial. *See Boca Investerings Partnership v. United States*, 128 F.Supp.2d 16 (D.D.C.2000).[3] Since Exhibit 91 was excluded, testimony about

---

**3.** Defendant's Exhibit 91 purports to be an internal ABN Bank memorandum from Mr. den Baas and Susan C. Casper to G. Stroomer of ABN Bank's Amsterdam branch. The

the exhibit also is excluded and cannot be used to explain how Defendant's Exhibits 121A and 190 relate to AHP or to Boca, and they, too, are excluded. For these reasons, the Court finds that there is no evidence that AHP ever discussed with Merrill Lynch the timing of any transactions, and no evidence that either AHP or Merrill Lynch ever relayed a schedule or timetable for potential transactions to the other.

74. It was understood within AHP that the Company might not engage in all of the transactions that Merrill Lynch had suggested. Consistent with the AHT system and sound financial management, the transactions that were outlined in the Merrill Lynch proposal would have to be reviewed individually as separate transactions at such time as they were proposed. The uncontested testimony at trial was that the decision to make a particular investment depended upon the Treasury Department's subsequent evaluation at the time and would be evaluated independent of any potential tax benefit. It was understood within AHP that, even if it invested in the Partnership, it was not bound to undertake the rest of the proposed transactions. Nee Tr. (6/20/00 p.m.) 10:19–11:4; Considine Tr. (9/12/00 a.m.) 27:12–24, 60:4–16; Considine Dep. (4/12/99) 26:22–25, 78:25–79:10.

### 2. AHP Internal Evaluation and Approval of Proposal

75. On April 4, 1990, Mr. Nee as tax counsel prepared a memorandum entitled "Tax Planning Re: Sale of Boyle–Midway to Reckertt & Colman" to inform and advise John Stafford and other executives at AHP of the tax consequences of the Merrill Lynch proposal should AHP decide to invest in the proposed partnership. The memorandum specifically noted that Merrill Lynch had advised that other companies were entering into similar transactions with Merrill Lynch and that any partnership in which AHP invested would be formed in a "favorable tax jurisdiction." The Nee Memorandum was not a recommendation to invest in the partnership, nor did it seek authorization to invest. Stip. ¶ 22; DEX 167B; Nee Tr. (6/20/00 p.m.) 21:12–17; 22:15–23:17; Considine Dep. (4/12/99) 19:15–20:3.[4]

76. The Nee Memorandum dealt with the tax considerations of the proposal and did not attempt to evaluate other considerations, such as major financial implications, that would bear on AHP's decision whether to invest. Mr. Nee noted that the transaction was "technically sound" but was likely to be "vigorously attacked by the IRS." DEX 167B. Mr. Nee testified that the financial implications of the proposal were not the responsibility of the Vice President, Taxes, and Mr. Nee therefore thought it would have been inappropriate for him to advise on these considerations, and he testified that he did not. Nee Tr. (6/20/00 p.m.) 21:12–23:17.

77. Mr. Nee attached to his memorandum a series of charts, DEX 1, given to

---

memorandum includes a narrative calendar of events alleged to be similar to the order of events in this case. The Court excluded Exhibit 91 as hearsay. *See Boca Investerings Partnership v. United States,* 128 F.Supp.2d at 18–23.

**4.** During closing argument, the government argued that the Court should draw an adverse inference from plaintiffs' claim of attorney-client privilege with respect to the Nee Memorandum (DEX 167B), as well as with respect

to a draft tax opinion from Lee, Toomey & Kent (DEX 170). The Court invited post-argument briefs on this issue. Upon consideration of the arguments presented and the cases cited by the parties, the Court concludes that the case law does not support the government's position and that no adverse inferences should be drawn from plaintiffs' invocation of the attorney-client privilege with respect to these documents.

him by Merrill Lynch that he thought would be helpful to Mr. Stafford. The specific amounts used in the charts were not necessarily meant to apply to AHP or reflect any specific transactions the partnership might enter, and (he testified) the charts did not set forth a schedule or timetable for potential transactions. On cross-examination Mr. Nee discussed how each proposed step listed in his memorandum was similar to or different from the steps listed in the charts, and how similar (or not) each of those proposed actions were to the actions that AHP and Boca eventually took after the partnership was formed. Mr. Nee acknowledged the similarities between the memorandum, the charts and the transactions Boca ultimately entered, but insisted repeatedly that the Boca partnership and the transactions it entered did not mirror those set forth in the memorandum and charts. *See, e.g.,* Nee Tr. (6/23/00) 65:1–3 ("[W]e didn't necessarily follow the transaction exactly the way it is laid out in these drawings.").

77a. Mr. Nee testified at his deposition that AHP "felt that it was imperative that each and every investment that was made had to be made as if it stood on its own grounds, that [it] wasn't conditioned upon the obtaining of a tax benefit, [and] that it was a sound financial investment ...." Nee Dep. (4/8/99) 73:12–18; *see* Nee Dep. (4/8/99) 72:21–73:18; 88:11–90:9. Mr. Nee also clarified that the conclusions made in his memorandum (some of which are redacted as privileged, *see* DEX 167B) were his own. Nee Tr. (6/22/00 p.m.) 90:4–7; Nee Tr. (6/23/00) 17:6–18:22, 60:18–70:21; Nee Dep. (3/17/98) 90:9–18. There was no testimony at trial that contradicted Mr. Nee's.

78. In April 1990, there was a meeting attended by Mr. Stafford, Mr. Blount, Mr. Considine, Mr. Nee, AHP Controller Ken Martin and AHP General Counsel Roger Kapp. The purpose of the meeting was to inform Mr. Stafford about the Merrill Lynch proposal to invest in a partnership and to answer any questions Mr. Stafford might have before AHP decided whether to invest. Mr. Considine was there to discuss the investment aspects of the proposal, and Mr. Nee was there to discuss the tax issues related to the proposal. Considine Tr. (9/12/00 a.m.) 30:4–24; Nee Tr. (6/20/00 p.m.) 20:4–21:4.

79. Shortly after the meeting with Mr. Stafford, Mr. Considine and Mr. Kofol drafted an AHT formally proposing that AHP enter the partnership. The AHT, submitted by Mr. Considine on April 17, 1990, sought authorization for an initial investment of $150 million to form a partnership with a highly-rated, foreign financial institution to invest in certain privately-placed floating rate notes rated A or better that the Treasury Department understood would yield between 12 and 24 basis points above AHP's typical return. The AHT was required because the investment involved entering into a partnership and the capital assets to be purchased by the partnership were outside of AHP's approved investment guidelines. JEX 2; Stip. ¶ 34; Considine Tr. (9/12/00 a.m.) 31:1–9: 31:23–32:18; Kofol Tr. (6/21/00 a.m.) 33:16–38:11; Nee Tr. (6/20/00 a.m.) 37:3–11; Nee Tr. (6/20/00 p.m.) 27:14–28:14, 30:4–10; FOF 21–25.

80. The April 17, 1990 AHT only sought approval to enter into a partnership and to invest in the privately placed notes. The AHT stated that the initial investment would be approximately $150 million. The AHT did not cover any other transaction. JEX 2; Considine Tr. (9/12/00 a.m.) 36:12–14; Kofol Tr. (6/21/00 a.m.) 37:20–38:2; Blount Dep. (4/28/00) 60:15–20.

81. The April 17, 1990, AHT was initiated by Mr. Considine of the Treasury Department because it involved the invest-

ment of Company funds and therefore was Treasury's responsibility. Considine Tr. (9/12/00 a.m.) 33:2–6; Considine Dep. (3/13/98) 54:8–55:12; Nee Tr. (6/20/00 p.m.) 28:15–24.

82. The AHT contemplated that a partnership agreement would be executed. Because AHP had not yet received a proposed agreement, the AHT provided that the formation of the partnership was contingent on AHP's Law Department approving the partnership agreement. If the partnership agreement were not acceptable to the Law Department, AHP would not have invested in Boca. JEX 2; Considine Dep. (3/13/98) 68:7–69:6; Kofol Tr. (6/21/00 a.m.) 33:16–34:12; Nee Tr. (6/20/00 p.m.) 34:4–15.

83. At the time the AHT was drafted, AHP and AHP 10 had not met their potential foreign partner. Merrill Lynch had provided assurances that the partner would be an institution or institutions with which AHP would be comfortable. AHP's approval of the investment in the partnership was contingent on AHP being satisfied with its potential partners. Had the partners not had sufficient financial resources and wherewithal, the AHP partners would not have entered into the partnership. Considine Tr. (9/12/00 a.m.) 28:24–29:12, 33:24–34:23, 43:18–24; Kofol Tr. (6/21/00 a.m.) 34:23–35:2.

84. AHP believed that the investment in PPNs would offer a return to the AHP partners of 12 to 24 basis points above AHP's average return on its domestic portfolio. Because the PPNs were to be rated A or better, a lower rating than that of AHP's domestic portfolio investments, AHP believed the return on the PPNs would be higher. JEX 2; Nee Tr. (6/20/00 p.m.) 32:19–33:7; Kofol Tr. (6/21/00 a.m.) 36:16–37:12; Considine Tr. (9/12/00 a.m.) 33:2–23.

85. The April 17, 1990, AHT indicated that the PPNs would contain a put option of 12, 18 or 24 months. The put option ensured liquidity. This was important to AHP because it ensured that AHP's principal would be returned even if the issuer's credit quality deteriorated during the time the partnership owned the notes. JEX 2; Considine Tr. (9/12/00 a.m.) 35:14–17; Kofol Tr. (6/21/00 a.m.) 35:18–36:15; Nee Tr. (6/20/00 p.m.) 32:10–17.

86. The AHT also indicated that the PPNs could be sold within one to two months in order to alert those within AHP who reviewed the AHT that the PPNs were liquid and could be sold prior to the date of any put option. The Treasury Department had to review the instruments, monitor their performance, and make recommendations when appropriate. JEX 2; Considine Tr. (9/12/00 a.m.) 35:18–36:11; Kofol Tr. (6/21/00 a.m.) 38:7–11; Nee Tr. (6/20/00 p.m.) 33:8–16; Nee Dep. (3/17/98) 154:8–22.

87. The AHT only authorized an initial investment of $150 million. At the time the AHT was drafted, AHP did not know what its total investment in the partnership might be. JEX 2; Considine Tr. (9/12/00 a.m.) 36:15–17; Considine Dep. (3/13/98) 72:15–73:4; Nee Tr. (6/20/00 p.m.) 34:16–25.

88. At the time the AHT was drafted, AHP did not have a potential timetable for any other potential investments in the partnership or by the partnership. AHP understood that the Company might enter into subsequent transactions, but because the Treasury Department would have to review and approve each proposed transaction on a pre-tax basis, based on financial considerations at the time a transaction was proposed, AHP did not know whether it would enter into any subsequent transactions. According to the uncontested testimony at trial, this is why AHP had to be

comfortable with the credit quality of the issuers of the PPNs and why the put option was important to AHP. Considine Tr. (9/12/00 a.m.) 34:24–36:21, 37:9–14; Considine Dep. (3/13/98) 74:22–75:16; Considine Dep. (4/12/99) 26:22–25; Kofol Tr. (6/21/00 a.m.) 35:18–36:15, 38:7–11.

89. The $150 million initial investment came from AHP's general funds. None of the funds was borrowed. Considine Tr. (9/12/00 a.m.) 37:15–21; Kofol Tr. (6/21/00 a.m.) 50:5–12.

90. AHP ultimately approved entering the partnership and investing in PPNs because AHP believed the PPNs provided a reasonable return with appropriate risk and because if other transactions were consummated, there was a potential tax benefit. In approving the AHT, the executives at AHP had the following understandings: (i) the investment would be in the form of a partnership; (ii) the original investment by the partnership would be in certain privately-placed, floating rate notes that would offer a higher return to AHP than it was experiencing on other investments in its current portfolio and would be satisfactory to AHP if held until the put date; and (iii) if other transactions were subsequently approved, there was a potential for AHP to experience a capital loss and tax benefit. There was no testimony at trial to the contrary. Blount Dep. (4/28/98) 57:7–58:9; Considine Tr. (9/12/00 a.m.) 37:22–38:6; Considine Dep. (3/13/98) 74:5–21; Nee Tr. (6/20/00 p.m.) 5:9–8:11, 27:14–34:25.

91. The testimony at trial makes clear that while tax consequences clearly were a consideration in AHP's evaluation of the investment partnership proposal, the Treasury Department evaluated the proposal as an investment from a Treasury perspective. The Treasury Department understood that these investments would yield a satisfactory return, separate and apart from any tax consequences. JEX 2; Considine Tr.(9/12/00 a.m.) 26:5–13, 37:22–38:6, 52:2–53:2; Considine Dep. (4/12/99) 26:22–25, 74:22–75:16, 78:9–23, 92:2–23; Nee Tr. (6/20/00 p.m.) 28:19–24; Nee Tr. (6/22/00 p.m.) 74:8–15; Nee Dep. (4/8/99) 72:21–73:18; 88:11–90:9.

92. AHP's approval of the initial AHT and the initial investment in the partnership did not obligate the AHP partners to engage in any other transactions, and neither AHP nor the Partnership could have entered into any subsequent transactions without AHT approval. Considine Tr. (9/12/00 a.m.) 27:12–16; Considine Tr. (9/12/00 a.m.) 58:22–59:6; Considine Tr. (9/12/00 p.m.) 13:5–6; Considine Dep. (3/13/98) 57:19–58: 21, 72:15–73:4, 74:22–75:16; Nee Tr. (6/20/00 a.m.) 41:16–42:2; Nee Tr. (6/20/00 p.m.) 27:24–28:14, 34:20–25; Kofol Tr. (6/21/00 a.m.) 37:25–38:6.

93. Each transaction needed to be evaluated on a stand alone basis to be sure it made economic sense. Each subsequent transaction by AHP was to be authorized pursuant to a separate AHT based on the same considerations. Considine Tr. (9/12/00 a.m.) 60:4–16; Considine Dep. (4/12/99) 78:20–79:10.

### 3. Foreign Partners' Decision to Invest in Partnership

94. During 1989, ABN Bank was the largest bank in the Netherlands and one of its largest financial institutions, with more than $85 billion in assets, approximately 950 offices in 43 countries worldwide, and approximately 29,000 employees. Stip. ¶ 23.

95. During the period in issue, ABN Bank offered comprehensive corporate, institutional and individual financial services, including domestic and international lending, trade finance and international payments, international corporate finance and advisory services, global investment man-

agement and advisory services, foreign exchange, treasury and risk management services, and trust services. In 1991, ABN Bank merged with Amsterdam Rotterdam Bank ("Amro Bank"). Stip. ¶ 24.

96. Syringa and Addiscombe, originally named Melisande Corporation N.V. and Pelleas Corporation N.V., respectively, were two companies that eventually partnered with AHP. Syringa and Addiscombe were registered as limited liability companies in Curacao, Netherlands Antilles and were owned by private foundations. They were formed by ABN Trust, and ABN Trust served as the managing director of Addiscombe and Syringa and maintained their books and records and the books and records of the Partnership. Stip. ¶¶ 26, 27, 30. According to uncontested testimony, they were not a part of ABN Bank. den Baas Dep. (4/6/00) 22:22–23:5.

97. Hans den Baas was a Vice President at ABN Bank. With respect to Boca, Mr. den Baas acted as a consultant to ABN Trust in managing Syringa's and Addiscombe's risks concerning their investments in the partnership, including interest rate and credit risks. Stip. ¶ 25; JEX 229, at ¶¶ 1–2; den Baas Dep. (3/11/98) 15:13–16:7, 71:17–73:19; den Baas Dep. (4/6/00) 30:6–32:8, 33:15–34:8.

98. ABN Bank's role in Boca was primarily twofold: (1) ABN Bank loaned funds to Syringa and Addiscombe to invest in Boca; and (2) ABN Bank provided advice to ABN Trust in managing Syringa's and Addiscombe's risks with respect to their investment in Boca. den Baas Dep. (3/11/98) 83:17–84:3; den Baas Dep. (4/6/00) 23:25–24:7; 31:5–34:8.

99. ABN Trust was a wholly-owned subsidiary of ABN Bank. With respect to Boca, ABN Trust acted as the representative of Addiscombe and Syringa at Partnership Committee meetings. Stip. ¶ 28;

den Baas Dep. (3/11/98) 35:10–13; den Baas Dep. (4/6/00) 168:21–25.

100. Peter de Beer was head of the Legal Department at ABN Trust. During 1990, Mr. de Beer was the person in charge of managing Syringa and Addiscombe. In this role, he and Robert Verhoef represented Syringa and Addiscombe at Partnership Committee meetings. Stip. ¶¶ 28, 31.

101. ABN Bank and ABN Trust Company were not partners in Boca. The partners were Addiscombe and Syringa. JEX 3; JEX 128–132; JEX 134–135; JEX 138–139; JEX 141–142; JEX 146–148; JEX 150–158; JEX 161–164. Nee Tr. (6/20/00 p.m.) 40:18–41:2, 42:17–43:1.

### D. Organization of Boca

#### 1. Formation of the Partnership in Bermuda

102. On April 19, 1990, two meetings were held at the Elbow Beach Hotel in Bermuda regarding the formation of Boca. The first was a meeting to introduce the partners, form Boca, and execute a partnership agreement. The Partnership Agreement is Joint Exhibit 3. JEX 3. Following the execution of the Partnership Agreement, the partners held the first meeting of the Partnership Committee. This meeting is referred to as the organizational meeting. The minutes of that meeting are Joint Exhibit 5. Stip. ¶ 37; JEX 5; Considine Tr. (9/12/00 a.m.) 43:25–44:4; Nee Tr. (6/20/00 p.m.) 39:3–41:2; Nee Tr. (4/12/01) 92:7–19; Nee Dep. (3/17/98) 171:16–172:11.

103. The meetings on April 19, 1990, were held in Bermuda at the request of the foreign partners; their stated reason was their concerns regarding U.S. tax liability. Considine Tr. (9/12/00 a.m.) 40:4–10; Considine Dep. (3/13/98) 82:8–14; Nee Dep. (3/17/98) 170:4–22; Das Tr. (9/13/00

a.m.) 18:16–19:6, 25:7–13; Merrill Lynch 30(b)(6) Dep. (Das 3/10/98) 75:9–15.

104. Defendant asserts that a meeting was held at the Castle Harbor Hotel in Bermuda prior to April 19, 1990, at which Mr. den Baas and Mr. Considine orally agreed to a "take-down schedule"—essentially a predetermined schedule setting dates for the foreign partners' withdrawal from Boca. Defendant further asserts that the agreement was not reduced to writing for concern that doing so would destroy any business purpose for the partnership. It is on this basis, among others, that defendant argues that the partnership agreement, and hence the partnership, is a sham.

105. The only evidence defendant offers in support of this "Castle Harbor meeting" theory and the oral "Castle Harbor agreement" is the testimony of Merrill Lynch relationship manager Warren Matthei.[5] Mr. Matthei's testimony, however, cannot support a finding that the Castle Harbor meeting ever occurred or that there ever was an oral Castle Harbor agreement. First, Mr. Matthei contends that the Castle Harbor meeting took place four or five weeks before the April 19, 1990 organizational meeting, but there is no documentary or testimonial evidence (other than his own) that anyone involved in the partnership was in Bermuda at the time. Indeed, all the evidence and all the testimony on this issue are to the contrary. JEX 26; JEX 27; JEX 229, at ¶¶ 14–15; Considine Tr. (9/12/00 a.m.) 40:16–41:25, 43:5–14, 46:9–15, 47:6–9, 50:22–51:3; Considine Dep. (3/13/98) 84:22–85:2; Nee Tr.

(6/20/00 p.m.) 30:25–31:5, 31:19–32:4, 44:25–45:7, 46:23–47:5, 56:1–8; Nee Tr. (4/12/01) 92:7–19; Nee Dep. (3/17/98) 166:3–8; Kofol Tr. (6/21/00 a.m.) 40:17–23; den Baas Dep. (3/11/98) 133:8–14; den Baas Dep. (4/6/00) 157:15–18, 166:16–167:10, 169:15–20, 170:9–15, 170:21–171:7; Das Tr. (9/13/00 a.m.) 26:20–27:2.

105a. Second, much of Mr. Matthei's testimony regarding the Castle Harbor meeting and agreement—and in particular his testimony that the alleged agreement was not reduced to writing for concern that doing so would destroy any business purpose—lacked a proper foundation. Mr. Matthei rarely clarified how he knew what the partners thought or what they were allegedly agreeing to and only occasionally attributed repeated statements to any one individual. A large portion of Mr. Matthei's testimony was hearsay and unreliable.

105b. Finally, the Court generally finds it difficult to place much stock in the testimony of Mr. Matthei since he admitted that he was not knowledgeable about the specifics of the Boca partnership, Matthei Tr. (11/28/00) 104:17–106:7; since he is biased against his former employer, Merrill Lynch, Matthei Tr. (11/28/00) 69:11–70:15; 87:7–91:8 (recounting Merrill Lynch's firing of Mr. Matthei, Mr. Matthei's threat to sue Merrill Lynch and Mr. Das, and his feelings about his treatment by Merrill Lynch and Mr. Das); and since, as an admitted liar in other court proceedings, he is generally untrustworthy and lacking in credibility. Matthei Tr. (11/28/00) 91:9–93:5 (Matthei admitting that "I lied in a

---

**5.** Defendant also cites an April 22, 1990 memorandum from Mr. den Baas to Jos Albers to support its contention that ABN sought to enter an oral agreement with AHP. DEX 189. The memorandum, however, (1) does not make any reference to AHP, ABN, Boca or the April 19 meeting in Bermuda; (2) was not referenced in or supported by any deposition or trial testimony; (3) is not corroborated or explained by any other testimonial or documentary evidence; and (4) was produced during discovery in an entirely different case from this one—a case not involving AHP in any way. For these reasons, the Court excludes DEX 189 and will not consider its contents.

sworn certification ... which was filed with the court" in connection with his alleged avoidance of child support, for which he currently is incarcerated).

105c. Based on the credible testimony before it, and discounting the testimony of Mr. Matthei, the Court therefore finds that the Castle Harbor meeting never took place, that the alleged Castle Harbor agreement was never reached, and that prior to April 19, 1990, no one from AHP or AHP 10 had been to Bermuda or any other offshore location in connection with the Merrill Lynch proposal to form an investment partnership. JEX 26; JEX 27; Considine Tr. (9/12/00 a.m.) 40:16–41:25; Nee Tr. (6/20/00 p.m.) 31:19–32:4; Kofol Tr. (6/21/00 a.m.) 40:17–23.

106. The AHP partners had not met or had any contact, directly or indirectly, with representatives of Addiscombe, Syringa, ABN Bank, or ABN Trust regarding an investment partnership prior to going to Bermuda on April 19, 1990. Nor, prior to April 19, 1990, did the AHP partners know the identity of the partners that Merrill Lynch would propose or their relationship with ABN Bank or ABN Trust. JEX 229, at ¶ 14; Considine Tr. (9/12/00 a.m.) 40:16–41:25, 43:5–14; Considine Dep. (3/13/98) 84:22–85:2; Nee Tr. (6/20/00 p.m.) 30:25–31:5, 31:19–32:4; Kofol Tr. (6/21/00 a.m.) 40:17–23; den Baas Dep. (3/11/98) 133:8–14; den Baas Dep. (4/6/00) 166:16–167:10.

107. The first meeting on April 19, 1990, was principally for the AHP partners to meet the potential partners, determine whether those partners were acceptable to AHP, and to negotiate a partnership agreement. Nee Tr. (6/20/00 p.m.) 38:6–9; Considine Tr. (9/12/00 a.m.) 43:15–44:17.

108. According to AHP officials, the topics of negotiation included: (i) sharing of profits and losses resulting from Boca transactions; (ii) sharing of expenses; (iii) sharing of risks among the partners; (iv) adoption of investment guidelines; and (v) partner participation in decision making. All negotiations regarding the formation and operation of Boca took place at this meeting on April 19, 1990. JEX 3; Considine Tr. (9/12/00 a.m.) 45:12–46:8; Nee Tr. (6/20/00 p.m.) 44:10–24, 52:1–53:7, 53:14–21; Nee Tr. (4/12/01) 61:21–62:23.

109. Mr. Considine, Mr. Nee, and Geraldine Moss, in-house legal counsel at AHP, negotiated the Partnership Agreement on behalf of the AHP partners. Mr. de Beer represented Addiscombe and Syringa in the negotiations and was assisted by Mr. den Baas. Martin Tallin of the law firm of Cravath, Swaine & Moore attended on behalf of the Partnership. Robert Feldgarden of the law firm of Lee, Toomey & Kent attended to assist the AHP partners if any tax issues arose. Representatives from Merrill Lynch (Mr. Das, Mr. Zakaria, Mr. Taylor, and Mr. Matthei) also were in Bermuda at this time to assist the partners, but they were not involved in the negotiation of the Partnership Agreement. Mr. Das was there to introduce the partners, Mr. Taylor was there to discuss potential investments, and Mr. Zakaria attended to provide general assistance to the Merrill Lynch team. Mr. Matthei came to Bermuda, but was absent from much of the meeting and was uninvolved with the formation of Boca while there. Considine Tr. (9/12/00 a.m.) 40:11–15; 42:2–43:3; Nee Tr. (6/20/00 p.m.) 39:3–41:2, 43:13–16; Das Tr. (9/13/00 a.m.) 25:7–26:6; Merrill Lynch 30(b)(6) Dep. (Taylor 3/10/98) 9:17–10:9; Merrill Lynch 30(b)(6) Dep. (Das 3/10/98) 80:20–81:14; den Baas Dep. (4/6/00) 167:11–20, 168:21–169:5; Zakaria Dep. (5/8/98) 25:7–26:3; Matthei (11/28/00) 104:17–105:9.

110. When negotiating the Partnership Agreement, AHP, AHP 10, Addiscombe, and Syringa understood that the relationship among them was going to be that of

partners and that the partners were going to share in the risks and rewards of the Partnership in accordance with the Partnership Agreement. JEX 229, at ¶¶ 4, 10; Considine Tr. (9/12/00 a.m.) 45:12–46:8; Nee Tr. (6/20/00 p.m.) 43:19–22; den Baas Dep. (4/6/00) 18:24–19:21, 20:19–21:18, 156:19–158:16, 169:6–14.

111. Defendant argues that the negotiations in Bermuda regarding the partnership consisted of little more than minor handwritten additions to a nearly complete pre-prepared partnership agreement provided by Cravath, Swaine & Moore, that perhaps was actually an agreement that was used in a previous partnership. The only proof offered by defendant in support of this argument is a faxed copy of a draft of the Partnership Agreement, DEX 370, and the testimony of Mr. Nee explaining the draft. Nee Tr. (4/12/01) 76:13–91:23. Mr. Nee testified, however, that he had no idea where the draft written partnership agreement originated—other than the fact that it was drafted by Mr. Tallin from Cravath, Swaine & Moore—or how many other drafts may have preceded or followed the draft; he testified that he did not believe that the draft was from another partnership. Nee Tr. (4/12/01) 77:23–78:21, 85:20–86:1. The Court finds that there is no evidence that the negotiations consisted merely of "minor handwritten additions." What is clear is that Joint Exhibit 3 is the final version of the Partnership Agreement agreed upon by the parties at the April 19 meeting. JEX 3; FOF 116–139.

112. The written Partnership Agreement was the only agreement between the AHP partners and Addiscombe and Syringa. There were no unwritten agreements or commitments between the partners, nor were there any side agreements between the AHP partners and ABN Bank or ABN Trust. JEX 3; Considine Tr. (9/12/00 a.m.) 50:22—51:3; Nee Tr. (6/20/00 p.m.) 56:1–8; den Baas Dep. (4/6/00) 157:15–18, 169:15–20. When specifically questioned about any side agreements or understandings, Mr. Nee testified that there was no agreed upon schedule whereby certain transactions would take place at certain times, there was no schedule by which the foreign partners would decrease their interest in or withdraw from the partnership, there was no commitment to the foreign partners that certain investments or transactions would occur at certain times, there was no agreement that the foreign partners would receive a specified return from their investment in the partnership, and there was no agreement or commitment to compensate the foreign partners for losses that the they might experience as a result of the partnership. Nee Tr. (4/12/01) 63:4–67:11; see Considine Tr. (9/12/00 a.m.) 46:9–15 (confirming absence of agreement that AHP partners would purchase additional interests in the partnership or that AHP partners would buy out Addiscombe and Syringa); Nee Tr. (6/20/00 p.m.) 44:25–45:7; Nee Dep. (3/17/98) 166:3–8; den Baas Dep. (4/6/00) 170:9–15. Mr. Kofol, who later monitored AHP's involvement in Boca and evaluated individual transactions, confirmed that no such schedules or agreements existed. Kofol Tr. (4/12/01) 43:20–44:13.

113. Defendant contends that while in Bermuda AHP promised ABN specific remuneration in the form of premiums for ABN's role in the partnership. Defendant relies upon certain deposition testimony of Hans den Baas, see den Baas Dep. (4/6/00) 41:21–45:25, 122:15–124:3, and on an August 7, 1989 memorandum from Mr. den Baas to Arthur Arnold that allegedly outlines ABN's anticipated remuneration. See DEX 202. The den Baas memorandum, which was only provisionally admitted by the Court during trial, cannot support defendant's assertion

for several reasons. *See* Trial Tr. (1/25/01) 81:11–17 (admitting memorandum primarily for background purposes); Order of Jan. 30, 2001 (same). First, defendant offered no testimony at trial or through depositions to explain the memorandum or place it in any context. Second, it seems highly unlikely that the memorandum is at all related to AHP or Boca because it predates the formation of Boca by eight months. Third, the memorandum was produced in a separate lawsuit involving ABN that did not involve either AHP or Boca. And fourth, the text of the memorandum gives no indication that it has any relation to AHP or Boca; indeed, it discusses a transaction subject to the Alternative Minimum Tax, a tax to which AHP has never been subject. The deposition testimony of Mr. den Baas is similarly unhelpful since, as plaintiffs pointed out when they objected to this deposition testimony, it discusses several partnerships with which ABN did business—none of them being AHP or Boca. It therefore is irrelevant.[6]

113a. The Court finds that there was no discussion or agreement between the AHP partners and Addiscombe, Syringa, ABN Bank, or ABN Trust for the payment of any premiums to Addiscombe, Syringa, ABN Bank, or ABN Trust if the AHP partners wanted to purchase an additional interest in the Partnership. Considine Tr. (9/12/00 a.m.) 46:16–19, 47:14–17; Kofol Tr. (6/21/00 p.m.) 21:19–22:2, 24:1–14; den Baas Dep. (4/6/00) 193:2–17; JEX 229, at ¶ 12.

114. There was no discussion or agreement among the AHP partners, Addiscombe and Syringa, or ABN Bank regarding a return the foreign partners hoped to achieve or that ABN Bank expected to

receive on the funds it loaned to Addiscombe and Syringa. Neither the foreign partners nor ABN Bank ever relayed to the AHP partners a target return they expected to achieve from the partnership. Considine Tr. (9/12/00 a.m.) 46:20—47:5; Nee Tr. (6/20/00 p.m.) 46:15–22; den Baas Dep. (4/6/00) 192:19–25.

115. There were no discussions between the AHP partners and ABN Bank or the foreign partners concerning any party's agreement to certain transactions that Boca might propose in the future. Likewise, there was no discussion or agreement setting forth a schedule for entering into any such transactions. JEX 229, at ¶ 15; Considine Tr. (9/12/00 a.m.) 47:6–9; Nee Tr. (6/20/00 p.m.) 46:23–47:5; Das Tr. (9/13/00 a.m.) 26:20–27:2; den Baas Dep. (4/6/00) 170:21–171:7.

### 2. *The Partnership Agreement*

116. On April 19, 1990, the four partners entered into the formal Partnership Agreement. DEX 3. The agreement was signed by Mr. Considine on behalf of both AHP and AHP 10, and by Mr. de Beer on behalf of each of the foreign partners. DEX 3, at GOV 026193.

117. Boca was formed as a general partnership under New York law, and each of its four named partners, including Addiscombe and Syringa, was bound by such law. The Partnership Agreement conformed with the partners' intent to create a "general partnership pursuant to the provisions of the partnership laws of the State of New York," and the Partnership Agreement was to be "construed in accordance with the laws of the State of New York." Stip. ¶ 41; JEX 2; JEX 3, at §§ 2.01, 11.11; JEX 229, at ¶ 4; Considine Tr. (9/12/00 a.m.) 27:17–24; Nee Tr.

---

6. An April 22, 1990 memorandum from Mr. den Baas to Jos Albers (DEX 189) also is irrelevant for similar reasons.

(6/20/00 p.m.) 7:11–18, 11:5–12, 17:24–18:3, 43:17–44:2; den Baas Dep. (4/6/00) 18:24–19:21, 20:19–21:18, 156:9–157:18.

118. Under the Partnership Agreement and New York Partnership Law: (i) the Boca partners were jointly and severally liable for Boca's obligations; (ii) each partner had the ability to bind Boca and the other partners; and (iii) each partner had the ability to dissolve or terminate Boca (although it could be in breach of its obligations to the other partners). JEX 3, at §§ 8.01, 10.01, 10.02, 11.01.

119. The partners agreed that Curacao would be the Partnership's principal place of business. JEX 3, at § 2.03.

120. The fiscal year of the Partnership for book and tax purposes was to end each year on May 31 because the majority partner's (Syringa's) fiscal year ended on May 31. JEX 3, at § 6.02; Nee Tr. (6/20/00 p.m.) 53:23–55:3. AHP did not request that May 31 be the partnership's fiscal year end. Prior to April 19, 1990, AHP did not know when the fiscal year end would be. Considine Tr. (9/12/00 a.m.) 50:4–8; Nee Dep. (3/17/98) 140:22–141:18.

121. Under the Partnership Agreement, except as otherwise expressly provided, Boca was to be governed by a Partnership Committee composed of a representative and alternate representative of each partner. Action by the Partnership Committee required the assent of partners "whose Partnership Percentages aggregate not less than 95%." In effect, the affirmative agreement of both the AHP partners and the foreign partners was required for actions taken by the Partnership Committee. JEX 3, at §§ 5.01–5.03.

122. Because most significant decisions required a 95% vote, neither the AHP partners nor the foreign partners, acting alone, could control the partnership. Under Boca's governance provisions, both the AHP partners and the foreign partners effectively had veto power over each other group's decisions with respect to actions to be taken by Boca, including any proposed sale or distribution of any assets by Boca. JEX 3, at §§ 5.01–5.03.

123. Boca adopted investment guidelines for the Partnership's investments. Stip. ¶ 36; JEX 4, at Sch. A. Schedule A investments included short-term bank certificates of deposit, bank holding company commercial paper, domestic bank Eurodollar CDs, commercial paper of industrial companies that had a Moody's rating of P–1 or higher and a Standard and Poor's rating of A–1, U.S. Government backed obligations, U.S. Federal agency securities, and municipal tax exempt notes. JEX 4, at Sch. A; JEX 5.

124. Under the Partnership Agreement, an investment in an instrument of the type identified on Schedule A to the Partnership Agreement could be made without the consent of representatives of the partners. Other investments could be made, but were subject to the 95% approval requirement. JEX 3, at §§ 5.01–5.03, 6.01.

125. The Partnership was formed for the "purpose of making investments in notes, bonds, debentures, and other interest bearing instruments ... [and] sharing the profits and losses therefrom." JEX 3, at § 2.04.

126. It was the intent of the partners that the income, expenses, gains, and losses of the Partnership be shared in accordance with the Partnership Agreement. JEX 128–132; JEX 134–135; JEX 138–139; JEX 141–142; JEX 146–148; JEX 150–158; JEX 161–164; Nee Tr. (6/20/00 p.m.) 52:1–53:7; Considine Tr. (9/12/00 a.m.) 45:15–46:8; den Baas Dep. (4/6/00) 158:17–159:12, 159:22–161:15, 170:21–173:5.

127. The Partnership Agreement provided that as a general rule Boca's income, expenses, gains, and losses for each fiscal period (or fiscal quarter) would be apportioned among the partners in proportion to their respective Partnership Percentages on the first day of the fiscal period. At the outset, therefore, the partners shared in the results of the Partnership's operations in proportion to their initial capital contributions. Thereafter, the partners' Partnership Percentages were adjusted by amendments to the Partnership Agreement to reflect the initial capital contributions adjusted by distributions, purchases of partnership interests, and prior allocations of income, expenses, gains, and losses. JEX 3, at §§ 2.04, 4.04; JEX 133; JEX 136: JEX 140: JEX 143: JEX 149; JEX 159; PEX 720 (direct testimony of Elizabeth Case) at 8–9; den Baas Dep. (4/6/00) 158:17–159:12, 159:22–161:15.

128. During any fiscal period in which the unrecovered capital of Addiscombe and Syringa exceeded 50 percent of the percentage of the Partnership's unrecovered capital (a "Qualified Fiscal Period"), the Partnership Agreement provided that the Partnership's operating income (excluding gains on sales of assets and default loss) was to be allocated as follows: (1) first, to AHP and AHP 10 in an amount up to their unrecovered capital multiplied by the 90–day Treasury Bill rate plus 10 basis points; (2) second, to Addiscombe and Syringa in an amount up to their unrecovered capital multiplied by LIBOR plus 10 basis points; and (3) third, the balance to the partners in proportion to their Partnership Percentages, as defined in the Partnership Agreement. JEX 3, at §§ I (Definitions), 4.04; den Baas Dep. (4/6/00) 158:17–159:12, 159:22–161:15. This provision is referred to as the "preferred return provision."

129. The Partnership Agreement further provided that, during a Qualified Fiscal Period, any loss to Boca attributable to the bankruptcy of an issuer of a debt instrument held by Boca ("default loss") was to be allocated as follows: (1) first, to Addiscombe and Syringa up to the amount of the positive balances of their capital accounts; (2) second, the AHP partners up to the amount of the positive balances of their capital accounts; and (3) third, the balance to the partners in proportion to their Partnership Percentages. JEX 3, at § 4.04(d); den Baas Dep. (4/6/00) 160:12–161:11. This provision is referred to as the "default loss provision."

130. While the combination of the preferred return provision and the default loss provision effectively assured AHP of achieving a rate of return higher than Treasury Bill rates with virtually no risk as long as the foreign partners held a majority interest in the Partnership, the main importance of the provision to AHP was that it decreased AHP's credit risk with respect to Boca's investments by effectively shifting that risk to Addiscombe and Syringa. Considine Tr. (9/21/00 a.m.) 48:11–50:3.

131. The Partnership Agreement provided that capital accounts be established for each partner and be maintained in accordance with the terms of the Partnership Agreement and in the same manner as required for federal income tax purposes (the "Partnership Capital Accounts"). As Boca received income or gains or incurred expenses or losses, and these amounts were shared by the four partners, corresponding adjustments were made to the Partnership Capital Accounts. JEX 3, at §§ 4.03, 8.02; PEX 720 (direct testimony of Elizabeth Case) at Appendix A.

132. The partners' interests in Boca's assets were distributable upon their withdrawal from Boca or upon its liquidation. JEX 3, at §§ 4.06, 8.02.

133. The Partnership Percentages, as adjusted from time to time by amendments to the Partnership Agreement reflected the relative Partnership Capital Accounts of the partners. JEX 133; JEX 136; JEX 140; JEX 143; JEX 149; JEX 159; PEX 720 (direct testimony of Elizabeth Case) at Appendix A.

134. Under the Partnership Agreement, the Partnership Capital Accounts also governed the amounts to be distributed to each partner upon withdrawal from or dissolution of the Partnership. JEX 3, at §§ 4.03, 4.06, 8.02.

135. Addiscombe and Syringa had no creditor's rights or remedies against Boca, its assets, or against AHP or AHP 10. JEX 3; Considine Tr. (9/12/00 a.m.) 50:19–21; FOF 110, 112, 114.

136. ABN Bank did not receive fees from participation in the purchase and sale of securities relating to Boca, except for very small amounts relating to securities clearances. JEX 229, at ¶ 16; den Baas Dep. (4/6/00) 65:11–22.

137. Pursuant to the terms of the Partnership Agreement, each partner was exposed to its pro rata share of the interest rate risks and credit risks associated with the Partnership's assets. Addiscombe and Syringa were aware that they were exposed to those partnership risks. JEX 3, at §§ 4.02–4.04; den Baas Dep. (4/6/00) 31:7–32:24, 163:10–164:7, 170:21–173:5, 175:22–176:5.

138. Boca consistently held itself out as a partnership to third parties, including issuers and purchasers of investment instruments, auditors, law firms, investment advisers, and the United States government. See, e.g., JEX 114; JEX 129; PEX 502A; PEX 503–505; PEX 561–573.

139. After meeting the partners and negotiating the Partnership Agreement, the AHP partners and Addiscombe and Syringa believed that Boca was a partnership and that Addiscombe and Syringa were partners. Considine Tr. (9/12/00 a.m.) 50:9–21; Nee Tr. (6/20/00 p.m.) 55:10–25; den Baas Dep. (4/6/00) 18:24–19:21, 20:19–21:15.

3. *The Organizational Meeting in Bermuda*

140. After the Partnership Agreement was signed, a second meeting was held in Bermuda on April 19, 1990, to organize the Partnership and to determine how it would operate on a day-to-day basis. This was the first meeting of the Partnership Committee and is referred to as the "organizational meeting." Mr. Considine and Mr. Nee represented AHP and AHP 10, respectively. Mr. de Beer represented Addiscombe and Syringa. Representatives from Merrill Lynch and Cravath, Swaine & Moore also attended. Minutes memorializing this meeting are Joint Exhibit 5. JEX 5; Considine Tr. (9/12/00 a.m.) 51:24–52:6; Considine Dep. (3/13/98) 93:12–94:12; Nee Tr. (6/20/00 p.m.) 56:20–58:14.

141. AHP appointed John R. Considine as its Representative. AHP 10 appointed Thomas M. Nee as its Representative. AHP and AHP 10 appointed Milan Kofol, Angel Seda–Coma, Geraldine Moss, and Eileen Lach as Alternate Representatives to the Boca Investerings Partnership Committee. Stip. ¶¶ 10, 16; JEX 5.

142. Mr. Considine was appointed AHP's Representative because significant amounts of AHP's funds were invested and Mr. Considine had responsibility for safeguarding AHP's investment. Considine Tr. (9/12/00 a.m.) 52:2–6.

143. As an Alternate Representative to the Partnership, Mr. Kofol understood that his responsibilities were to ensure that the Partnership was managed in accordance with the Partnership Agreement and to protect the AHP partners' financial

interests. Kofol Tr. (6/21/00 a.m.) 38:22–39:6.

144. Addiscombe and Syringa appointed Mr. de Beer as their Representative and Mr. Robert G.M. Verhoef as First Alternate Representative and Geraldine X.C. Martines as a Second Alternate Representative to the Partnership Committee. JEX 5; Stip. ¶ 31.

145. At the organizational meeting on April 19, 1990, certain aspects of Boca's operations were delegated by the Partnership Committee to outside advisers. JEX 5. Boca engaged N.V. Fides, an affiliate of ABN Trust, to perform certain administrative and investment management services on behalf of Boca. JEX 5; Nee Tr. (6/20/00 p.m.) 58:15–23; Kofol Tr. (6/21/00 a.m.) 43:23–44:23. It engaged Merrill Lynch Capital Services as its financial advisor to provide advice to Boca on investment strategies, acquisition and disposition of assets, and general financial matters. Stip. ¶ 40; JEX 102; Das Tr. (9/13/00 a.m.) 26:11–19. It decided that audited financial statements, which were to be prepared in accordance with generally accepted accounting principles, would be prepared by Arthur Andersen, Willemstad, Curacao, and that unaudited financial statements would be prepared by N.V. Fides. Stip. ¶ 39; JEX 5; JEX 129; Kofol Tr. (6/21/00 a.m.) 45:10–46:8. And it hired Cravath, Swaine & Moore as its legal counsel. Nee Tr. (6/20/00 p.m.) 48:16–17; Nee Tr. (6/22/00 p.m.) 76:23–24. The fees charged by N.V. Fides, Arthur Andersen and Cravath, Swaine & Moore were taken into account in determining the Partnership's operating income and allocated among the four partners in accordance with the Partnership Agreement. Stip. ¶ 38; JEX 3, at

Article I, §§ 4.04 and 4.05; JEX 5; JEX 128–132; JEX 134–135; JEX 138–139; JEX 141–142; JEX 146–148; JEX 150–158; JEX 161–164; Nee Tr. (6/20/00 p.m.) 58:15–23; Kofol Tr. (6/21/00 a.m.) 43:23–45:9, 46:4–8.[7]

146. In addition to discussing the Partnership's daily operations, those in attendance at the organizational meeting also discussed a proposal by Merrill Lynch for Boca to invest in private placement notes ("PPNs"). During the meeting, Merrill Lynch assured the partners that the PPNs would be issued by "investment grade issuers." JEX 5. Merrill Lynch also explained that the PPNs would be "floating rate with a five-year maturity and a one-time put after 13 months to 2½ years." JEX 5. After discussing the proposal at the organizational meeting, the partners decided to make such an investment and instructed Merrill Lynch to locate potential issuers in accordance with the criteria discussed at the meeting. JEX 5; Considine Tr. (9/12/00 a.m.) 52:11–13, 53:3–6; Nee Tr. (6/20/00 p.m.) 59:18–60:14; den Baas Dep. (4/6/00) 167:21–168:12.

147. The AHP partners were authorized to agree to the purchase of the PPNs based on the April 17, 1990 AHT approved by AHP management. JEX 2; FOF 79–93. The AHP partners wanted to invest in PPNs because they understood that the notes were of high quality, were liquid, and would yield a satisfactory return, and that if other transactions were subsequently completed, the AHP partners would receive a tax benefit. JEX 2; Considine Tr. (9/12/00 a.m.) 52:14–21; Nee Tr. (6/20/00 p.m.) 60:15–23.

148. When Boca decided to purchase the PPNs, there was no understanding or

---

7. Boca paid a $1,000 fee to MLCS in exchange for its services. While there is no evidence to the contrary, it is unclear from the record before the Court whether the fee was taken into account in determining the Partnership's operating income and allocated among the four partners in accordance with the Partnership Agreement. JEX 102.

agreement as to how long the Partnership would hold the PPNs. The AHP representatives understood that the PPNs did not have to be sold by a certain date in order for AHP to receive a tax benefit from investing in the Partnership. Considine Tr. (9/12/00 a.m.) 27:8–11, 54:10–21, 57:23–25; Kofol Tr. (6/21/00 a.m.) 38:7–11; Kofol Tr. (4/12/01) 43:20–44:13; Nee Tr. (6/20/00 p.m.) 61:25–62:16; Nee Tr. (4/12/01) 63:4–8; Nee Dep. (3/17/98) 163:12–17.

149. There was no discussion of the purchase of LIBOR Notes at the organizational meeting. Considine Dep. (3/13/98) 94:13–16; den Baas Dep. (4/6/00) 168:13–16; den Baas Dep. (4/6/00) 168:13–16.

150. AHP, AHP 10, Syringa and Addiscombe made the following capital contributions in exchange for the following partnership interests:

| | Percent | Amount |
| --- | --- | --- |
| AHP | 9% | $ 135,000,000 |
| AHP 10 | 1% | 15,000,000 |
| Syringa | 83% | 1,245,000,000 |
| Addiscombe | 7% | 105,000,000 |
| | 100% | $1,500,000,000 |

Stip. ¶ 43.

151. The $1.5 billion contributed by the partners was used to purchase Boca's investments. JEX 128–129; JEX 114; JEX 561–563.

152. There was no assurance or guarantee from AHP that Syringa's and Addiscombe's capital contributions would be returned, that they would possess a priority claim on the Partnership's assets, that they would have creditor's rights, that they would be protected from risk of loss if credit risks materialized for the Partnership, that they would receive a particular rate of return on their capital contributions, or that they would be reimbursed for losses incurred as a result of their capital contributions to Boca. FOF 354–359.

153. On April 30, 1990, a meeting was held in Bermuda to change the names of the foreign partners to Syringa and Addiscombe and to increase their capital contributions and their proportionate interests in the partnership. Other minor changes also were made to the Partnership Agreement. Mr. Nee and Mr. Considine attended on behalf of the AHP partners. Addiscombe and Syringa attended via telephone. An amended and restated Partnership Agreement was executed on May 3, 1990. JEX 4; Nee Dep. (3/17/98) 182:19–183:19, 232:12–233:11; Considine Dep. (3/13/98) 95:5–96:3.

E. *Boca's Investments and Transactions*

1. *Purchases of PPNs*

154. After receiving instructions from the Boca partners, Merrill Lynch contacted potential PPN issuers and relayed to them certain criteria that Boca required for the PPNs. Merrill Lynch 30(b)(6) Dep. (Taylor 3/10/98) 54:9–16, 55:21–56:19; Pepe Dep. (5/7/98) 38:20–39:13.

155. After Merrill Lynch located potential issuers, the AHP Treasury Department conducted due diligence on the PPNs proposed by Merrill Lynch. Mr. Kofol reviewed the particular issues to ensure that the PPNs complied with the April 17, 1990 AHT authorizing the investment. Specifically, Mr. Kofol made sure that the PPNs were issued by institutions with A ratings or better, that the PPNs contained a put option, that the PPNs were floating rate, and that the PPNs would likely pay a rate of interest between 12 and 24 basis points above AHP's average yield. Prior to approving the PPNs, Mr. Kofol satisfied himself that the Partnership was paying a fair price for the PPNs given the yield, risk, put option, and maturity. Although Mr. Considine delegated this responsibility to Mr. Kofol, Mr. Considine also satisfied himself with respect to the PPNs' creditworthiness, liquidity, yield, and price. Considine Tr. (9/12/00 a.m.) 53:9–54:9; Ko-

fol Tr. (6/21/00 a.m.) 47:3–48:15, 49:6–15; Merrill Lynch 30(b)(6) Dep. (Taylor 3/10/98) 73:23–74:15.

156. The put provisions contained in the PPNs assured AHP that the PPNs could be sold (or put) back to the issuers at par after a certain interval. If the Partnership held the PPNs until the put date, AHP knew that it would receive the promised rate of return for the period the PPNs were held. Mr. Kofol testified that the put options were important to all the partners. If the credit of a PPN issuer deteriorated during the period between the put date and the option date, the PPN could be put back to the issuer at the put date. Kofol Tr. (6/21/00 a.m.) 35:18–36:15, 38:7–11; Considine Tr. (9/12/00 a.m.) 35:16–17.

157. So long as Syringa's and Addiscombe's Partnership Percentages were greater than 50 percent, the Partnership Agreement provided that Syringa and Addiscombe would be responsible for any default losses caused by bankruptcy up to the amount of their capital contributions. JEX 3, at § 4.04(d); Nee Tr. (6/20/00 a.m.) 52:20–53:7; den Baas Dep. (4/6/00) 157:19–159:12; 160:19–161:11. Default losses would have to exceed $1.35 billion (out of $1.5 billion invested) before the AHP partners would bear any portion of the losses. Stip. ¶ 43; JEX 3, at § 4.04(d).

158. The uncontradicted testimony at trial was that the AHP partners agreed to the purchase of the PPNs by the Partnership because: (1) AHP believed that the PPNs were creditworthy (rated A or better) and offered a reasonable rate of return; and (2) the PPNs qualified for installment sale treatment under Section 453 of the Internal Revenue Code. Considine Tr. (9/12/00 a.m.) 37:24–38:6, 52:14–53:1; Nee Tr. (6/20/00 p.m.) 60:15–23; FOF 90.

159. ABN Trust, on behalf of Addiscombe and Syringa, also reviewed the PPNs to assure itself of the creditworthiness of the issuers because Addiscombe and Syringa were exposed to the first loss position should the issuers' credit deteriorate. den Baas Dep. (4/6/00) 161:18–162:21; *see also* JEX 3, at § 4.04.

160. The AHP partners and the foreign partners understood that the credit risk associated with the A rating of the PPN issuers would be borne by the Partnership and shared by the partners in accordance with the Partnership Agreement. Considine Tr. (9/12/00 a.m.) 54:2–5; Kofol Tr. (6/21/00 a.m.) 48:11–50:4; den Baas Dep. (4/6/00) 175:22–176:18, 176:20–177:2.

161. On May 1, 1990, Boca purchased private placement, floating-rate certificates of deposit from Norinchukin having a face value of $300 million and similar instruments from Sanwa having a face value of $300 million. Tranche A of the Norinchukin PPNs ($200 million issue) had a five-year term and paid a rate of interest of 8.2875% for the first period and LIBOR minus 15 basis points for the period commencing on the third Wednesday in May 1990 through the third Wednesday in November 1991. Thereafter the PPNs paid LIBOR minus 25 basis points. Tranche B of the Norinchukin PPNs ($100 million) had a five-year term and paid a rate of interest of 8.50% for the first period and LIBOR minus 10 basis points for the period commencing on the third Wednesday in May 1990 through the third Wednesday in April 1992. Thereafter, the PPNs paid LIBOR minus 25 basis points. Interest was reset monthly. The payment of interest was to occur on the third Wednesday of every month commencing on the third Wednesday of May 1990. The Sanwa PPNs had a five-year term and paid 8.4625% for the initial period and, thereafter, LIBOR minus 10 basis points. Interest was reset monthly. The payment of interest was to occur on the first day of

each month commencing on June 1990. At the time of the purchase, the credit ratings of Norinchukin and Sanwa were AA. Stip. ¶ 44; PEX 561; PEX 562; PEX 563.

162. On May 2, 1990, Boca purchased private placement floating rate certificates of deposit from PepsiCo with a face value of $500 million. The PepsiCo PPNs had a five-year term and paid a rate of interest of commercial paper minus 12.5 basis points. Interest was reset monthly. The payment of interest was to occur on the third Wednesday of each month commencing on the third Wednesday in May 1990. At the time of the purchase, the credit rating of PepsiCo was A. The Norinchukin, Sanwa, and PepsiCo PPNs are collectively referred to as "the PPNs." The interest rates on all the PPNs were consistent with market rates. Stip. ¶ 45; JEX 114; PEX 561–563; Pepe Dep. (5/7/98) 82:16–83:5.

163. Under the terms of the PPNs, Boca had the option of putting the notes to the issuers (Norinchukin, Sanwa and PepsiCo) at par plus accrued interest in between twelve, eighteen or twenty-four months. The put option had considerable value to Boca. The put option was important because there was a real possibility of (1) the credit deteriorating, and (2) holding the PPNs until maturity. If the credit of the issuer deteriorated during the period between the issue date of the PPNs and the date of the option, the notes could be put back to the issuer at the put date. PEX 561; PEX 562; PEX 563; JEX 114; Kofol Tr. (6/21/00 a.m.) 35:18–36:15.

164. The terms of the purchases of the PPNs were negotiated between the issuers and Merrill Lynch. Merrill Lynch was only authorized to negotiate on the Partnership's behalf after it had received authorization to do so from the partners at the April 19, 1990, organizational meeting. Merrill Lynch 30(b)(6) Dep. (Taylor 3/10/98) 53:22–54:16.

165. The PPNs were not registered under the Securities Act of 1933, nor were they traded on an established securities market. Stip. ¶ 46.

166. Of the $1.1 billion used by Boca to acquire the PPNs, 10% was provided by AHP and AHP 10, and 90% was provided by Addiscombe and Syringa—consistent with their partnership interests at the time. Stip. ¶ 43; JEX 128–129.

167. At the time the Partnership purchased the PPNs, there had been no determination to sell the PPNs at any particular time. This is one reason the put options were important. Considine Tr. (9/12/00 a.m.) 54:10–21, 56:11–13; Considine Tr. (9/12/00 p.m.) 39:10–16; Kofol Tr. (6/21/00 a.m.) 38:7–11; Kofol Tr. (4/12/01) 43:20–44:13; Nee Tr. (6/20/00 p.m.) 61:16–62:16; Nee Tr. (4/12/01) 63:4–8.

168. As of May 2, 1990, Boca had invested a total of $1.1 billion in PPNs. The remaining $400 million was invested in certain other short-term obligations that were within the Partnership's investment guidelines. N.V. Fides was responsible for managing these investments. Mr. Kofol monitored the investments on behalf of the AHP partners to make sure they were within the Partnership's investment guidelines and to check the creditworthiness of the issuers. Stip. ¶ 47; PEX 407; PEX 408; Kofol Tr. (6/21/00 a.m.) 50:24–54:17.

169. Boca possessed all the benefits and burdens of ownership with respect to the PPNs as well as the short-term obligations, including the receipt of market-rate interest and all risk of loss. JEX 114; PEX 561–563.

170. AHP, AHP 10, Syringa, and Addiscombe shared the interest rate risk, credit risk, default risk, and credit spread risk with respect to the PPNs and other investments in accordance with the Partnership Agreement. den Baas Dep. (4/6/00)

30:6–21, 162:15–22; 175:22–176:5, 195:16–196:23.

171. Boca purchased and held title to the PPNs and other investments in its own name. JEX 114; PEX 561; PEX 562; PEX 563.

172. There was no agreement between the AHP partners and Syringa and Addiscombe that AHP would make up any loss to Syringa and Addiscombe on the PPNs or on other investments. Syringa and Addiscombe were liable for any default loss up to $1.35 billion. Stip. ¶ 43; JEX 3, at § 4.40(d); Kofol Tr. (4/12/01) 46:24–47:5; Nee Tr. (4/12/01) 167:1–11; den Baas Dep. (4/6/00) 169:21–170:8.

### 2. Sale of the PPNs for Cash and LIBOR Notes

#### a. May 18, 1990 Partnership Meeting

173. A Partnership Committee meeting was held on May 18, 1990, in Bermuda. Mr. Kofol attended on behalf of AHP and AHP 10. Mr. Verhoef represented Addiscombe and Syringa via telephone conference from Curacao. A Merrill Lynch representative and a Cravath, Swaine & Moore representative also were in attendance. The Merrill Lynch representative proposed selling the PPNs for $880 million in cash and contingent installment payment agreements ("LIBOR Notes"). The $880 million was to be reinvested in commercial paper. LIBOR is the London Interbank Offering Rate. The aggregate notional principal amounts of all of the LIBOR Notes was $578,689,000. These amounts were "notional" in the sense that, unlike typical debt securities, the LIBOR Notes required no principal payment at maturity. The only payments were the 20 quarterly payments. Because the quarterly payments depended on three-month LIBOR, as determined in the future, the total contract price could not be readily ascertained. The three-month

LIBOR for the first quarterly payment did not become fixed until June 1, 1990. Stip. ¶ 49; JEX 8; Kofol Tr. (6/21/00 a.m.) 58:5–61:1. FOF 190–192, 320.

174. During the May 18 meeting, Merrill Lynch illustrated the mechanics of the proposed sale and explained certain characteristics of the LIBOR Notes. Specifically, Merrill Lynch explained that (i) the value of the LIBOR Notes would fluctuate significantly with changes in interest rates and were extremely volatile instruments; (ii) the sale of the PPNs and purchase of the LIBOR Notes may effectively reduce Boca's credit risk because (a) the $1.1 billion investment in PPNs would be spread over the LIBOR Note and the $880 million of commercial paper, and (b) Merrill Lynch would look for LIBOR Note issuers with a credit rating higher than that of the PPN issuers; and, (iii) the cash received on the sale could be invested in commercial paper thereby reducing the maturities of Boca's investments and improving the liquidity of the Partnership's portfolio. Stip. ¶ 49; JEX 8; Kofol Tr. (6/21/00 a.m.) 58:5–61:1.

175. Mr. Kofol approved the sale of the PPNs on behalf of the AHP partners. Prior to approving the sale, Mr. Kofol called Mr. Considine from the May 18 meeting to inform him of Merrill Lynch's proposal to sell the PPNs for cash and LIBOR Notes. After discussing the proposal with Mr. Kofol, Mr. Considine gave oral authorization approving the transaction. Considine Tr. (9/12/00 a.m.) 59:14–60:3; Considine Dep. (3/13/98) 105:7–25; Kofol Tr. (6/21/00 a.m.) 61:2–10.

176. At the meeting, the partners agreed to sell the PPNs for 80% cash and LIBOR Notes for the remaining 20%. The partners authorized Merrill Lynch to locate purchasers of the PPNs who would issue LIBOR Notes consistent with the criteria and list of issuers discussed at the

meeting. Stip. ¶ 49; JEX 8; Kofol Tr. (6/21/00 a.m.) 61:2–10.

177. At the time of the meeting, Mr. Considine and Mr. Kofol were aware of the then current interest rate environment and interest rate trends predicted in the market. Considine Tr. (9/12/00 a.m.) 60:17–22; Considine Dep. (3/13/98) 109:9–18; Kofol Tr. (6/21/00 p.m.) 3:1–9.

178. AHP and AHP 10 had not discussed or reached any agreement with Addiscombe or Syringa to sell the PPNs prior to the May 18, 1990 meeting. Considine Tr. (9/12/00 a.m.) 54:10–21, 56:11–13; Nee Tr. (6/20/00 p.m.) 61:7–62:16.

179. At the conclusion of the May 18, 1990 meeting, there was no understanding or agreement as to when the next partnership meeting would be held. Kofol Tr. (6/21/00 p.m.) 16:9–21.

b. *AHP Approval*

180. On May 24, 1990, the AHP Treasury Department initiated an AHT to request authorization for Boca to sell the PPNs for cash and LIBOR Notes. An AHT was required because the proposed investment in LIBOR Notes was outside of AHP's investment guidelines and because the Partnership was selling an asset that AHP previously had authorized it to buy. JEX 25; Considine Tr. (9/12/00 a.m.) 58:13–59:6.

181. The AHT was requested after Mr. Considine had given oral approval of the sale by telephone to Mr. Kofol during the May 18, 1990 Partnership Committee meeting. An AHT had not been written prior to the meeting because AHP was unaware that the sale was to be the subject of the meeting. This practice was unusual but in conformance with the AHT system, which required flexibility. Considine Tr. (9/12/00 a.m.) 59:14—60:3; Considine Dep. (3/13/98) 105:7–25, 111:22–113:5;

Kofol Tr. (6/21/00 a.m.) 61:2–10; Nee Dep. (3/17/98) 199:7–16; FOF 25.

182. The AHP partners agreed to the sale of the PPNs for cash and LIBOR Notes because (i) the LIBOR Notes had potential to generate a significant return because of their sensitivity to interest rates; (ii) the sale would reduce credit risk and maturities; and (iii) the sale of the PPNs for cash and LIBOR Notes qualified for contingent payment installment treatment under Section 453 of the Internal Revenue Code so that, if certain transactions were subsequently approved, AHP could receive a tax benefit. JEX 25; Considine Tr. (9/12/00 a.m.) 56:14—57:15; Kofol Tr. (6/21/00 p.m.) 3:15–4:17, 6:12–7:17.

183. The potential financial benefits of the transaction, as understood by the AHP partners at that time, were the following: (i) because of their interest-rate sensitivity the LIBOR Notes had the potential to generate a significant return; (ii) the reinvestment of the cash proceeds in commercial paper would provide a return commensurate with the risk associated with those investments; (iii) diversification would reduce credit risk on the partnership portfolio; and (iv) diversification would reduce maturities and, thus, improve the portfolio's liquidity. JEX 8; JEX 25; Considine Tr. (9/12/00 a.m.) 56:15–22; Kofol Tr. (6/21/00 p.m.) 3:1–4:17, 6:12–7:17.

184. Although Mr. Considine was aware of a potential tax benefit if certain other transactions took place, he recommended and sought authorization for the sale of the PPNs and purchase of the LIBOR Notes based on the potential financial benefits of the transaction; there was no guarantee or obligation that any subsequent transactions would occur. Consequently, the sale of the PPNs for cash and LIBOR Notes had to stand on its own financial viability irrespective of any potential tax consequences. Considine Tr.

(9/12/00 a.m.) 60:4–16; Considine Dep. (4/12/99) 78:20–79:10; Nee Dep. (4/8/99) 88:17–90:9.

185. At the time AHP approved the sale of the PPNs for cash and LIBOR Notes, AHP had an understanding of the interest rate environment. Considine Tr. (9/12/00 a.m.) 60:17–22; see FOF 177.

186. At the time of the purchase of the LIBOR Notes, there was no understanding or expectation by the Partnership or AHP as to how long the LIBOR Notes would be held by the Partnership. Considine Tr. (9/12/00 p.m.) 9:15–20; Kofol Tr. 44:23–46:2.

187. There was no agreement between the AHP partners and Syringa and Addiscombe that the AHP partners would make up any loss Syringa and Addiscombe might experience on the LIBOR Notes. den Baas Dep. (4/6/00) 169:21–170:8.

c. *Sale of PPNs for Cash and LIBOR Notes*

188. At the request of Boca and in accordance with instructions received from Boca, Merrill Lynch identified BFCE, Sumitomo, BETA, and Mitsubishi as potential purchasers of the PPNs. Merrill Lynch negotiated the sales on behalf of Boca, after it had received instructions from the Partnership to do so. Merrill Lynch 30(b)(6) Dep. (Taylor 3/10/98) 55:21–56:19.

189. After Merrill Lynch located potential LIBOR Note issuers, Mr. Kofol reviewed the LIBOR Notes to ensure that they were consistent with what was decided at the May 18, 1990 Partnership Committee meeting and that they complied with the May 24, 1990 AHT. Among other things, Mr. Kofol made sure that the credit quality of the LIBOR Notes was higher than that of the PPNs because credit risk was a concern of AHP's. Kofol Tr. (6/21/00 p.m.) 7:18–9:3.

190. On May 24, 1990, the Partnership sold $200 million in principal amount of the Norinchukin, Sanwa, and PepsiCo PPNs to BFCE and Sumitomo. The aggregate consideration received by the partnership from the sales consisted of $160 million in cash and certain Installment Purchase Agreements providing for contingent payments (the "BFCE LIBOR Notes" and "Sumitomo LIBOR Notes"). The BFCE and Sumitomo LIBOR Notes required BFCE and Sumitomo to make 20 quarterly payments, starting on September 1, 1990, equal to three-month LIBOR multiplied by stated notional amounts times the number of days from the last payment divided by 360. The first quarterly payments under the BFCE and Sumitomo LIBOR Notes were based on three-month LIBOR on June 1, 1990, and did not become fixed until June 1, 1990. Stip. ¶ 50; PEX 564; PEX 565; PEX 566.

191. On May 29, 1990, the Partnership sold $400 million principal amount of the Norinchukin, Sanwa, and PepsiCo PPNs to BETA. The aggregate consideration received by the partnership from the sales consisted of $320 million in cash and certain Installment Purchase Agreements providing for contingent payments (the "BETA LIBOR Notes"). The BETA LIBOR Notes required BETA to make 20 quarterly payments, starting on September 1, 1990, equal to three-month LIBOR multiplied by stated notional amounts times the number of days from the last payment divided by 360. The amounts of the first quarterly payments under the BETA LIBOR Notes were based on three-month LIBOR on June 1, 1990, and did not become fixed until June 1, 1990. Stip. ¶ 51; PEX 567; PEX 568; PEX 569.

192. On May 30, 1990, the Partnership sold $500 million principal amount of the Norinchukin, Sanwa, and PepsiCo PPNs to Mitsubishi. The aggregate consideration

received by the partnership in the sale consisted of $400 million in cash and certain Installment Purchase Agreements providing for contingent payments (the "Mitsubishi LIBOR Notes"). The Mitsubishi LIBOR Notes required Mitsubishi to make 20 quarterly payments, starting on September 1, 1990, equal to three-month LIBOR multiplied by stated notional amounts times the number of days from the last payment divided by 360. The amounts of the first quarterly payments under the Mitsubishi LIBOR Notes were based on three-month LIBOR on June 1, 1990, and did not become fixed until June 1, 1990.[8] Stip. ¶ 52; PEX 570; PEX 571; PEX 572; PEX 573.

193. Thus, all together, the PPNs were sold for $880 million in cash plus LIBOR Notes. The cash was received in Boca's taxable year ended May 31, 1990. The 20 quarterly payments were to be received over the next six taxable years, starting on September 1, 1990, and ending on June 1, 1995. Thus, all together, the payments were to be received over seven taxable years. Stip. ¶¶ 50–52; PEX 564–573.

194. The LIBOR Notes provided that the issuers would make 20 quarterly payments based upon the three-month LIBOR interest rate and a notional amount. The LIBOR Notes did not provide for payment of any stated principal, and the amount of each of the periodic payments varied depending upon the three-month LIBOR interest rates on the specified dates. The future interest rates on those dates were not known as of May 31, 1990. Therefore, although the term and notional amounts of the LIBOR Notes were fixed, because of the variable and unknown future three-month LIBOR rate, the total contract price for the PPNs could not be readily

ascertained as of the end of the tax period in which the sale occurred (May 31, 1990). PEX 564–573; Walsh Tr. (9/11/00 a.m.) 28:2–29:5; AHP 30(b)(6) Dep. (Walsh 3/3/98) 28:1–22; Nee Tr. (6/20/00 p.m.) 12:2–13:18.

195. The sales of the PPNs were treated as contingent payment installment sales because (i) the payments to be received stretched over seven taxable years, and because (ii) the amount of each quarterly payment under the LIBOR Notes depended on future interest rates and, therefore, could not be ascertained. PEX 564–573.

196. After Boca sold the PPNs, it retained no incidents of ownership of the PPNs, either directly or indirectly. JEX 114; PEX 561–563.

197. When Merrill Lynch negotiated the sale of the PPNs for cash and LIBOR Notes, Merrill Lynch made no assurances to the LIBOR Note issuers that the PPNs would be bought back or that the LIBOR Notes would be sold prior to their maturity. Taylor Dep. (3/10/98) 57:21–58:5; den Baas Dep. (4/6/00) 186:9–187:11.

198. At the time of the issuance of the LIBOR Notes, AHP was aware that the LIBOR Notes were very volatile. This is one of the reasons AHP believed the LIBOR Notes could be profitable. AHP knew that the LIBOR Notes could go up significantly in value if interest rates went up. AHP also knew that the LIBOR Notes could go down significantly in value if interest rates fell. The AHP partners did not hedge their 10% interest in the LIBOR Notes because they believed that hedging would eliminate the potential benefit of owning the Notes. Considine Tr. (9/12/00 a.m.) 60:23—61:14; Kofol Tr. (6/21/00 p.m.) 9:4–10:1.

---

8. The BFCE, Sumitomo, BETA, and Mitsubishi LIBOR Notes will hereinafter be collectively referred to as the "LIBOR Notes."

199. Boca invested the $880 million in cash received on its sale of the PPNs in commercial paper and time deposits consistent with Boca's investment guidelines. JEX 128–129.

200. The return on this investment of $880 million plus the original $400 million plus the LIBOR Notes was shared pro rata by the partners as were all risks such as credit risk, default risk, interest rate risk, and liquidity risk. JEX 128–129.

### d. *Negotiability of LIBOR Notes*

201. The "LIBOR Notes [were] very illiquid and privately negotiated instruments." Fong Tr. (9/21/00 p.m.) 12:3–4.[9] They were not registered under the Securities Act of 1933, they were not payable on demand, and they did not have interest coupons attached. Stip. ¶ 54; PEX 564–573; Fong Tr. (9/21/00 a.m.) 32:14–34:13; Fong Tr. (9/21/00 p.m.) 11:23–12:9. Merrill Lynch never provided any guarantees that it would be able to sell the LIBOR Notes. Pepe Dep. (5/7/98) 74:13–18.

202. The LIBOR Notes themselves expressly precluded the creation of a market for the LIBOR Notes. Paragraph 5.9 of the LIBOR Notes provided:

*No Secondary Markets.* Purchaser and Seller each agree (i) not to engage any broker or dealer to make a market in this Agreement (or any direct or indirect interest therein), and (ii) not to offer or list this Agreement (or any direct or indirect interest herein) in an established securities market. An established securities market is (a) a national securities exchange which is registered under Section 6 of the Securities Exchange Act of 1934 (the "Exchange Act"), (b) an exchange which is exempted from registration under Section 5 of the Exchange

Act because of its limited volume of transactions or (c) any over-the-counter market. An over-the-counter market includes any system of general circulation to brokers and dealers which regularly disseminates quotations of obligations by identified brokers or dealers, other than a quotation sheet prepared and distributed by a broker or dealer in the regular course of business and containing only quotations of such broker or dealer.

PEX 564–573. In compliance with these limitations, Merrill Lynch refrained from taking any steps that would have been necessary to create a market for the LIBOR Notes at the time they were issued. PEX 564–573; Merrill Lynch 30(b)(6) Dep. (Taylor 3/10/98) 63:17–64:3.

### e. *Results as of May 31, 1990*

203. On May 31, 1990, the end of Boca's first taxable year, Boca owned all of the LIBOR Notes and all other assets shown on the financial statements. Stip. ¶ 57.

204. During the period April 19, 1990 to May 31, 1990, Boca's net operating income, as reflected in its financial statements, was $10,055,226, as follows:

| | |
|---|---:|
| Interest on securities | $ 2,884,639 |
| Interest on PPNs | 6,883,106 |
| Interest on time deposits | 288,035 |
| | $10,055,780 |
| Less: General expenses | 554 |
| | $10,055,226 |

This is reflected in the Partnership balance sheet as of May 31, 1990, which is Joint Exhibit 128. Stip. ¶ 58; JEX 128.

205. Pursuant to Section 4.04(c) of the Partnership Agreement, this operating income, including expenses, was allocated first to AHP and AHP 10 up to the amounts of their preferred returns and the

---

**9.** Gifford Fong is an expert in the areas of corporate finance, valuation, financial engineering, and risk management. *See* FOF 303.

balance to Syringa and Addiscombe, as follows:

| | |
|---|---|
| AHP | $ 887,130 |
| AHP 10 | 98,570 |
| Syringa | 8,364,119 |
| Addiscombe | 705,407 |
| | $10,055,226 |

Stip. ¶ 59; JEX 128; Kofol Tr. (6/21/00 p.m.) 13:4–13.

206. A partner's allocation of the interest income from Boca's investments, including the PPNs for Boca's tax year ended May 31, 1990, was credited to that partner's respective capital account pursuant to Section 4.03(a) of the Partnership Agreement. Stip. ¶ 60.

207. Boca's partners shared the income from the PPNs. Syringa and Addiscombe were allocated approximately 90% of the interest income received on the PPNs. Stip. ¶ 60; JEX 128–129.

208. The installment gain was allocated in accordance with the Partnership Agreement as follows:

| | | |
|---|---|---|
| AHP | 9% | $ 64,968,646 |
| AHP 10 | 1% | 7,218,738 |
| Syringa | 83% | 599,155,290 |
| Addiscombe | 7% | 50,531,169 |
| | 100% | $ 721,873,843 |

These amounts were credited to each partner's capital account maintained under the Partnership Agreement. Stip. ¶ 61; JEX 128–129.

209. Boca's reported tax basis in the PPNs was $1,106,883,099, which included the $1.1 billion cost of the PPNs plus accrued interest. PEX 502A.

### f. Merrill Lynch Valuations and the Loss on the LIBOR Notes

210. Merrill Lynch periodically provided Boca with what was stated to be the market value of the LIBOR Notes. For purposes of these valuations, the transaction costs—specifically the cost of the transaction in which Boca sold the PPNs for cash and LIBOR Notes—was embedded (or included) in the value of the LIBOR Notes. Subsequent valuations were then adjusted to reflect changes in the value of the LIBOR Notes. Merrill Lynch's valuation letters are Joint Exhibits 31A through 31D. Stip. ¶ 55; JEX 31A–JEX 31D; Pepe Dep. (5/7/98) 86:3–89:15.

211. Merrill Lynch's valuation of the LIBOR Notes was based on the value a purchaser would have to pay to acquire the Notes, rather than on the value a seller could obtain by selling the Notes. AHP did not know how Merrill Lynch valued the Notes and in fact understood the valuation to represent the amount for which the Notes could be sold. Kofol Tr. (6/21/00 p.m.) 15:6–16:8; Merrill Lynch 30(b)(6) Dep. (Taylor 3/10/98) 47:10–48:3, 52:3–5, 76:8–24; Pepe Dep. (5/7/98) 86:8–88:6; den Baas Dep. (4/6/00) 52:3–17.

212. On June 4, 1990, Merrill Lynch sent a letter to Boca, stating that the market value of the LIBOR Notes on May 31, 1990, was $223,880,000. Stip. ¶ 62; JEX 31A.

213. The partnership's LIBOR Notes decreased in value during the period ended May 31, 1990, by $705,928.94. Pursuant to the Partnership Agreement, this amount was allocated among the four partners as follows:

| | | |
|---|---|---|
| AHP | 9% | $ 63,534 |
| AHP 10 | 1% | 7,059 |
| Syringa | 83% | 585,921 |
| Addiscombe | 7% | 49,415 |
| | 100% | $ 705,929 |

Stip. ¶ 63; JEX 128; Kofol Tr. (6/21/00 p.m.) 12:1–13:3.

214. There is a letter from Merrill Lynch to Boca, dated "As of July 20, 1990," stating that the market value of the LIBOR Notes on July 20, 1990, was $220,770,000. This amount reflected a decrease in value of $3,110,000 during the period from June 1, 1990 through July 20, 1990. Stip. ¶ 69, 70; JEX 31C, 131.

215. Pursuant to the Partnership Agreement, the additional loss of $3,110,000 was allocated among the partners as follows:

| | | | |
|---|---|---|---|
| AHP | 9% | $ | 279,900 |
| AHP 10 | 1% | | 31,100 |
| Syringa | 83% | | 2,581,300 |
| Addiscombe | 7% | | 217,700 |
| | 100% | $ | 3,110,000 |

Stip. ¶ 70; JEX 131.

### g. *Transaction Costs*

216. When AHP agreed to the sale of the PPNs for cash and LIBOR Notes, it expected that there would be normal transaction costs. Considine Tr. (9/12/00 a.m.) 58:1–5.

217. The transaction costs involved in the sale of the PPNs for cash and LIBOR Notes were approximately $13 million. These costs were embedded in Merrill Lynch's valuation of the LIBOR Notes. *See* FOF 210. As a consequence of Merrill Lynch's valuations, the transaction costs would be borne by the party that owned the LIBOR Notes when they were sold or matured. The costs therefore would be shared pro rata among the partners if the Partnership sold the LIBOR Notes or held the LIBOR Notes until they matured. Alternatively, if the LIBOR Notes were distributed, the costs would be borne by the partners who received the LIBOR Notes in the distribution. Stip. ¶ 56; JEX 229, at ¶ 11; Pepe Dep. (5/7/98) 84:11–89:15; den Baas Dep. (4/6/00) 49:7–50:9; Tucker Tr. (9/20/00 p.m.) 2:9–21.

218. Because the costs of the PPN/LIBOR Notes transaction was reflected in the carrying value of the LIBOR Notes, the .costs were not deducted by the partnership for accounting and financial reporting purposes at the time of the sale of the PPNs. JEX 128, JEX 129, JEX 131, JEX 132, JEX 134, JEX 135; den Baas Dep. (4/6/00) 49:7–51:14, 198:9–199:3; Pepe Dep. (5/7/98) 88:11–89:15.

219. When the LIBOR Notes were distributed by Boca to AHP and AHP 10 on August 3, 1990, *see* FOF 237–254, the cost of acquiring the LIBOR Notes was effectively passed on to the AHP partners. If the Notes had been retained by Boca, all of the partners would have shared the cost proportionately. There was no pre-existing agreement that the AHP partners would bear the cost. JEX 229, at ¶ 11; Considine Tr. (9/12/00 p.m.) 16:5–20; den Baas Dep. (4/6/00) 52:3–16.

220. Since the AHP partners received the LIBOR Notes and the potential benefits of such ownership, it accepted those costs. If the partnership had retained ownership of the LIBOR Notes and the potential benefits, it would have borne the cost. Kofol Tr. (6/21/00 p.m.) 37:24–40: 20; den Baas Dep. (4/6/00) 49:7–51:14, 198:9–199:3.

221. All of Boca's other costs were shared proportionately by the four partners pursuant to the Partnership Agreement. JEX 128–132; JEX 134–135; JEX 138–139; JEX 141–142; JEX 146–148; JEX 151–158; JEX 160–163.

### 3. *Purchase of Portion of Syringa's Partnership Interest in Boca*

#### a. *Syringa's Request and Partnership Meeting*

222. On July 6, 1990, Syringa sent a letter to AHP requesting that the partners meet to discuss a reduction in Syringa's interest in the Partnership. Stip. ¶ 64; JEX 89. Before it received this letter, there was no expectation on AHP's part as to when the foreign partners might want to reduce their investment in the Partnership. Considine Tr. (9/12/00 a.m.) 62:17–63:4; Considine Dep. (3/13/98) 116:12–118:6.

223. In response to the July 6 letter and because this expenditure was not con-

templated in the April 17, 1990 AHT, on July 10, 1990, the AHP Treasury Department initiated an AHT seeking authorization to increase the AHP partners' interests in Boca from 10% to 55%. Although the purchase price of the additional 45% was estimated at $680 million, the exact purchase price was to be determined on the day of the purchase because the value of Boca's assets varied every day. The AHT authorized using the proceeds from the sale of Boyle–Midway, which had occurred on June 29, 1990, for the purchase. Stip. ¶ 65; JEX 19; JEX 111;7 Kofol Tr. (6/21/00 p.m.) 17:3–19:20; *see also* JEX 2; JEX 25.

224. Mr. Considine recommended purchasing the additional interest in the Partnership because AHP would have an increased interest in a generally very safe, attractive portfolio and it would have a 45% greater interest in the LIBOR Notes, which had a potential for significant gains given their interest rate sensitivity. In addition, if additional transactions were approved, AHP had the potential for a tax benefit. Considine Tr. (9/12/00 a.m.) 4:4–12, 6:10–19.

225. On July 20, 1990, the Partnership Committee held a meeting in Curacao. Mr. Kofol represented the AHP partners. Mr. de Beer represented Addiscombe and Syringa. A representative from Merrill Lynch and Mr. den Baas also were in attendance. They discussed, the AHP partners' purchase of an increased interest in the Partnership. Stip. ¶ 66; JEX 19; Kofol Tr. (6/21/00 p.m.) 19:21–20:25.

226. At the July 20, 1990 partnership meeting, the partners agreed that AHP and AHP 10 would purchase approximately 45% of Boca from Syringa for $684,292,462. This price reflected (1) Syringa's share of Boca's operating income and expenses up to that time, including the interest from the PPNs, (2) Syringa's

share of the decrease in the value of the LIBOR Notes as a consequence of a decrease in interest rates, and (3) a premium of $2.5 million above book value. Book value was $681,792,462. Stip. ¶ 66; JEX 229, at ¶ 12; JEX 134–135.

227. The $2.5 million premium was negotiated at arms-length at the July 20 meeting by Mr. Kofol, Mr. de Beer, and Mr. den Baas. The premium had not been discussed among any representatives of AHP, AHP 10, Addiscombe, Syringa, and ABN Bank prior to July 20, 1990, and was not based on a prior agreement or formula. Because the July 10, 1990, AHT did not provide for the payment of a premium, Mr. Kofol called Mr. Considine to discuss the proposal and to seek authorization to pay the premium. Mr. Considine approved payment of the premium. Neither the value of Boca's assets nor the premium payments were agreed to prior to July 20, 1990. JEX 19; JEX 229, at ¶ 12; den Baas Dep. (4/6/00) 193:2–17; Kofol Tr. (6/21/00 p.m.) 21:19–24:4; Considine Tr. (9/12/00 a.m.) 46:16–19; Considine Tr. (9/12/00 p.m.) 5:22–7:20; Considine Dep. (3/13/98) 131:9–24.

228. A new AHT, in addition to the July 10 AHT authorizing the purchase of Syringa's interest, was not necessary because the AHT system allows for some flexibility. The July 10th AHT had approved a $680 million investment. An additional $2.5 million premium, only one-third of one percent of the purchase price, was allowed without having to obtain subsequent approval. Considine Tr. (9/12/00 p.m.) 6:23–7:12; Considine Dep. (3/13/98) 130:12–25; Kofol Tr. (6/21/00 p.m.) 22:11–23; Nee Dep. (3/17/98) 206:22–207:11; FOF 25.

229. The AHP partners agreed to pay the $2.5 million premium over the value of Syringa's partnership interest because (1) it was necessary to purchase an additional 45% interest in the Partnership which pur-

chase furthered the goals of investing the proceeds from Boyle–Midway in a relatively conservative portfolio with the additional upside and risk of the investment in volatile LIBOR Notes, and (2) because if certain transactions occurred, AHP had the potential for a tax benefit. AHP representatives testified that these goals were consistent with the AHP partners' objectives for investing in Boca in the first place. Considine Tr. (9/12/00 p.m.) 6:7–19; Considine Dep. (3/13/98) 126:4–8; Kofol Tr. (6/21/00 p.m.) 24:17–23.

230. AHP was not obligated to purchase a portion of Syringa's interest in Boca. There was no commitment of any kind except as provided in the Partnership Agreement, which provides that a partner may request redemption under certain circumstances. JEX 3, at Article VII; Considine Tr. (9/12/00 a.m.) 50:22–51:3; Nee Tr. (6/20/00 p.m.) 56:1–8; den Baas Dep. (4/6/00) 157:15–18, 169:15–20.

b. *Effect of Purchase*

231. The partners' capital accounts and Partnership Percentages on July 20, 1990, following the purchase, were as follows:

| | Capital Account | Partnership Percentage |
|---|---|---|
| AHP | $ 750,456,154 | 49.3495467 |
| AHP 10 | 83,384,017 | 5.4832830 |
| Syringa | 580,404,604 | 38.1670588 |
| Addiscombe | 106,450,355 | 7.0001115 |
| | $1,520,695,129 | 100.0000000 |

Stip. ¶ 71.

232. These capital accounts reflected the partners' prior sharing of both operating income and the decrease in value of the LIBOR Notes in accordance with the Partnership Agreement. This is reflected in the partnership balance sheet as per July 20, 1990, before and after the change in partnership interest, which are Joint Exhibits 131 and 132. Stip. ¶ 71; JEX 131, 132.

233. After their purchase of Syringa's interest, the AHP partners had approximately $834 million invested in Boca of which approximately $720 million was in conservative high grade securities and $115 million was in the more risky, volatile LIBOR Notes. JEX 134–135; JEX 138–139; JEX 141–142; JEX 146–148; JEX 150–150; JEX 160–165.

234. The purchase of Syringa's interest resulted in the AHP partners having approximately a 55% interest in the partnership and, thus, a 55% interest in the LIBOR Notes. Consequently, insofar as the LIBOR Notes rose or fell in value, 55% of such future gain or loss would be allocated to AHP and AHP 10. The AHP partners did not hedge their risk in owning the LIBOR Notes because that would have eliminated the possibility to profit from the LIBOR Notes. Considine Tr. (9/12/00 p.m.) 7:21–8:11; Kofol Tr. (6/21/00 p.m.) 24:24–25:23.

235. During the period from June 1, 1990 through July 20, 1990, Boca's net operating income, as reflected in its financial statements, was $14,455,832, as follows:

| | |
|---|---|
| Interest on securities | $14,462,735 |
| Interest on time deposits | 69,743 |
| | $14,532,478 |
| Less: General expenses | 76,646 |
| | $14,455,832 |

Stip. ¶ 67; JEX 131.

236. Pursuant to Section 4.04(c) of the Partnership Agreement, the operating income was allocated first to AHP and AHP 10 up to the amounts of their preferred returns and the balance to Syringa and Addiscombe, as follows:

| | |
|---|---|
| AHP | $ 1,299,241 |
| AHP 10 | 144,360 |
| Syringa | 12,000,169 |
| Addiscombe | 1,012,062 |
| | $14,455,832 |

Stip. ¶ 68; JEX 131.

4. *Distribution of LIBOR Notes to AHP and AHP 10 and Cash to Addiscombe and Syringa*

237. At a meeting of the Partnership Committee on August 3, 1990, the partners

decided to distribute the LIBOR Notes to AHP and AHP 10 and cash to Addiscombe and Syringa. Mr. Kofol attended the partnership meeting on behalf of AHP and AHP 10. Mr. de Beer represented Addiscombe and Syringa. JEX 11.

238. Mr. Kofol, in consultation with Mr. Considine, authorized the distribution of the LIBOR Notes to the AHP partners based on their belief that the Notes still provided an upside opportunity. Kofol Tr. (6/21/00 p.m.) 34:6–35:8; Considine Dep. (3/13/98) 133:10–134:16; 137:3–13.

239. During the period from July 20, 1990 to August 3, 1990, Boca's net operating income was $4,003,611 ($3,856,376 in interest on securities, plus $147,235 in interest on time deposits). This is reflected in the partnership balance sheet as per August 3, 1990, before distribution, which is Joint Exhibit 134. Stip. ¶ 73; JEX 134.

240. Pursuant to Section 4.04(a) of the Partnership Agreement, the net operating income was allocated by the partners based on their partnership percentages established on July 20, 1990, as follows:

| | Partnership Percentages | | Amount |
|---|---|---|---|
| AHP | 49.3495467 | $ | 1,975,764 |
| AHP 10 | 5.4832830 | | 219,529 |
| Syringa | 38.1670588 | | 1,528,060 |
| Addiscombe | 7.0001115 | | 280,258 |
| | 100.0000000 | $ | 4,003,611 |

This is also reflected in the partnership balance sheet as per August 3, 1990, before distribution, which is Joint Exhibit 134. Stip. ¶ 74; JEX 134.

241. There are two sets of signed meeting minutes in existence which purport to be the minutes of the August 3, 1990 Boca partnership meeting. Both are signed by Peter de Beer who appears as the elected secretary of the meeting. DEX 10; JEX 11. The minutes are nearly identical in format and content except that one set, JEX 11, values the installment notes at a higher value—a value that includes transaction costs—while the other set, DEX 10, does not. At trial, Mr. Kofol stated that he had seen both sets of minutes in August 1990, but could not explain why two sets of minutes existed. Mr. Kofol was aware that the LIBOR Notes had recently decreased in value and that insofar as the AHP partners accepted the Notes, they would accept the associated costs of acquiring the Notes. Kofol Tr. (6/21/00 p.m.) 37:24–46:24; Kofol Tr. (6/22/00 a.m.) 13:11–18:2; FOF 217, 219, 220, 242.

242. There was a letter from MLCS to Boca, dated "As of August 3, 1990," stating that the market value of the LIBOR Notes on August 3, 1990, was $217,082,000, a value that includes transaction costs. The valuation letter is Joint Exhibit 31D. JEX 31D. It is this value that is stated on what therefore must be the correct minutes of the August 3, 1990 meeting—Joint Exhibit 11. JEX 11. The second set of minutes sets forth a lesser value, DEX 10, but that value apparently does not include the embedded transaction costs of the LIBOR Notes that AHP agreed to accept upon distribution. Stip. ¶ 75. See Kofol Tr. (6/21/00 p.m.) 37–44; see Merrill Lynch 30(b)(6) Dep. (Taylor 3/10/98) 10:22–11:25; FOF 241.

243. The Partnership's LIBOR Notes decreased in value during the period ended August 3, 1990, by $3,688,000. This amount was allocated among the partners based on their partnership percentages established on July 20, 1990, as follows:

| | Partnership Percentages | | Amount |
|---|---|---|---|
| AHP | 49.3495467 | $ | 1,820,012 |
| AHP 10 | 5.4832830 | | 202,223 |
| Syringa | 38.1670588 | | 1,407,600 |
| Addiscombe | 7.0001115 | | 258,165 |
| | 100.0000000 | $ | 3,688,000 |

This is reflected in the partnership balance sheet as per August 3, 1990, before distri-

bution, which is Joint Exhibit 134. Stip. ¶ 76; JEX 134.

244. During the period the LIBOR Notes were owned by Boca, the LIBOR Notes decreased in value by $7,503,929 as a consequence of a decrease in interest rates. This decrease in value was shared by the partners as follows:

| | Acquisition Date Through May 31 | June 1 Through July 20 | July 21 Through August 3 | Total |
|---|---|---|---|---|
| AHP | $ 63,534 | $ 279,900 | $1,820,012 | $2,163,446 |
| AHP 10 | 7,059 | 31,100 | 202,223 | 240,382 |
| Syringa | 585,921 | 2,581,300 | 1,407,600 | 4,574,821 |
| Addiscombe | 49,415 | 217,700 | 258,165 | 525,280 |
| | $ 705,929 | $3,110,000 | $3,688,000 | $7,503,929 |

Under the Partnership Agreement, Syringa's and Addiscombe's shares of the decrease in value of the LIBOR Notes were fully borne by them. AHP's and AHP 10's share of the decrease in value was $2,303,822 out of $7,503,929. Addiscombe and Syringa bore the remainder, and no portion was shifted to the AHP partners.

| | LIBOR Notes | Cash | Total |
|---|---|---|---|
| AHP | $197,485,353 | $ 0 | $197,485,353 |
| AHP 10 | 19,596,647 | 2,264,432 | 21,861,079 |
| Syringa | 0 | 147,282,023 | 147,282,023 |
| Addiscombe | 0 | 27,596,125 | 27,596,125 |
| | $217,082,000 | $177,142,580 | $394,224,580 |

Stip. ¶ 72; JEX 11.

246. AHP had monitored the performance of the LIBOR Notes while they were in the Partnership. AHP was aware that the LIBOR Notes had decreased in value because of a decline in interest rates. Although interest rates had declined, the AHP partners wanted the LIBOR Notes because (1) the AHP partners believed there was at least an equal chance that interest rates would rise and there was a commensurate potential for profit, and (2) there was a potential tax benefit should the AHP partners sell or hold LIBOR Notes to maturity. JEX 11; Considine Tr. (9/12/00 p.m.) 10:9–24; Kofol Tr. (6/21/00 p.m.) 34:6–22.

247. When the AHP partners accepted the LIBOR Notes, they accepted the costs

JEX 128; JEX 131; JEX 132; JEX 134; Kofol Tr. (6/21/00 p.m.) 10:16–13:13, 27:19–28:18, 35:22–36:6.

245. When Boca assigned its rights and interests arising from the LIBOR Notes to AHP and AHP 10 on August 3, 1990, it distributed the LIBOR Notes and cash as follows:

associated with acquiring the LIBOR Notes. Because the AHP partners were taking the five year Notes with each of its 20 quarterly payments inuring to their benefit, they determined it was fair to accept the costs to the Partnership of acquiring such Notes. If the Notes had stayed in the Partnership, Boca would have borne these costs. JEX 229, at ¶ 11; Considine Tr. (9/12/00 p.m.) 16:10–20; Kofol Tr. (6/21/00 p.m.) 37:24–41:6, 44:1–5; den Baas Dep. (4/6/00) 49:7–50:9; FOF 216–221.

248. When the AHP partners accepted the LIBOR Notes, Mr. Considine and Mr. Kofol were aware of the interest rate environment. Considine Dep. (3/13/98) 138:16–23; Considine Tr. (9/12/00 p.m.) 10:9–24; Kofol Tr. (6/21/00 p.m.) 36:7–37:8.

249. When the LIBOR Notes were purchased in May 1990, the AHP partners did not know that they would be distributed to them in August 1990. Considine Tr. (9/12/00 p.m.) 9:10–20; Kofol Tr. (6/21/00 p.m.) 44:23–46:1.

250. When the AHP partners accepted the LIBOR Notes in distribution in August, 1990, they had no plan to sell them. AHP's Treasury Department continued to monitor the performance of the LIBOR Notes to determine whether they should be sold or held until maturity. Considine Tr. (9/12/00 p.m.) 10:25–11:11, 18:4–13; FOF 148.

251. On September 1, 1990, AHP and AHP 10 received the first quarterly payment under the LIBOR Notes of approximately $12 million. PEX 731; Nee Tr. (4/12/01) 71:8–72:25; 93:20–94:7; Ross Tr. (9/18/00 p.m.) 93:2–20.

252. The distribution of the LIBOR Notes to the AHP partners resulted in the AHP partners having a 100% interest in the LIBOR Notes. The AHP partners did not enter into any interest rate swaps or other hedging activity to reflect their increased exposure to interest rate sensitivity following the August 3, 1990 distribution. AHP's Treasury Department made the decision for economic reasons, believing that there was a prospect of profit on the LIBOR Notes due to the Notes' interest rate sensitivity. Considine Tr. (9/12/00 p.m.) 9:21–10:24; Kofol Tr. (6/21/00 p.m.) 34:20–35:8; 46:4–12.

253. As a result of the distribution of the LIBOR Notes to AHP and AHP 10, the capital accounts of AHP and AHP 10 were reduced by the reported value of the LIBOR Notes. The capital accounts of Syringa and Addiscombe were reduced by the amounts of the cash distributed. The partners' reported capital accounts and Partnership Percentages on August 3, 1990, following the distributions, were as follows:

| | Capital Account | Partnership Percentage |
|---|---|---|
| AHP | $ 553,126,553 | 49.0888664 |
| AHP 10 | 61,540,244 | 5.4615726 |
| Syringa | 433,242,041 | 38.4494463 |
| Addiscombe | 78,876,323 | 7.0001147 |
| | $1,126,786,161 | 100.0000000 |

This is reflected in the Partnership balance sheet as per August 3, 1990, after distribution, which is Joint Exhibit 135, and the amendment to the Partnership Agreement, dated August 3, 1990, which is Joint Exhibit 136. Stip. ¶ 77; JEX 135, JEX 136.

254. AHP and AHP 10 reported a basis in the LIBOR Notes equal to their reported tax basis in their partnership interests computed as follows:

| | AHP | AHP 10 | Consolidated |
|---|---|---|---|
| Initial Contribution | $135,000,000 | $ 15,000,000 | $150,000,000 |
| Portfolio Interest Income | 905,020 | 100,558 | 1,005,578 |
| Net Short Term Capital Gain | 64,968,646 | 7,218,738 | 72,187,384 |
| Purchase of Syringa's Partnership Interest | 615,863,216 | 68,429,246 | 684,292,462 |
| Total Tax Basis as of 7/20/90, 8/3/90 | $816,736,882 | $ 90,748,542 | $907,485,424 |

As a consequence, the reported tax bases in their partnership interests were reduced to zero. Stip. ¶ 78; see FOF 391, 392.

### 5. Further Reductions In Syringa's Interest

255. On August 29, 1990, Syringa sent a letter to AHP requesting a further reduction in its interest in Boca. JEX 13; Stip. ¶ 79.

256. An AHT was not required to authorize Syringa's request for a reduction because the AHP partners continued to own the same amount of assets and the same type of assets. As Mr. Considine testified, AHP "continued to own the same dollar amount of assets as it had the second before Syringa withdrew. [AHP] ended up owning a larger percentage of a smaller partnership. But in terms of dollars, we owned the same amount, so it had no impact on [AHP] . . . ." Because Syringa's reduction in interest would have no financial impact on AHP, the AHT system did not require an AHT in that instance. Considine Tr. (9/12/00 p.m.) 11:12–12:1.

257. On September 12, 1990, the Partnership Committee held a meeting during which the Partnership redeemed a portion of Syringa's interest at book value by distributing to it $245,038,806 in cash and $54,961,194 in marketable securities. Stip. ¶ 80; JEX 12.

258. During the period August 3, 1990 to September 12, 1990, Boca's net operating income was $9,787,042. This is reflected in the partnership balance sheets as per August 31, 1990, and as per September 12, 1990, before distribution, which are Joint Exhibits 135 and 138, respectively. Stip. ¶ 81; JEX 135, JEX 138.

259. Pursuant to Section 4.04(a) of the Partnership Agreement, the net operating income was allocated among the partners based on their Partnership Percentages established on August 3, 1990, as follows:

| | Partnership Percentages | Amount |
| --- | --- | --- |
| AHP | 49.0888664 | $4,804,348 |
| AHP 10 | 5.4615726 | 534,527 |
| Syringa | 38.4494463 | 3,763,063 |
| Addiscombe | 7.0001147 | 685,104 |
| | 100.0000000 | $9,787,042 |

This is reflected in the partnership balance sheet as per August 31, 1990, and September 12, 1990, which are Joint Exhibits 135

and 139, respectively. Stip. ¶ 82; JEX 135, JEX 139.

260. The partners' reported capital accounts and Partnership Percentages on September 12, 1990, following the distribution, were as follows:

| | Capital Account | Partnership Percentage |
| --- | --- | --- |
| AHP | $ 557,930,901 | 66.6924184 |
| AHP 10 | 62,074,771 | 7.4201242 |
| Syringa | 137,006,104 | 16.3770611 |
| Addiscombe | 79,561,427 | 9.5103963 |
| | $ 836,573,203 | 100.0000000 |

This is reflected in the partnership balance sheet as per September 12, 1990, after distribution, which is Joint Exhibit 139 and the amendment to the Partnership Agreement, dated September 12, 1990, which is Joint Exhibit 140. Stip. ¶ 83; JEX 139, JEX 140.

261. On October 17, 1990, Syringa sent a letter to AHP requesting a further reduction in its interest in Boca due to continuing financial needs. Syringa's letter is Joint Exhibit 16. Stip. ¶ 84; JEX 16.

262. On October 31, 1990, the Partnership Committee held a meeting during which the Partnership redeemed a portion of Syringa's interest at book value by distributing to it $95,363,916 in cash and $9,968,811 in marketable securities. Minutes of the meeting are Joint Exhibit 15. Stip. ¶ 85; JEX 15.

263. During the period September 12, 1990 to October 31, 1990, Boca's net operating income was $9,191,132. This is reflected in the partnership balance sheet as per October 31, 1990, which is Joint Exhibit 141. Stip. ¶ 86; JEX 141.

264. Pursuant to Section 4.04(a) of the Partnership Agreement, the net operating income was allocated by the partners based on their Partnership Percentages established on September 12, 1990, as follows:

| | Partnership Percentages | Amount |
|---|---|---|
| AHP | 66.6924184 | $6,129,789 |
| AHP 10 | 7.4201242 | 681,993 |
| Syringa | 16.3770611 | 1,505,237 |
| Addiscombe | 9.5103963 | 874,113 |
| | 100.0000000 | $9,191,132 |

This is reflected in the partnership balance sheet as per September 12, 1990, after distribution, which is Joint Exhibit 139. Stip. ¶ 87; JEX 139.

265. The partners' capital accounts and Partnership Percentages on October 31, 1990, following the distribution, were as follows:

| | Capital Account | Partnership Percentage |
|---|---|---|
| AHP | $564,060,690 | 76.1799852 |
| AHP 10 | 62,756,764 | 8.4757003 |
| Syringa | 33,178,614 | 4.4809830 |
| Addiscombe | 80,435,540 | 10.8633315 |
| | $740,431,608 | 100.0000000 |

These capital accounts reflected the partners' prior sharing of both operating income and the decrease in value of the LIBOR Notes in accordance with the Partnership Agreement, which is reflected in the partnership balance sheet as per October 31, 1990, after distribution, which is Joint Exhibit 142, and the amendment to the Partnership Agreement, dated October 31, 1990, which is Joint Exhibit 143. Stip. ¶ 88; JEX 142, JEX 143.

### 6. *Sale of LIBOR Notes*

266. The Treasury Department monitored the performance of the LIBOR Notes when they were owned by Boca and after they were distributed on August 3, 1990. Considine Tr. (9/12/00 p.m.) 10:9–11:1; Kofol Tr. (6/21/00 p.m.) 46:16–19.

267. The LIBOR Notes increased in value by $10,951,000 or approximately 5% from August 3, 1990, the date of distribution, to September 25, 1990. After that, the Notes fluctuated in value and then began a general downward trend that lasted approximately three years. PEX 721 (direct written testimony of Rahl) at 45–47; Kofol Tr. (6/21/00 p.m.) 54:24–55:21.[10]

268. AHP and AHP 10 had no expectation regarding when they might dispose of the LIBOR Notes. Considine Tr. (9/12/00 p.m.) 9:21–11:1, 16:21–18:13; Merrill Lynch 30(b)(6) Dep. (Taylor 3/10/98) 62:23–63:9.

269. Concerned about an increasingly unstable credit market and unstable interest rates and the volatility of the LIBOR Notes, AHP decided to sell the LIBOR Notes in late 1990. Mr. Kofol, Mr. Considine and possibly Mr. Blount were principally involved in the decision to sell the LIBOR Notes. AHP gave instructions to Merrill Lynch to find buyers for the LIBOR Notes for an appropriate price. Kofol Tr. (6/21/00 p.m.) 54:24–56:4; Considine Tr. (9/12/00 p.m.) 10:9–11:2, 16:12–17:13; AHP 30(b)(6) Dep. (Walsh 3/3/98) 223:16–224:8. Merrill Lynch 30(b)(6) Dep. (Taylor 3/10/98) 62:23–63:9.

270. On November 6, 1990, AHP 10 sold its LIBOR Note with a total reported basis of $90,748,542 for $17,703,145, reporting a short-term capital loss of $73,045,397. Stip. ¶ 89.

271. Also on November 6, 1990, AHP sold four LIBOR Notes with a total reported basis of $329,531,346 for $71,981,040, reporting a short-term capital loss of $257,550,306. Stip. ¶ 90.

272. On November 7, 1990, AHP sold an additional three LIBOR notes with a total reported basis of $325,064,843 for $71,782,478, reporting a short-term capital loss of $253,282,365. Stip. ¶ 91.

273. On November 8, 1990, AHP sold the final two LIBOR notes with a total

---

**10.** Leslie Rahl is an expert in the areas of risk management, financial engineering, valuation of complex instruments and new securities, and market practices. *See* FOF 301.

reported basis of $162,140,692 for $35,349,624, reporting a short-term capital loss of $126,791,068. Stip. ¶ 92.

274. The sales of the LIBOR Notes were the result of arms-length negotiations with the buyers, and there was no market to set the price. Merrill Lynch 30(b)(6) Dep. (Taylor 3/10/98) 63:22–64:24. The price for the LIBOR Notes was determined by reference to market conditions on the date of the sale transaction and was computed in accordance with standard market practices. Merrill Lynch 30(b)(6) Dep. (Taylor 3/10/98) 73:23–74:15.

275. If AHP had held the Notes, they would have lost as much as $70 million because of severely declining interest rates. PEX 721 (direct written testimony of Rahl) at 39–40; Rahl Tr. (9/15/00 a.m.) 37:22–38:7; Ross Tr. (9/18/00 p.m.) 95:6–8.

276. On its consolidated 1990 consolidated Federal income tax return, Form 1120, AHP reported the following on its Schedule D:

| | AHP | AHP 10 | Other Companies | Total |
|---|---|---|---|---|
| Short term cap gain from Form 1065 | $ 64,968,646 | $ 7,218,738 | $0 | $ 72,187,382 |
| Other short-term capital gain | 5,149,664 | 0 | 0 | 5,149,664 |
| Long-term cap. gain f/sale of Boyle–Midway | 99,807,436 | 0 | 505,297,147 | 605,104,583 |
| Other long-term capital gains | 9,058,240 | 0 | 996,102 | 10,054,342 |
| Other gains from Form 4797 | 0 | 0 | 1,098,828 | 1,098,828 |
| TOTAL CAPITAL GAINS | $178,983,986 | $ 7,218,738 | $507,392,077 | $693,594,801 |
| Short-term cap. loss f/sale of LIBOR Notes | (637,623,739) | (73,045,397) | | (710,669,136) |
| NET CAPITAL LOSS | | | | ( 17,074,335) |

Stip. ¶ 93.

277. The short-term capital losses generated from the sale of the LIBOR Notes offset AHP's long-term capital gain of $605,104,183 from the sale of Boyle–Midway (as well as other smaller gains). Stip. ¶ 94.

### 7. *Withdrawal Of Syringa from Boca*

278. On December 3, 1990, Syringa wrote to AHP requesting to withdraw from Boca because of its financial needs. Syringa's letter is Joint Exhibit 18. Stip. ¶ 95; JEX 18.

279. On December 17, 1990, a Partnership Committee meeting was held during which the Partnership redeemed the remainder of Syringa's interest in the partnership by distributing to it $33,524,207 in cash. Minutes of the meeting are Joint Exhibit 17. Stip. ¶ 96; JEX 17, JEX 150.

280. During the period October 31, 1990 to December 17, 1990, Boca's net operating income as reflected in its financial statement was $7,712,433. This is reflected in the partnership balance sheet as per December 17, 1990, after the change in partnership interest, which is Joint Exhibit 146. Stip. ¶ 97; JEX 146.

281. Pursuant to Section 4.04(a) of the Partnership Agreement, the net operating income was allocated by the partners based on their Partnership Percentages established on October 31, 1990, as follows:

| | Partnership Percentages | Amount |
|---|---|---|
| AHP | 76.1799852 | $5,875,330 |
| AHP 10 | 8.4757003 | 653,583 |
| Syringa | 4.4809830 | 345,593 |
| Addiscombe | 10.8633315 | 837,827 |
| | 100.0000000 | $7,712,433 |

This is reflected in the partnership balance sheet as per December 17, 1990, after distribution, which is Joint Exhibit 142. Stip. ¶ 98; JEX 142.

282. The partners' reported capital accounts and Partnership Percentages on December 17, 1990, following the distribution, were as follows:

| | Capital Account | Partnership Percentage |
|---|---|---|
| AHP | $569,936,020 | 79.7537365 |
| AHP 10 | 63,410,447 | 8.8733119 |
| Addiscombe | 81,273,368 | 11.3729516 |
| | $714,619,834 | 100.0000000 |

These capital accounts reflected the partners' prior sharing of both operating income and the decrease in value of the LIBOR Notes in accordance with the Partnership Agreement. This is reflected in the amendment to the Partnership Agreement, dated December 17, 1990, which is Joint Exhibit 149. Stip. ¶ 99; JEX 149.

### 8. Purchase of Addiscombe's Partnership Interest

#### a. AHP's Request

283. In the summer of 1991, AHP was in the process of reviewing a potential acquisition, Genetics Institute, and AHP wanted to use the funds in Boca to make the acquisition. There were sufficient funds in the Partnership for the acquisition, and AHP would not have to borrow for the acquisition if it could use these funds. Using the funds in Boca also made sense from a tax perspective, because AHP would not have to take funds out of tax-advantaged investments in Puerto Rico in order to acquire Genetics Institute. If AHP had taken the funds out of the Puerto Rican investments it would have had to pay a surtax to repatriate such funds. JEX 20; Considine Tr. (9/12/00 p.m.) 13:19–25; Kofol Tr. (6/21/00 p.m.) 51:22–52:10; Walsh Tr. (9/11/00 a.m.) 33:6–36:5.

284. The acquisition of Genetics Institute was not within the stated kind of investments allowed by the Partnership Agreement. Any decision of the partnership to invest had to be agreed to by 95% of the partnership. Accordingly, AHP needed consent from Addiscombe in order to use the Partnership's funds to acquire Genetics Institute. JEX 3, at 5.01–5.03, JEX 20; Walsh Tr. (9/11/00 a.m.) 36:14–37:1; FOF 283.

285. On July 25, 1991, AHP requested that the partners meet to discuss "a significant equity investment in which it anticipated using Boca's funds." Mr. den Baas, as consultant to Addiscombe, informed AHP that Addiscombe was reluctant to agree to the request. AHP's request is Plaintiffs' Exhibit 416. Stip. ¶ 103; PEX 416; Walsh Tr. (9/11/200 a.m.) 37:10–15.

286. Because of Addiscombe's reluctance to consent to the desired use of funds, AHP's Treasury Department sought and received authorization to purchase Addiscombe's interest in Boca on August 30, 1991. The AHT authorizing the buy-out approved up to a $3 million premium to be paid to Addiscombe for its investment in Boca. The AHT is Joint Exhibit 20. Stip. ¶ 104; JEX 20; Walsh Tr. (9/11/00 a.m.) 37:5–38:2.

287. The AHP partners were willing to pay a premium of up to $3 million for Addiscombe's interest in Boca because AHP wanted to use the funds in Boca to purchase Genetics Institute; AHP believed Addiscombe would not consent; and even if Addiscombe would agree to AHP's request, AHP did not want another partner having an interest in Genetics Institute. Considine Tr. (9/12/00 p.m.) 14:1–17; Considine Dep. (3/13/98) 158:16–159: 14; Blount Dep. (4/28/98) 122:10–123:3, 126:7–16; Walsh Tr. (9/11/00 a.m.) 37:16–38:2; 46:2–10.

#### b. Effect of Buy-Out

288. At a Partnership Committee meeting on September 13, 1991 in Toronto, Canada, the partners agreed that on September 17, 1991, AHP and AHP 10 would purchase Addiscombe's interest in Boca. Mr. Kofol and Mr. Walsh attended on behalf of the AHP partners. Mr. Verhoef represented Addiscombe via telephone conference. Mr. den Baas attended the

meeting in person to assist Mr. Verhoef in negotiating the price of the buy-out. During the meeting, the AHP partners agreed to purchase Addiscombe's interest for $87,496,250. This price reflected: (1) Boca's undistributed operating income; (2) Addiscombe's share of the decrease in value of the LIBOR Notes; and (3) a negotiated premium of $2.2 million above book value. The book value of Addiscombe's partnership interest was $85,296,250. Stip. ¶ 105; JEX 162; JEX 166; Walsh Tr. (9/11/00 a.m.) 38:11–46:1; Walsh Tr. (9/11/00 p.m.) 19:6–24:3; Considine Tr. (9/12/00 p.m.) 14:18–21.

289. There are two sets of minutes for the September 13 partnership meeting in Toronto. One set, DEX 331, was signed and apparently drafted by Mr. Walsh, while the other set, JEX 166, was signed and drafted by Mr. Verhoef. The existence of two sets of minutes appears to arise from confusion over who was the secretary of the meeting, Mr. Walsh or Mr. Verhoef. The sets of minutes are different in only minor respects that have nothing to do with the business that took place at the meeting. The only relatively substantive difference is the fact that Mr. Walsh's set, DEX 331, do not indicate the amount of the premium paid to Addiscombe. Since there is no dispute that a premium was paid and no evidence that AHP was trying to hide that fact—indeed, the September 3 AHT authorized a premium and the premium was eventually recorded in the books and records of AHP— Mr. Walsh's mistake or oversight is insignificant. Because Mr. Verhoef's minutes are more complete, the Court finds that his minutes, JEX 166, were the correct minutes for the September 13 partnership meeting in Toronto. Stip. ¶ 105; JEX 166; DEX 331; Walsh Tr. (9/11/00 a.m.) 38:11–43:19; Walsh Tr. (9/11/00 p.m.) 19:6–24:3; Considine Tr. (9/12/00 p.m.) 14:18–21.

290. The premium paid to Addiscombe was negotiated at arms-length at the time of payment between the representative of AHP and AHP 10 and the representative of Addiscombe. Neither the value of Boca's assets nor the premium payments were agreed to prior to the September 13, 1991 partnership meeting. AHP paid the premium because there were sufficient funds in the partnership to make the acquisition of Genetics Institute and because it would not have to borrow money or take funds out of Puerto Rican tax advantaged investments if it could use Boca assets for the Genetics Institute acquisition. At the time of the buyout, there was no tax benefit involved in AHP's purchase of Addiscombe's interest. JEX 229, at ¶ 13; Considine Tr. (9/12/00 p.m.) 14:18–21; Walsh Tr. (9/11/00 p.m.) 22:9–23:24; Nee Dep. (3/17/98) 226:10–227:2.

291. During the period December 17, 1990 to May 31, 1991, Boca's net operating income as reflected in its financial statements was $22,344,037. This is reflected in the partnership financial statements for the periods December 17, 1990–December 31, 1990, December 31, 1990–January 31, 1991, January 31, 1991–February 28, 1991, February 28, 1991–March 31, 1991, March 31, 1991–April 30, 1991, and April 30, 1991–May 31, 1991, which are Joint Exhibits 150 through 155. Stip. ¶ 100; JEX 150, JEX 151, JEX 152, JEX 153, JEX 154, JEX 155.

292. Pursuant to Section 4.04(a) of the Partnership Agreement, the operating income was allocated by the partners based on their Partnership Percentages established on December 17, 1990, as follows:

| | Partnership Percentages | Amount |
| --- | --- | --- |
| AHP | 79.7537365 | $17,820,204 |
| AHP 10 | 8.8733119 | 1,982,656 |
| Addiscombe | 11.3729516 | 2,541,177 |
| | 100.0000000 | $22,344,037 |

This is reflected in the partnership balance sheet as per December 17, 1990, after change in the partnership interest, which is Joint Exhibit 147. Stip. ¶ 101; JEX 147.

293. The partners' reported capital accounts and Partnership Percentages on May 31, 1991, were as follows:

| | Capital Account | Partnership Percentage |
|---|---|---|
| AHP | $587,756,224 | 79.7537365 |
| AHP 10 | 65,393,103 | 8.8733119 |
| Addiscombe | 83,814,544 | 11.3729516 |
| | $736,963,871 | 100.0000000 |

These capital accounts reflected the partners' prior sharing of both operating income and the decrease in value of the LIBOR Notes in accordance with the Partnership Agreement. This is reflected in the financial statements as of May 31, 1991, which is Joint Exhibit 155. Stip. ¶ 102; JEX 155.

294. During the period May 31, 1991 to September 17, 1991, Boca's net operating income was $13,028,332. This is reflected in the partnership balance sheet as per September 17, 1991, which is Joint Exhibit 161. Stip. ¶ 106; JEX 161.

295. Pursuant to Section 4.04(a) of the Partnership Agreement, the net operating income was allocated among the partners based on their Partnership Percentages established on May 31, 1991, as follows:

| | Partnership Percentages | Amount |
|---|---|---|
| AHP | 79.7537365 | $10,390,581 |
| AHP 10 | 8.8733119 | 1,156,045 |
| Addiscombe | 11.3729516 | 1,481,706 |
| | 100.0000000 | $13,028,332 |

This is reflected in the partnership balance sheet as of September 17, 1991 which is Joint Exhibit 155. Stip. ¶ 107; JEX 155.

296. The reported capital accounts and Partnership Percentages on September 17, 1991, following the distribution, were as follows:

| | Capital Account | Partnership Percentage |
|---|---|---|
| AHP | $674,903,222 | .899880318 |
| AHP 10 | 75,088,981 | .100119682 |
| | $749,992,203 | 100.000000000 |

This is reflected in the partnership balance sheet as per September 17, 1991, which is Joint Exhibit 161. Stip. ¶ 108; JEX 161. These capital accounts reflected the partners' prior sharing of both operating income and the decrease in value of the LIBOR Notes in accordance with the Partnership Agreement. Stip. ¶ 109.

297. After buying out Addiscombe, AHP used the funds in the Partnership to purchase a majority interest in Genetics Institute. The purchase price for Boca's interest in Genetics Institute was $666 million. Since then, the Partnership has acquired 100% of Genetics Institute. Considine Tr. (9/12/00 p.m.) 12:5–13:1; Considine Dep. (3/13/98) 157:21–158:4.

298. Since the buyout of Addiscombe, Boca has continued operating as a partnership with a principal place of business in Curacao. The partners, AHP and AHP 10, share the operating income of the Partnership pursuant to Section 4.04(a) of the Partnership Agreement. The partners' capital accounts reflect the partners' sharing of operating income. Boca is still administered by N.V. Fides, which is paid $10,000 a year. The partnership books and records are still audited by Arthur Andersen, Curacao. Each year, the Partnership files a partnership Federal income tax return with the IRS in Philadelphia, Pennsylvania. The Partnership has filed U.S. Federal and state income tax returns as a partnership for each year of its existence. Stip. ¶ 3; PEX 502A; PEX 503–505; Considine Dep. (3/13/98) 11:22–12:8; Nee Tr. (4/12/01) 97:16–98:4.

F. *Economic Relationship Among the Partners*

299. Based on the preceding findings of fact, the Court finds that: (1) AHP, AHP

10, Addiscombe, and Syringa all intended to, and did, organize Boca as a partnership to share the income, expenses, gains, and losses from Boca's investments; (2) Boca was properly formed as a general partnership under New York law, and each of its named partners, including Addiscombe and Syringa, was bound by such law; (3) the written Partnership Agreement was the only agreement between the AHP partners and Addiscombe and Syringa and there were no unwritten agreements, side agreements or commitments between the AHP partners and Addiscombe, Syringa, ABN Bank or ABN Trust; (4) there was no discussion or agreement between the AHP partners or their representatives and Addiscombe, Syringa, ABN Bank, ABN Trust, or their representatives concerning a specified return to Addiscombe or Syringa on their contributions to the Partnership; (5) the Partnership was formed for the purpose of making investments in notes, bonds, debentures, and other interest bearing instruments and sharing the profits and losses therefrom; and (6) all four partners shared the income, expenses, gains, and losses from the Partnership's assets in accordance with the Partnership Agreement. *See* FOF 61, 62, 79, 112, 117, 118, 207, 213, 215, 221, 243, 244, 259, 354–358.

### G. *Economic Substance of Plaintiffs' Transactions*

#### 1. *The Expert Witnesses*

300. Elizabeth A. Case, an expert witness called by plaintiffs, heads the National Partnership Tax Services Group of PricewaterhouseCoopers LLP, an international accounting firm that provides auditing, tax accounting, and consulting services to a variety of companies. Ms. Case has experience consulting with partnerships on tax accounting rules and maintenance of partnership capital accounts under Section 704(b) of the Internal Revenue Code. Ms. Case is an expert in tax accounting with an emphasis on partnership tax accounting. PEX 720 (direct testimony of Elizabeth Case) at 1–3; Case Tr. (9/14/00 a.m.) 11:13–16.

301. Leslie Rahl, an expert witness called by plaintiffs, is the President of Capital Markets Risk Advisors ("CMRA"), a consulting firm that specializes in risk management and complex capital market transactions. Ms. Rahl has been in the financial services industry for almost 30 years and is recognized as a pioneer in the swaps and derivatives business. She has been a trader, has managed traders with books of business in excess of $100 billion, and has worked with clients to review and update their risk management practices, to value individual transactions and portfolios, to set up independent risk assessment functions, and to vet models. She has dealt with the issues of valuation of complex instruments as head of the derivatives desk for Citibank and for clients. Ms. Rahl is an expert in the areas of risk management, financial engineering, valuation of complex instruments and new securities, and market practices. PEX 721 (direct testimony of Leslie Rahl) at 1–7; PEX 719.[11]

---

11. Even though defendant did not specifically object to Ms. Rahl's qualifications as an expert, Trial Tr. (9/15/00 a.m.) 80:23–25, and admitted that she might be "eminently qualified," Trial Tr. (9/15/00 a.m.) 81:12, defendant moved to exclude all written and oral testimony given by Ms. Rahl at trial regarding whether Boca and or AHP had a reasonable prospect for profit, arguing that her methodology was wrong and that her analysis was simplistic with respect to this issue. *See* Trial Tr. (9/15/00 a.m.) 78:20–82:21, 86:13–87:19. The Court saw no reason to exclude any of Ms. Rahl's testimony and denied the motion *See* Trial Tr. (9/15/00 a.m.) 88:23–94:5.

302. Tanya Beder, an expert witness hired by plaintiffs, was a Principal of CMRA and a partner of Ms. Rahl's until the summer of 1999. She had 21 years of experience in the financial markets as a trader, manager and analyst at large Wall Street financial institutions and as a consultant to the financial industry. Ms. Beder is an expert in the areas of risk management, financial engineering, valuation of complex instruments and new securities, and market practices. Ms. Beder issued an expert report and an amendment to the report in which she offered her opinion regarding certain issues in this case. Pretrial Hearing Tr. (5/31/00) 3:24–4:20, 8:15–9:12; PEX 575, at 2, 5.

302a. Because Ms. Beder left CMRA after issuing her report and after being deposed, but before trial, Ms. Rahl was asked if she could render opinions with respect to the questions that had been posed to CMRA and Ms. Beder. After reviewing Ms. Beder's report and independently evaluating the merits of the opinions rendered therein, Ms. Rahl adopted the report and issued an addendum to it explaining the calculations and analyses done to satisfy herself that she was in agreement with Ms. Beder's opinions and conclusions. Ms. Rahl's and CMRA's expert opinion in this case therefore consists of Plaintiffs' Exhibit 575 (the report initially issued by Ms. Beder, then adopted by Ms. Rahl), Plaintiffs' Exhibit 719 (Ms. Rahl's addendum to the report), Plaintiffs' Exhibit 721 (written direct testimony of Ms. Rahl), and the trial testimony of Ms. Rahl. See PEX 721 (direct testimony of Ms. Rahl) at 9–12.

303. Gifford Fong was called by plaintiffs to rebut the testimony of all three of defendant's experts. Mr. Fong is the President of Gifford Fong Associates, an investment consulting firm specializing in fixed income, asset allocation, derivatives product valuation, and risk analysis. His areas of emphasis are independent valuation, model validation, and portfolio strategy. Mr. Fong is an expert in the areas of corporate finance, valuation, financial engineering, and risk management. Fong Tr. (9/21/00 a.m.) 3:5–11:19, 24:18–19; PEX 576.

304. David J. Ross, an expert called by defendant, is the Senior Vice President of Lexecon Inc., a consulting firm that specializes in the application of economics to a variety of legal and regulatory issues. At Lexecon he has specialized in the areas of financial economics and the economics of corporate law and has published several articles in these areas. Mr. Ross is an expert in financial economics, corporate finance, and valuation. DEX 342 (direct testimony of David Ross) ¶ 1.

305. Alan Tucker, an expert witness called by defendant, is an Associate Professor of Finance at the Lubin School of Business at Pace University and an Adjunct Professor at the Stern School of Business at New York University, where he teaches graduate courses in derivative instruments and fixed income markets. Dr. Tucker is also a Principal of Marshall, Tucker & Associates, LLC, a financial engineering and derivatives consulting firm. He is an expert in corporate finance and financial engineering. DEX 343 (direct testimony of Alan Tucker)

306. Richard Leftwich was called by defendant as a rebuttal witness. Dr. Leftwich is the Fuji Bank/Heller Professor of Accounting and Finance at the Graduate School of Business at the University of Chicago. His research at the University of Chicago involves the effect of information on securities prices, a topic on which he has published numerous articles. He has taught or is teaching graduate classes in the MBA program in accounting, investments and financial analysis, and Execu-

tive Education classes on investment analysis, financial instruments and corporate finance. Dr. Leftwich is an expert in finance, financial instruments, corporate finance and investment analysis. DEX 255 (direct testimony of Richard Leftwich), at ¶¶ 1–2.

307. The Court has carefully considered the testimony of the experts offered by both plaintiffs and defendant. The Court found plaintiffs' experts, particularly Ms. Rahl and Mr. Fong, to be particularly credible regarding their analyses of whether Boca and AHP had a reasonable prospect for profit and regarding the proper *ex ante* analysis to be applied in this case. The Court also credits the expert testimony of Ms. Case, particularly as it relates to the treatment of the partners' capital accounts and installment sale gain. Dr. Tucker's testimony was also quite helpful and credible. On the other hand, much of the testimony of Mr. Ross and Dr. Leftwich is either irrelevant, based on facts or assumptions contrary to the facts found by the Court herein, or so theoretical on some points as to add little to an understanding of the other evidence in this case.

2. *Boca's Ownership of the PPNs*

a. *Benefits of Ownership*

308. The PPNs were purchased at on-the-market prices for arms-length transactions relative to deals of their kind at the time and were executed in accordance with standard market practices. The price the partnership paid for the PPNs was an appropriate price. PEX 721 (written testimony of Rahl) at pp. 17, 21; Ross Tr. (9/18/00) 7:19–23.

309. Boca possessed the benefits of owning the PPNs, chief among them accrued interest. Boca accrued $6,883,106 of interest from the PPNs, which was allocated among Boca's four partners and reflected in their capital accounts. Boca in-cluded the interest income from the PPNs in taxable income. Stip. ¶ 58; JEX 128; PEX 502A, PEX 503–506; FOF 204, 205

310. The price paid by the AHP partners to Syringa for a portion of Syringa's partnership interest and to Addiscombe for Addiscombe's partnership interest reflected the allocation of Boca's interest income, including the interest from the PPNs, to Syringa's and Addiscombe's capital accounts, respectively. The amount of the redemption payments made by Boca to Syringa and Addiscombe reflected the allocation of Boca's interest income. Stip. ¶¶ 66, 71, 101, 102, 107; JEX 131, JEX 132, JEX 134, JEX 135; JEX 147, JEX 155, JEX 229, at ¶ 12; FOF 226, 231, 232, 288, 292, 293, 295.

b. *Risks of Ownership*

311. Boca also possessed the burdens and risks of owning the PPNs, including the credit, default, credit downgrade, liquidity and interest-rate risks. Considine Tr. (9/12/00 a.m.) 52:14–57:5; Kofol Tr. (6/21/00 a.m.) 47:3–50:4.

312. Credit risk reflects the possibility that a borrower will not make a scheduled interest or principal payment. Credit risk, which in this case depended on the creditworthiness or credit rating of the PPN issuers, is significant even on short-term instruments as changes in credit quality can change overnight. Boca experienced credit risk while it owned the PPNs. PEX 725; Rahl Tr. (9/15/00 a.m.) 57:11–58:19; Fong Tr. (9/21/00 a.m.) 50:19–59:23; Kofol Tr. (6/21/00 a.m.) 17:12–18:11, 19:22–21:9, 48:11–49:5; Tucker Tr. (9/20/00 p.m.) 11:1–14; Tucker Tr. (9/21/00 a.m.) 11:9–14; den Baas Dep. (4/6/00) 195:20–196:23. The credit risk with respect to the PPNs was real, was of concern to all of the partners, including Syringa and Addiscombe, and was shared by all four partners. If the credit of any of the private placement issuers had deteriorated during the period

Boca owned the PPNs so that the value of the PPNs decreased, all four of the partners would have shared this decrease proportionately. JEX 3 at § 4.02–4.04; Considine Tr. (9/12/00 a.m.) 45:12–46:8, 50:9–50:25, 54:2–5; Kofol Tr. (6/21/00 a.m.) 48:22–50:4; den Baas Dep. (4/6/00) 160:6–14, 162:15–21, 174:8–17, 177:7–20; Fong Tr. (9/21/00 a.m.) 50:19–59:23; Tucker Tr. (9/20/00 p.m.) 6:18–8:1.

313. Default risk reflects the possibility that the borrower will not make a scheduled investment or principal payment. All four partners were exposed to the risk, albeit minimal, that the issuers of the PPNs would default. Kofol Tr. (6/21/00 a.m.) 17:6–19; Tucker Tr. (9/20/00 a.m.) 31:23–32:11; Tucker Tr. (9/20/00 p.m.) 9:2–11. Syringa's and Addiscombe's default risk was greater than AHP's prior to July 20, 1990; thereafter, all of the partners shared the risk in proportion to their Partnership Percentages. JEX 3, at § 4.04(d); Nee Tr. (6/20/00 a.m.) 52:20 53:7; den Baas Dep. (4/6/00) 176:6–177:6.

314. A corporation's debt instrument can be downgraded by Standard & Poor's or Moody's. If a debt instrument is downgraded, its value will be reduced and its spread to Treasuries will be increased. Fong Tr. (9/21/00 a.m.) 52:3–7; Kofol Tr. (6/21/00 a.m.) 48:11–50:4. Boca was exposed to this type of downgrade risk with respect to the PPNs. Tucker Tr. (9/20/00 a.m.) 32:3–33:22.

315. Liquidity risk is the risk that the owner of an instrument cannot convert the instrument into cash at its fair market value. The PPNs were not registered under the Securities Act of 1933 and were not traded on an established securities market, making them relatively illiquid. Stip. ¶ 46; Kofol Tr. (6/21/00 a.m.) 13:24–14:4.

316. Interest rate risk is exposure to accounting or opportunity loss as a result of a relative or absolute change in interest rates. Since the PPNs were floating-rate notes, Boca's interest income from the PPNs depended on the LIBOR rate or the Commercial Paper rate on the interest reset dates for the PPNs. Depending on LIBOR and the Commercial Paper rate, the amount of interest from the PPNs could be more or less. Boca bore the risk that the floating-rate PPNs would produce less interest income. JEX 114, PEX 561–563, PEX 575 at 68.

317. Neither Boca nor its partners hedged against the credit, default, credit downgrade, credit spread, liquidity and interest rate risks with respect to the PPNs. den Baas Dep. (4/6/00) 175:16–21; Tucker Tr. (9/20/00 p.m.) 7:18–19. Boca had all of the benefits, such as interest income, and all of the burdens, such as credit risk, of owning the PPNs. Considine Tr. (9/12/00 a.m.) 52:14–57:5; FOF 169, 170.

318. There were substantial economic effects from Boca's ownership of the PPNs separate and apart from tax consequences. Considine Tr. (9/12/00 a.m.) 37:24–38:6; Fong Tr. (9/21/00 a.m.) 51:1–59:23.

### 3. Boca's Ownership of the LIBOR Notes

319. The Partnership also was exposed to credit risk, default risk, risk of credit downgrade, and credit spread risk with respect to the LIBOR Notes. den Baas Dep. (4/6/00) 196:18–23; Pepe Dep. (5/7/98) 196:6–16; Tucker Tr. (9/20/00 p.m.) 6:18–8:1, 17:25–18:3. Boca had all the benefits, such as interest income, and all of the burdens, such as credit risk, of owning the LIBOR Notes. Kofol Tr. (6/21/00 p.m.) 2:19–4:17; Kofol Tr. (4/12/01) 47:10–17; Tucker Tr. (9/20/00 p.m.) 17:25–18:3.

320. The LIBOR Notes required the issuers to make 20 quarterly payments, starting on September 1, 1990, equal to three-month LIBOR multiplied by stated

notional amounts. PEX 564–PEX 573; FOF 148. The value of the contingent LIBOR Notes depended, in part, on the LIBOR Note issuer's credit quality. If the creditworthiness of these institutions had improved, then the value of the LIBOR Notes would have increased. On the other hand, if the creditworthiness of the LIBOR Note issuers had declined, the value of the notes would have fallen. This credit risk was real and was of concern to all four partners. PEX 575 at 29; Rahl Tr. (9/15/00 a.m.) 57:11–58:19; Kofol Tr. (6/21/00 a.m.) 48:11–49:5; Pepe Dep. (5/7/98) 196:6–16; Tucker Tr. (9/20/00 p.m.) 17:25–18:3.

321. The LIBOR Notes were not registered under the Securities Act of 1933 nor were they traded on an established securities market and thus could only be sold in a private sale. They therefore were less liquid than publicly traded debt instruments. PEX 564–PEX 573; Merrill Lynch 30(6)(b) Dep. (Taylor 3/10/98) 63:22–64:3; FOF 322–323, 339–348. Boca bore the liquidity risk with respect to the LIBOR Notes when they were owned by Boca. The AHP partners assumed that risk when Boca distributed the Notes to them. FOF 201.

322. The LIBOR Notes were extremely interest-rate sensitive and volatile. If interest rates went up, the projected payments under the LIBOR Notes would increase and the value of the notes would increase significantly. Similarly, the value of the notes would decrease significantly if interest rates went down. PEX 721 (written testimony of Rahl) at 18,32,35,42,44; Leftwich Tr. (9/19/00 p.m.) 39:25–43:9; 49:10–16; den Baas Dep. (3/11/98) 71:17–73:20, 133:21–134:20; den Baas Dep. (4/6/00) 173:17–176:10; Pepe Dep. (5/7/98) 196:6–197:12; Ross Tr. (9/18/00) 32:23–33:9, 55:21–56: 5.

323. If interest rates went up, an investor holding a LIBOR Note could earn a profit by either holding the LIBOR Note and receiving larger quarterly payments or selling the LIBOR Note at a price reflecting its higher value. Fong Tr. (9/21/00 p.m.) 3:15–5:9; Considine Tr. (9/12/00 a.m.) 56:23–57:5; Considine Dep. (4/12/99) 68:22–69:2; Kofol Tr. (6/21/00 a.m.) 58:23–59:1; Leftwich Tr. (9/19/00 p.m.) 42:25–43:11; 49:10–16.

324. During 1990, LIBOR Notes did fluctuate significantly in value as interest rates changed. Mr. Taylor, who monitored interest rate changes on a daily basis as part of his profession, observed that interest rates moved as much as 10 to 20 basis points in a day during 1990. Merrill Lynch 30(b)(6) Dep. (Taylor 3/10/98) 165:16–22.

325. From May 31 to July 20, 1990, the five year swap rate fell 32 basis points, and Merrill Lynch calculated that the LIBOR Notes' value fell by $3,110,000. From July 20 to August 3, 1990, the five year swap rate fell 22 basis points, and Merrill Lynch calculated that the LIBOR Notes' value fell by $3,688,000. From August 3 to August 24, 1990, CMRA calculated that the five year swap rate increased 59 basis points, and the LIBOR Notes' value increased by $10,951,000. In a two week period, the LIBOR Notes went down in value approximately $3.7 million, and, in a three week period thereafter, the Notes went up almost $11 million in value. JEX 31A–D; PEX 721 (written testimony of Rahl) at 45–46.

326. The opportunity for Boca and its partners to make a profit by holding the LIBOR Notes depended on market conditions, including interest rates and the credit quality of the LIBOR Note issuers. PEX 721 (written testimony of Rahl) at 35; Fong Tr. (9/21/00 a.m.) 59:24–64:5; Fong Tr. (9/21/00 p.m.) 2:24–8:18, 12:10–21.

#### 4. *Prospects for Profit on Investments*

327. For the reasons that follow, the Court finds that Boca had the potential to make significant amounts of money as a result of its holdings in the PPNs and the LIBOR Notes, and that AHP had the potential to make or lose significant amounts of money as a result of its holdings in Boca. There was a reasonable prospect for profit given the sensitivity of the LIBOR Notes to fluctuations in interest rates. In particular, the LIBOR Notes, which increased in value as interest rates went up and decreased in value as interest rates went down, were extremely volatile. Because of the sensitivity of the LIBOR Notes' value to fluctuations in interest rates, and the real possibility of interest rate movements, there was a significant possibility for the holder of those Notes to make or lose substantial amounts of money, and there was a reasonable prospect for profit. PEX 721, (written testimony of Leslie Rahl) at 18, 32, 35–36, 49–56; PEX 521 (report of Gifford Fong) at 18–60.

328. Representatives of AHP testified that when the AHP partners invested in Boca, they expected that they would make a profit from their investment. There was no testimony that this was not their expectation, and the Court finds that it was. Considine Dep. (4/12/99) 92:14–93:14; Blount Dep. (4/28/00) 130:21–131:9, 131:21–132:5; Kofol Tr. (9/21/00 a.m.) 39:17–23.

329. Defendant's experts, David Ross, Richard Leftwich and Alan Tucker, opined that AHP could not have had any reasonable expectation of earning a profit from its investments in Boca because (1) the direct and indirect costs of the Boca transactions—in particular the lost opportunity costs and certain transaction costs—were so large, and (2) interest rates would have had to increase substantially before AHP could have realized a profit. DEX 342 (direct testimony of Ross) ¶ 19–29; DEX 255 (report of Richard Leftwich) at 4; DEX 343 (direct testimony of Tucker) at 7–10. The Court rejects this testimony insofar as it was based on a consideration of lost opportunity costs and instead credits the testimony of plaintiffs' experts, who discounted any consideration of lost opportunity costs in their prospect-for-profit analysis.

330. In October 1990, AHP had invested $623 million in the Partnership with a rate of return of 6.007%. In October 1991, AHP had invested $657 million in the Partnership with a rate of return of 5.54%. PEX 488; Nee Tr. (6/20/00 a.m.) 30:23–31:11.

331. As of September 17, 1991, AHP had made a profit of $33,073,640 on its investment in Boca. This was calculated as follows, including transaction costs:

| | |
|---|---:|
| Contribution to Boca | ($ 60,000,000) |
| Contribution to Boca | ( 90,000,000) |
| Purchase of partnership interest from Syringa | ( 684,292,462) |
| Boca distribution | 2,264,432 |
| Quarterly payment under LIBOR Notes | 12,789,429 |
| Sales of LIBOR Notes | 196,816,288 |
| Purchase of partnership interest from Addiscombe | ( 87,496,250) |
| Value of Boca | 749,992,203 |
| Merrill Lynch fee | ( 7,000,000) |
| Profit | $ 33,073,640 |

JEX 128–JEX 132; JEX 134–JEX 135; JEX 138–JEX 139; JEX 141–JEX 142; JEX 146–JEX 148; JEX 150–JEX 158; JEX 161–JEX 164; PEX 731; Nee Tr. (4/12/01) 69:12–22, 71:8–72:25, 93:4–12;

93:20–94:12, 95:10–96:22, 96:25–97:15; Ross Tr. (9/18/00 p.m.) 93:2–20.

332. Defendant argues that AHP cannot be said to have made a profit of $33 million dollars because the foregoing analysis failed to take account of lost opportunity costs and certain transaction costs. Specifically, based primarily on the testimony of Mr. Ross and Dr. Tucker, it argues that the premiums paid to Syringa and Addiscombe when they purchased their interests—$2.5 million and $2.2 million, respectively—and certain other funding and transaction costs, along with lost opportunity costs meant that AHP actually incurred substantial losses, not profits, on these transactions. DEX 342 (written testimony of Ross) at 10–11; DEX 343 (written testimony of Tucker) at 1–2; DEX 255 (report of Leftwich) at 4. Among the opportunity costs suggested is the loss of interest income that would have been earned if the funds had been otherwise invested as, for example, in short term money market instruments. DEX 342 at 11; DEX 343 at 3–5, 9–10, and Appendix 2. *See* FOF 349.

333. Alternatively, defendant argues that even if AHP did make a profit its return on investment was very poor based on the amount invested. Specifically, Mr. Ross testified that AHP earned a "poor rate of return," Ross Tr. (9/18/00 p.m.) 93:2–94:11, and Dr. Leftwich testified that $33 million would be an "abysmal rate of return." 48:1–20. Defendant also suggests that plaintiffs' calculation of profit ignores fundamental concepts of present value. Ross Tr. (9/18/00 p.m.) 50:14–51:4, 54:16–55–10.

334. The Court finds that this $33 million profit takes into account all relevant transaction costs and that lost opportunity cost is not an appropriate consideration. Fong Tr. (9/21/00 a.m.) 26:15–32:12; *see* FOF 216–221. Furthermore, neither the premiums paid to Addiscombe and Syringa or the $7 million fee paid to Merrill Lynch were costs related to these transactions. *See* FOF 349, 350.

335. Not only did the AHP partners actually realize a profit from their strategy of selling the PPNs and investing in the highly volatile LIBOR notes, independent of tax benefits, but the Court finds that the AHP partners had a reasonable prospect of generating a profit from the outset. It is true that AHP could have made a lot more money had interest rates not fallen. But if interest rates had risen, AHP could have had a profit greater than $33 million. As it happened, if AHP had held on to the LIBOR Notes longer, it would have had a smaller profit. PEX 731; Nee Tr. (4/12/01) 69:12–22, 71:8–72:25, 93:4–12; 93:20–94:12, 95:10–96:22, 96:25–97:15; Ross Tr. (9/18/00 p.m.) 93:2–20. The Court finds that both Boca and the AHP partners had a reasonable possibility of profit on its investments. The Court bases this finding primarily on the testimony of expert witnesses Leslie Rahl and Gifford Fong which the Court credits as rational and reliable. FOF 336–348; PEX 721 (written testimony of Rahl) at 18, 32,-35,42,44; Fong Tr. (9/21/00 p.m.) 2:3–8:13; Fong (9/21/00 a.m.) 59:24–64:5.

336. Investment profit quantifies the change in wealth associated with a particular investment. Investment profit is the gain in value minus the out-of-pocket costs. It does not include lost opportunity costs. The Court finds that investment profit is the appropriate measure to determine the prospect for profit on the LIBOR Notes. Fong Tr. (9/21/00 a.m.) 26:15–28:16.

337. With respect to the LIBOR Notes, the gain in value is the sum of (1) the quarterly payments that occur over time, and (2) the change in the value of the Notes due to the movement of interest rates. To determine prospect for profit,

one then subtracts out-of-pocket costs, *i.e.,* those out-of-pocket or transaction costs *directly* associated with the LIBOR Notes. Fong Tr. (9/21/00 a.m.) 26:15–23; *see* FOF 216–221.

338. By contrast, the term "economic profit," as used by defendant's experts, is investment profit minus opportunity costs. Opportunity costs represent the next best alternative in which one could otherwise have invested, as compared to the investment that was actually made. By this analysis, one can have an investment profit but no economic profit. Conversely, one can have an economic loss but not an investment loss. As Mr. Fong explained, the concept of economic profit is used in the corporate finance area to compare capital budgeting alternatives. Economic profit is a means to determine the best alternative; but it does not measure the change in wealth associated with a particular investment.

339. The Court finds that economic profit is not the appropriate measure of profit when analyzing the profitability, or prospect for profit of, the LIBOR Notes. Defendant's experts' analysis was fundamentally flawed because it focused on economic profit—and lost opportunity costs in particular—rather than on the proper measure to determine prospect for profit, investment profit. Fong Tr. (9/21/00 a.m.) 26:15–30:24; 31:21–32:12; *see* Ross Tr. (9/18/00) 54:7–19.

340. Both the lay witnesses and the experts presented by plaintiffs and by defendant agreed that LIBOR notes are extremely volatile instruments. PEX 721 (written testimony of Rahl) at 18, 32, 35, 42, 44; Leftwich Tr. (9/19/00 p.m.) 39:25–43:9; 49:10–16; den Baas Dep. (3/11/98) 71:17–73:20, 133:21–134:20; den Baas Dep.

(4/6/00) 173:17–176:10; Pepe Dep. (5/7/98) 196:6–197:12; Ross Tr. (9/18/00) 32:23–33:9, 55:21–56: 5; FOF 174, 198, 322, 327, 341. The witnesses disagreed, however, with respect to the impact this volatility had on AHP's prospect for making a profit.

341. Because LIBOR Notes are so volatile, are not traded on a public market and do not have a listed price, some experts testified that the use of economic models is an appropriate way to calculate both the value of such an instrument and its potential for profit. Once the model results in a value for an instrument, it is necessary to analyze the range of possible outcomes that give rise to that value. Fong Tr. (9/21/00 a.m.) 32:14–36:8.

342. In determining potential future values of the LIBOR Notes, it is necessary to analyze the possible outcomes that are in fact associated with the LIBOR Notes. In order to understand the possible outcomes, one has to apply an interest rate model that will allow one to evaluate the behavior of interest rates in order to quantify the range of possible values. Fong Tr. (9/21/00 a.m.) 34:19–36:17.

343. Using an interest rate model projecting 20,000 possible interest rate scenarios to simulate potential interest rate fluctuations as of May 24, 1990 and May 29, 1990, and taking into account relevant transactions costs, CMRA's results showed that Boca and AHP would have a profit on the LIBOR Notes 75% of the time with a wide range in profit potential. PEX 575, at 48–52, 54, n. 7–8, 71; PEX 721 (written testimony of Rahl) at 47, 49–50, 53; *see* Tucker Tr. (9/20/00 a.m.) 57:13–58:13.[12]

344. Using an alternative approach, Ms. Rahl and CMRA also showed what

---

12. In making these calculations, CMRA took into account transaction costs of $13.04 million on the sale of the PPNs for cash and

LIBOR Notes and 1.39 percent of the potential sale value of the LIBOR Notes. PEX 575, at 54 n. 7–8, 71; PEX 721, at 49–50.

would have happened if Boca had made the same investment 3 years and 7 months earlier. Based on how interest rates actually moved over that period, Boca would have made more than $100 million in profit over the period. PEX 721 (written testimony of Rahl) at 50–52.

345. Ms. Rahl also testified about what would have happened if AHP had held the LIBOR Notes until December 31, 1993. Taking into account direct transaction costs and the income from the PPNs, her model projected profit and loss over the period ended December 31, 1993. CMRA's results showed that because interest rates began to decline after late August, 1990, and continued to decline thereafter, AHP would have lost more than $70 million had it held the Notes instead of selling when it did. When AHP sold the LIBOR Notes in October 1990, interest rates were falling. PEX 721 (written testimony of Rahl) at 46–47; *see also* Leftwich Tr. (9/19/00 p.m.) 49:25–51:22.

346. Mr. Fong agreed with Ms. Rahl that the probability of the future outcomes could be modeled. Mr. Fong opined that in a case where there is no likelihood of the value remaining the same from one month to the next (as both Mr. Tucker and Mr. Ross agreed was the case here), one can and should use modeling to replicate possible interest rate scenarios and the range of possible outcomes. Fong Tr. (9/21/00 a.m.) 32:14–36:17; 61:3–64:7; Fong Tr. (9/21/00 p.m.) 12:10–14.

347. Using a particular model, the Monte Carlo simulation, which he testified is standard practice within the financial industry, Mr. Fong calculated a range of possible outcomes from the investment in the LIBOR Notes as of May 24, 1990.[13] The simulation indicates that two years

after May 24, 1990, there was a 10% chance of the holder of the Notes receiving something greater than $308 million in profit and a 50% chance of receiving something greater than $248 million in profit. Because of the volatility of the Notes, the range of outcomes is very wide. According to Mr. Fong, there are many situations in which the AHP partners would make a profit and some situations where their profit would be substantial. PEX 726; Fong Tr. (9/21/00 p.m.) 7:9–8:14.

348. Mr. Fong agreed with Ms. Rahl that the $7 million fee paid to Merrill Lynch was properly allocated because it did not relate to the specific PPN and LIBOR Note sale transactions. It related, instead, to Boca's overall portfolio and therefore should not be considered as a transaction cost in analyzing prospect for profit on the LIBOR Notes. Fong Tr. (9/21/00 a.m.) 36:17–40:9; Rahl Tr. (9/15/00 a.m.) 41:14–20, 42:13–19. The Court agrees. *See* FOF 68–70.

349. Dr. Tucker testified that the following should have been considered as transaction costs: (1) the $7 million fee paid to Merrill Lynch; (2) transaction costs of about $12.24 million in connection with the PPN/LIBOR Note Sale and purchase; (3) the $2.5 million premium paid to Syringa; (4) the $2.2 million paid to Addiscombe; and (5) a $500,000 advisory fee paid to ABN. In addition he would consider foregone interest income on capital invested in the LIBOR Notes of $5.12 million. DEX 343 (Tucker Testimony) at 23. Mr. Ross agreed with this analysis. DEX 342 (Ross Testimony) at 11. For the foregoing reasons, the Court rejects this testimony, finding that only the *direct* transaction costs of about $13 million were

---

**13.** The analysis performed by CMRA also includes Monte Carlo simulations with the different interest rate assumptions. PEX 721 (direct testimony of Rahl) at 36.

appropriate for consideration and were properly considered.

350. In sum, the Court credits the testimony of Ms. Rahl and Mr. Fong and finds that the credible expert testimony supports the view of the AHP witnesses (1) that it was reasonable to believe that AHP could make a profit on the volatile LIBOR notes, PEX 575, at 48–52, 54 nn. 7 & 8, 71; PEX 721 (written testimony of Rahl) at 18, 32, 35, 42–53; PEX 726; Fong Tr. (9/21/00 a.m.) 32:14–36:17; 61:3–64:7; Fong Tr. (9/21/00 p.m.) 7:9–8:14; 12:10–14; and (2) that lost opportunity costs, the premiums paid to Syringa and Addiscombe, and the $7 million fee paid to Merrill Lynch all were properly excluded from consideration in doing the profitability analysis. *See* FOF 217–220, 227–229, 241–242, 286–287, 289–290, 334–339.

5. *Addiscombe's and Syringa's Profits*

351. Syringa's economic profit from its investment in Boca was $25,431,419, as follows:

| Contribution | <$1,245,000,000> |
|---|---|
| Cash on sale of partnership interest to AHP | 684,292,462 |
| Proceeds from redemption by partnership | 586,138,957 |
| | $ 25,431,419 |

Stip. ¶¶ 72, 80, 85, 96.

352. Addiscombe's economic profit from its investment was $10,092,375 as follows:

| Contribution | <$ 105,000,000> |
|---|---|
| Proceeds from redemption by partnership | 27,596,125 |
| Cash on sale of partnership interest to AHP | 87,496,250 |
| | $ 10,092,375 |

FOF 150, 245, 288.

6. *Absence of Debtor/Creditor Relationship*

353. Under the terms of the Partnership Agreement, a partner could not unilaterally cause the Partnership to redeem its interest prior to June 1, 1995. JEX 3, at §§ 2.05, 8.02; Article VII.

354. Based on the testimony and documentary evidence before it, the Court finds that there was no debtor-creditor relationship between the AHP partners and the foreign partners or between the AHP partners and ABN Bank. JEX 3, at §§ 2.05, 4.04, 4.06, 5.01–5.03, 8.02; JEX 5; JEX 8; JEX 9; JEX 11; JEX 12; JEX 15; JEX 17; Considine Tr. (9/12/00 a.m.) 45:15–23, 46:20–47:5, 50:9–51:3; Nee Tr. (6/20/00 p.m.) 46:15–22, 55:19–56:8; Nee Tr. (4/12/01) 65:20–66:24, 67:1–14; Kofol Tr. (4/12/01) 46:24–47:5; den Baas Dep. (4/6/00) 169:15–173:5, 192:19–25; Tucker Tr. (9/20/00 a.m.) 34:8–35:3; FOF 110, 112–114, 126, 139, 358.

355. There were no agreements or commitments to establish a loan, and the foreign partners had no creditors' rights against Boca or the AHP partners. JEX 3, at §§ 4.04, 4.06; Nee Tr. (4/12/01) 67:7–14; Kofol Tr. (4/12/01) 46:24–47:5; den Baas Dep. (4/6/00) 170:21–173:5; Considine Tr. (9/12/00 a.m.) 50:9–21; FOF 110, 113–114, 126.

356. The AHP partners did not execute any documentation that could be characterized as a loan from ABN Bank, Addiscombe or Syringa. The only agreement was the Partnership Agreement. FOF 112, 358.

357. There was no agreement to reimburse the foreign partners or to protect them from any loss. den Baas Dep. (4/6/00) 169:21–173:5; Nee Tr. (4/12/01) 65:20–66:24; Kofol Tr. (4/12/01) 46:24–47:5; Tucker Tr. (9/20/00 a.m.) 34:8–35:3; *see* Considine Tr. (9/12/00 a.m.) 45:15–23.

358. There were no side agreements, oral or written, between Boca or the AHP partners and ABN Bank, Addiscombe or Syringa under which Boca or the AHP partners agreed to repay funds ABN Bank loaned to Addiscombe and Syringa or to pay a specified rate of return on those funds. Considine Tr. (9/12/00 a.m.) 46:20–47:5, 50:22–51:3; Nee Tr. (6/20/00 p.m.) 46:15–22, 56:1–8; Nee Tr. (4/12/01) 65:20–66:24; den Baas Dep. (4/6/00) 169:15–20, 172:18–173:5, 192:19–25; Tucker Tr. (9/20/00 a.m.) 34:8–35:3.

359. Had the Partnership been unable to return Addiscombe's and Syringa's capital contributions, Addiscombe, Syringa and ABN Bank could not look to either Boca or the AHP partners to be made whole. den Baas Dep. (4/6/00) 172:18–173:5; Nee Tr. (4/12/01) 67:1–14; Kofol Tr. (4/12/01) 46:24–47:5.

360. Addiscombe and Syringa had a right to participate in the management of the Partnership, and they exercised that right. JEX 3, at §§ 5.01–5.03; JEX 5; JEX 8; JEX 9; JEX 11; JEX 12; JEX 15; JEX 17.

361. AHP did not intend to borrow money from Addiscombe, Syringa, or ABN Bank. Considine Tr. (9/12/00 a.m.) 50:9–21.

### 7. *The Partners' Capital Accounts and Installment Gain*

362. Boca's Partnership Agreement provided (1) for the determination and maintenance of capital accounts ("Partnership Capital Account") (2) that liquidating distributions were to be made in accordance with the partners' positive capital account balances, and (3) that any partner with a deficit balance in its capital account following the liquidation of its interest was required to restore the deficit balance in a timely manner. JEX 3, at § 4.03 and 8.02(d).

363. The Partnership Agreement's provisions on maintaining the Partnership Capital Accounts differed from the capital account maintenance requirements of Treas. Reg. § 1.704–1(b)(2)(iv) in only one respect: Under the Partnership Agreement, Boca's assets were revalued (and the Partnership Capital Accounts were adjusted to reflect the reevaluations) more frequently than under Treas. Reg. § 1.704–1(b)(2)(iv)(f). JEX 3, at § 4.03(b).[14] The periodic reevaluations of the Partnership assets provided for under the Partnership Agreement were undertaken for non-tax business reasons. Aside from the more frequent reevaluations called for in the Partnership Agreement, in all other respects, Boca's Partnership Capital Accounts satisfied the capital account maintenance requirements of Treas. Reg. of § 1.704–1(b)(2)(iv). PEX 720 (direct testimony of Case) at 6–13.

364. Under the Partnership Agreement, the Partnership established a Partnership Capital Account for each partner that reflected each partner's share of the Partnership's economic income and loss. Under Section 4.03(b) of the Partnership Agreement, the Partnership Capital Accounts would have been revalued before a Partnership liquidation. If the Partnership were to liquidate at the end of each taxable year, the Partnership Capital Accounts would have been revalued at the end of each year. Under Section 8.02(d) of

---

**14.** The purpose of Treasury Regulation Section 1.704–1(b)(2) is to effectuate the "safe harbor" provision of Section 704(b) of the Internal Revenue Code.

the Agreement, the Partnership would liquidate in accordance with the Partnership Capital Accounts. In addition, each partner was obligated to restore any deficit balance in its Partnership Capital Account on dissolution of the Partnership. Accordingly, the Partnership Capital Accounts reflected each partner's economic interest in the Partnership's assets and liabilities. PEX 720 (direct testimony of Case) at 22.

365. A liquidation of Boca at the end of each of Boca's taxable years—ended May 31, 1990, May 31, 1991, December 31, 1991, December 31, 1992, and December 31, 1993—in accordance with the Partnership Capital Accounts would have produced the same economic results to each Partner as would have occurred if the Partnership had liquidated on these dates in accordance with capital accounts maintained for each Partner in strict compliance with the requirements of Treas. Reg. § 1.704–1(b)(2)(iv) (i.e., the Section 704(b) Capital Accounts). PEX 574 (report of Case) at 4.

366. On August 3, 1990, the date of the distribution of cash and LIBOR Notes to the partners; on September 12, 1990, and October 31, 1990, the dates of partial redemptions of Syringa's Partnership interest; and on December 17, 1990, the date of the redemption of Syringa's remaining Partnership interest, each partner's economic interest in the Partnership assets and liabilities as reflected in the Partnership Capital Accounts was the same as each Partner's interest in Partnership assets and liabilities that would have been reflected in the capital account maintained in strict compliance with the requirements of Treas. Reg. § 1.704–1( b)(2)(iv). PEX 574 (report of Case) at 4; PEX 720 (direct testimony of Case) at 6–8.

367. The economic results on the critical dates to each partner under the Partnership Capital Accounts would have been the same as the economic results under the Section 704(b) Capital Accounts. PEX 720 (direct testimony of Case) at 7.

368. The Partnership Capital Accounts constructed in accordance with the terms of the Partnership Agreement produced the same economic results as would have occurred if the Partnership Capital Accounts had been maintained in strict compliance with the safe harbor rules of the Section 704(b) Regulations. PEX 720 (direct testimony of Case) at 7, 22.

369. If the Partnership had maintained capital accounts in strict compliance with the safe harbor rules, the Section 704(b) Capital Accounts also would have been revalued before a Partnership liquidation. If the Partnership were to liquidate at the end of each taxable year, the Section 704(b) Capital Accounts would have been revalued at the end of each year. Adjusting the Section 704(b) Capital Accounts for the unrealized gain or loss in Partnership assets at the end of each year would have resulted in capital account balances that were identical to the balances as reflected in the Partnership Capital Accounts. PEX 720 (direct testimony of Case) at 22–23.

370. The allocation of the gain on the sale of the PPNs held by Boca had economic effect under the economic effect equivalence test set forth in Treas. Reg. § 1.704–1(b)(2)(ii)(i). PEX 574 (report of Case) at 4, 11–2; PEX 720 (direct testimony of Case) at 25.

## H. Activities Outside of the Partnership

### 1. Addiscombe and Syringa Swaps with ABN Bank

371. Addiscombe and Syringa entered into swaps with ABN Bank which hedged the interest rate risk on their share of the LIBOR Notes held by the Partnership. Addiscombe and Syringa hedged their interest rate risk with respect to the LIBOR Notes because they were concerned that, if interest rates declined, they could lose not

only the return on the principal but the principal as well. DEX 203–DEX 226; JEX 229, at ¶ 8; den Baas Dep. (4/6/00) 30:6–34:3, 70:21–71:2, 72:3–7, 173:17–175:10.

372. AHP, AHP 10 and Boca were not parties to the swap transactions between Addiscombe and Syringa and ABN Bank. Moreover, AHP and AHP 10 were unaware of these swaps during the period in issue. JEX 229, at ¶ 9; Considine Tr. (9/12/00 a.m.) 61:15–18; Kofol Tr. (6/21/00 p.m.) 9:13–20, 25:18–23; den Baas Dep. (4/6/00) 175:11–15; Merrill Lynch 30(b)(6) Dep. (Taylor 3/10/98) 142:8–25; Pepe Dep. (5/7/98) 197:13–23.

373. The swap transactions between Addiscombe and Syringa and ABN Bank did not eliminate Addiscombe's and Syringa's exposure to the LIBOR Note issuers' credit. Rather, Addiscombe and Syringa had the full credit risk with respect to the LIBOR Notes. If any of the issuers had defaulted, or if there had been a decline in value of the LIBOR Notes resulting from an issuer's credit deterioration, Addiscombe and Syringa would have suffered a loss in the value of their partnership interests. By entering the swaps, Addiscombe and Syringa narrowed their risk in their ownership interest in the LIBOR Notes but did not eliminate risk. JEX 229, at ¶ 8; den Baas Dep. (4/6/00) 162:22–164:7, 175:21–176:5; Tucker Tr. (9/20/00 p.m.) 7:18–19, 17:25–18:3.

374. Addiscombe's and Syringa's swap transactions did not alter or modify the risk shared among the partners and did not affect the financial relationship among the partners. JEX 229, at ¶¶ 8–9. Hedging did not eliminate Addiscombe's and Syringa's economic interest in the LIBOR Notes. den Baas Dep. (4/6/00) 163:3–166:15.

375. The swap transactions between Addiscombe and Syringa and ABN Bank relating to the LIBOR Notes had no economic effect on Boca or the AHP partners. Boca still received the LIBOR payments from the issuers of the LIBOR Notes. The swaps had no effect on Boca's or its financial statements. Nor did the swaps affect the AHP partners or their accounting treatment of the Boca transactions. FOF 213, 244, 371.

376. Addiscombe's and Syringa's swap transactions with ABN Bank hedged a portion of their risks associated with their ownership of Boca, but in no way affected their role as partners in Boca. Addiscombe and Syringa still participated in Boca and shared decisionmaking authority regarding Boca's activities, including the disposition of the LIBOR Notes. JEX 3, at § 5.01–5.03; Tucker Tr. (9/20/00 p.m.) 2:9–21; 6:18–8:1, 17:25–18:3.

### 2. *ABN Bank–MLCS Swaps*

377. While Addiscombe and Syringa entered into interest rate swaps with ABN Bank, ABN Bank entered into interest rate swaps with MLCS to reduce ABN Bank's interest rate risk under its swaps with Addiscombe and Syringa. den Baas Dep. (3/11/98) 88:17–21; den Baas Dep. (4/6/00) 34:25–35:24; 74:9–79:5.

378. AHP, AHP 10, and Boca were not parties to the swap transactions between MLCS and ABN Bank, and the AHP partners had no knowledge of the swaps during the period in issue. den Baas Dep. (3/11/98) 134:24–135:4; Merrill Lynch 30(b)(6) Dep. (Taylor 3/10/98) 142:8–25; Pepe Dep. (5/7/98) 197:13–23.

### 3. *MLCS Swaps with LIBOR Note Issuers*

379. To facilitate the sale of the PPNs by Boca, Merrill Lynch proposed structured transactions to the LIBOR Note issuers. The structured transactions included the sales by Boca of the PPNs for cash and LIBOR Notes and swaps (the asset or

basis swap and the hedge swap) between MLCS and the three LIBOR Note issuers, BFCE, Sumitomo, BETA, and Mitsubishi. Merrill Lynch 30(b)(6) Dep. (Taylor 3/10/98) 74:22–75:23; PEX 721 (written testimony of Rahl) at 19, 57–63.

380. Boca, AHP and AHP 10 were not parties to the swap transactions, and Merrill Lynch did not inform AHP or AHP 10 that it was entering into swaps with the LIBOR Note issuers as part of the structured transactions. AHP and AHP 10 were unaware of these swaps at the time they were executed and during the period in issue. Merrill Lynch 30(b)(6) Dep. (Taylor 3/10/98) 142:18–25; Pepe Dep. (5/7/98) 197:13–23.·

381. There were no promises or commitments between Merrill Lynch and any of the third parties that engaged in the transactions related to Boca, aside from the clear written agreements entered into by those parties. Merrill Lynch 30(b)(6) Dep. (Taylor 3/10/98) 57:21–58:5.

382. The swaps did not hedge the LIBOR Note issuers' credit risk in owning the PPNs. This risk was real as the PPN owner was at risk of losing its principal as a results of any credit deterioration of the PPN issuer. Oston Dep. (4/29/98) 100:24–102:4; 111:24–112:9; 113:6–114: 18.

### 4. *Effect of Swaps on the Partnership*

383. These swap transactions engaged in by Addiscombe, Syringa, ABN Bank and the LIBOR Note issuers had no effect on the Partnership or the relationship among the partners. The swaps were done outside of the Partnership. FOF 213, 244, 371–376.

384. Neither AHP nor AHP 10 entered into swaps or in any way hedged any investment of the Partnership, including their interest in the PPNs or LIBOR Notes. Considine (9/12/00 a.m.) 61:2–14; Considine (9/12/00 p.m.) 7:21–8:11, 9:21–

10:5; Considine Dep. (4/12/99) 70:8–10; Kofol Tr. (6/21/00 p.m.) 9:21–10:1, 25:6–17, 34:23–36:8.

385. Merrill Lynch never informed the AHP partners about the swap transactions entered into by ABN Bank, the foreign partners, or the LIBOR Note Issuers. Merrill Lynch 30(b)(6) Dep. (Taylor 3/10/98) 142:8–25.

### I. *Boca's Tax Reporting*

386. On its partnership federal income tax return for the fiscal year 1990 (Form 1065), Boca reported the sale of the PPNs under the contingent payment installment method pursuant to Section 453 of the Internal Revenue Code and Temporary Treasury Regulation Section 15A.453–1(c). PEX 502A; PEX 503–PEX 505; Walsh Tr. (9/11/00 a.m.) 26:2–30:8.

387. Under the contingent payment installment sale rules of Temporary Treasury Regulation Section 15A.453–1(c), Boca determined that its tax basis in the PPNs was recovered ratably over the maximum period over which payments were to be received. In this case, the maximum period was seven taxable years. PEX 502A, Walsh Tr. (9/11/00 a.m.) 26:2–30:8.

388. Boca's tax basis in the PPNs was reported as $1,106,883,099, which included the initial cost of $1,100,000,000 for the PPNs plus $6,883,099 of accrued interest that was included in taxable income. Under the Temporary Treasury Regulation, one-seventh of the basis—or $158,126,-157—was allocated to Boca's taxable year ended May 31, 1990. This resulted in an installment gain of $721,873,843 ($880 million ·of cash payment less $158,126,157 of basis). PEX 502A; PEX 503–PEX 505; Walsh (9/11/00 a.m.) 26:2–30:8.

389. The $721,873,843 capital gain on the sale of the PPNs was allocated among the four partners, as follows:

| | | Percentage |
|---|---|---|
| AHP | $ 64,968,646 | 9% |
| AHP 10 | 7,218,738 | 1% |
| Syringa | 599,155,290 | 83% |
| Addiscombe | 50,531,169 | 7% |
| | $721,873,843 | 100% |

PEX 502A.

390. AHP's and AHP 10's tax basis in their partnership interest equaled the sum of: (i) their initial capital contribution of $150,000,000; (ii) the purchase price paid for a portion of Syringa's interest on July 20, 1990, of $684,292,462; and (iii) their shares of Boca's taxable income, including the capital gain. The sum of these three amounts is $907,485,424. Since this amount was less than Boca's tax basis of $948,756,942 in the LIBOR Notes, AHP and AHP 10 used the smaller amount as their basis in the LIBOR Notes. FOF 254.

391. Under the ratable basis recovery rule of Temporary Treasury Regulation Section 15A.453–1(c), six-sevenths of the tax basis in the PPNs (i.e., $948,756,942) was assigned to the LIBOR Notes. When the LIBOR Notes were distributed on August 3, 1990, AHP and AHP 10 received a tax basis in the LIBOR Notes equal to the lesser of Boca's tax basis in the LIBOR Notes ($948,756,942) or AHP's and AHP 10's tax bases in their partnership interests ($907,485,424). Section 732(a) of the Internal Revenue Code. PEX 502A; Walsh Tr. (9/11/00 a.m.) 26:2–30:8.

392. As a result, AHP and AHP 10's tax bases in their partnership interests were reduced to zero. Following the distribution, Boca's assets were worth $1,126,786,161, and the AHP partners' combined ownership interest was approximately 54.6 percent. When AHP and AHP 10 sold their LIBOR Notes, they calculated their losses accordingly using the tax basis of $907,485,424. AHP and AHP 10 declared this loss on its 1990 tax return. FOF 253, 254, 271–273.

## II. CONCLUSIONS OF LAW

Under Section 701 of the Internal Revenue Code, a partnership as such is not subject to tax. Instead, the partners are liable in their separate and individual capacities by taking into account and reporting their shares of the partnership's income, gains, losses, deductions, and credits on their individual tax returns. Section 6221 and subsequent sections of the Internal Revenue Code establish procedures for determining the tax treatment of these partnership items at the partnership level. This treatment is then binding on the partners with respect to their individual tax returns. See 26 U.S.C. §§ 6221–6233.[15]

After examining Boca Investering Partnership's tax returns for the years ended May 31, 1990, May 31, 1991, May 31, 1992, and May 31, 1993, the Commissioner of Internal Revenue issued a Notice of Final Partnership Administrative Adjustments ("FPAA") on December 30, 1996. JEX 326. The Commissioner determined that there was no gain or loss from the sale of the PPNs, that all of Boca's income, gains (including the installment gain from Boca's sales of the PPNs), deductions, and losses should be allocated 90 percent to AHP and 10 percent to AHP 10 (disregarding the existence of Addiscombe, Syringa, and the partnership generally), and that Boca's tax basis in the LIBOR Notes should be reduced from $948,756,942 to $201,789,852 ($183,573,674 in the LIBOR Notes distrib-

---

**15.** Unless otherwise noted, all statutory section references in this Opinion are to Title 26 of the United States Code—the Internal Revenue Code. Similarly, all regulatory section references are to Title 26 of the Code of Federal Regulations. All citations are to the relevant Code sections and regulations as in effect during the tax years at issue (namely, Boca Investering Partnership's tax years ended May 31, 1990 to May 31, 1993).

uted to AHP and $18,216,178 in the LIBOR Notes distributed to AHP 10). JEX 326 at GOV 25538, 25541–45. Plaintiffs' complaint seeks a judicial readjustment of these partnership items in the FPAA pursuant to 26 U.S.C. § 6226.

The FPAA makes several determinations justifying the adjustments contested by the plaintiffs, although the determinations in some respects overlap. The parties agree that the Commissioner's determinations can be summarized as follows:

(1) Boca Investerings should not be recognized as a partnership for federal income tax purposes since the parties did not intend to form a partnership and did not form a partnership for purposes of federal income tax.

(2) The transactions financing the purchase and sale of the private placement notes are not recognized for federal income tax purposes because the transactions lacked economic substance, were prearranged and predetermined, and had no legitimate business purpose.

(3) Syringa and Addiscombe were not partners in Boca Investerings since Syringa and Addiscombe made loans rather than capital contributions to the partnership.

(4) Under the step transaction doctrine, transitory steps occurring as part of a plan may be disregarded if they add nothing of substance to the completed transaction. Therefore the transactions undertaken by Boca with respect to the purchase and sale of private placement notes should be collapsed so that no gain or loss is recognized for federal income tax purposes.

(5) Boca's sales of the private placement notes are disqualified from installment sale reporting under 26 U.S.C. § 453 since the steps necessary to create a market for the LIBOR notes were taken at the time the notes were issued.

(6) The allocation of the installment tax gain lacked substantial economic effect under 26 U.S.C. § 704(b) and should be reallocated to American Home Products in accordance with the partners interests in the "partnership."

JEX 326; see Def.'s Post Trial Brief at 24 and Pls.' Reply Brief at 10.

The parties also agree that the first two determinations listed above—(1) that Boca was a sham partnership, and (2) that its purchase and sale of the financial instruments at issue were sham transactions—were primary to the Commissioner's decision, while the last four determinations were alternative determinations. The tax treatment of these partnership items therefore turns principally on the Court's resolution of two legal issues: (1) whether Boca was in fact a partnership for federal income tax purposes whose partners included AHP, AHP 10, Syringa, and Addiscombe; and (2) whether Boca's ownership and sales of the PPNs for cash and LIBOR Notes had sufficient economic substance to be recognized for federal income tax purposes. These two questions, as well as the several alternative grounds offered by the Commissioner, are discussed below.[16]

---

**16.** Plaintiffs assert that the Court need not review all six determinations because the government has conceded that the Commissioner erred with respect to two of those determinations. Specifically, plaintiffs suggest that the government has conceded that determination 3 (that Syringa and Addiscombe were not partners in Boca Investerings since they made loans rather than capital contributions to the partnership) and determination 5 (that Boca's sales of the private placement notes are disqualified from installment sale reporting under 26 U.S.C. § 453 since the steps necessary to create a market for the LIBOR notes were taken at the time the notes were issued) lack merit.

## A. The Burden of Proof

■■■■ The rulings of the Commissioner of Internal Revenue are presumed correct. *Welch v. Helvering*, 290 U.S. 111, 115, 54 S.Ct. 8, 78 L.Ed. 212 (1933); *Wickwire v. Reinecke*, 275 U.S. 101, 105, 48 S.Ct. 43, 72 L.Ed. 184 (1927); *Brewster v. Commissioner*, 607 F.2d 1369, 1375 (D.C.Cir.1979) (presumption of correctness in determinations by Commissioner); *Continental Oil Co. v. Helvering*, 100 F.2d 101, 108 (D.C.Cir.1938) (determination of Commissioner is *prima facie* correct). The taxpayer challenging a notice of deficiency has the burden of proving the Commissioner's position incorrect by a preponderance of the evidence. *Helvering v. Taylor*, 293 U.S. 507, 515, 55 S.Ct. 287, 79 L.Ed. 623 (1935); *Lucas v. Structural Steel Co.*, 281 U.S. 264, 271, 50 S.Ct. 263, 74 L.Ed. 848 (1930); *American Postal Workers Union, AFL–CIO v. United States*, 925 F.2d 480, 484 (D.C.Cir.1991). Although a notice of deficiency is not involved in this case, a notice of final partnership administrative adjustment is the functional equivalent of a notice of deficiency for these purposes. *Sealy Power, Ltd. v. Commissioner*, 46 F.3d 382, 385 (5th Cir.1995); *cf. Meserve Drilling Partners v. Commissioner*, 152 F.3d 1181, 1183 (9th Cir.1998) (FPAA deemed "ticket to the Tax Court" for partner and therefore legal equivalent of notice of deficiency).

■■■■ In the case at hand, the Commissioner determined that the partnership was a sham for federal income tax purposes, or that the purchase and sale of the PPNs were sham transactions, motivated solely by tax considerations and having no legitimate business purpose. The Commissioner's determination that a transaction is a sham is itself presumptively correct, and the taxpayers have the burden of producing evidence to the contrary as well as the burden of persuasion. *Sochin v. Commissioner*, 843 F.2d 351, 355 n. 9 (9th Cir.), *cert. denied*, 488 U.S. 824, 109 S.Ct. 72, 102 L.Ed.2d 49 (1988), citing *Welch v. Helvering*, 290 U.S. at 115, 54 S.Ct. 8; *Goldberg v. United States*, 789 F.2d 1341, 1343 (9th Cir.1986) (burden is on taxpayer to show that form of transactions reflect their substance). Thus, in the case at bar it is plaintiffs' burden to produce evidence and to persuade the Court, by a preponderance of the evidence, that the Commissioner's determinations are erroneous.

## B. Relevant Statutory and Legal Background

The Internal Revenue Code contains numerous rules of tax accounting that are designed to provide an accurate measure of a taxpayer's actual gain or loss from a specific transaction. *See Massey Motors v. United States*, 364 U.S. 92, 106, 80 S.Ct. 1411, 4 L.Ed.2d 1592 (1990) ("[A]ccounting for federal income tax purposes ... focus[es] on the need for an accurate determination of the net income from operations of a given business for a fiscal period."). Section 1001 of Title 26 of the United States Code generally provides that gain

It is true that these two alternative determinations are not defended in defendant's post-trial brief, nor were any findings of fact or conclusions of law proposed with respect to these determinations. Defendant's apparent decision not to defend these determinations, however, is not the same as conceding that they were in error; neither at trial nor in its post-trial briefs did the government explicitly concede that these two alternative determina-

tions lacked merit. Since the rulings of the Commissioner of Internal Revenue must be presumed correct, leaving the taxpayer challenging the Commissioner's determinations with the burden to prove the Commissioner's position incorrect by a preponderance of the evidence, *see infra* Section II.A., the Court will consider all six determinations on the merits.

or loss from the sale or exchange of property is to be reported in the year the transaction occurs. 26 U.S.C. § 1001. In the event the taxpayer has a "gain" from the transaction—defined as the sum by which the amount received exceeds the taxpayer's "adjusted basis" in the property—that amount is included in the taxpayer's gross income under 26 U.S.C. § 61(a)(3). In the event the taxpayer has a "loss" from the transaction—defined as the sum by which the taxpayer's adjusted basis in the property exceeds the amount received—that amount generally is deductible under Section 165(a) of the Internal Revenue Code. *See* 26 U.S.C. § 165(f). Section 165(a) allows a deduction for "any loss sustained during the taxable year and not compensated for by insurance or otherwise." *Id.* Treasury Regulation Section 1.165–1(b) provides in pertinent part:

> To be allowable as a deduction under [Section] 165(a), a loss must be evidenced by closed and completed transactions, fixed by identifiable events, and ... actually sustained during the taxable year. Only a bona fide loss is allowable. Substance and not mere form shall govern in determining a deductible loss.

26 C.F.R. § 1.165–1(b).

The installment method of accounting provided in Section 453 of the Internal Revenue Code is an exception to the general rule for recognizing gain or loss from a transaction. Section 453(a) provides generally that "income from an installment sale shall be taken into account ... under the installment method." Section 453(b)(1) defines an installment sale as "a disposition of property where at least 1 payment is to be received after the close of the taxable year in which the disposition occurs." Section 453(c) defines the installment method as "a method under which the income recognized for any taxable year

from a disposition is that proportion of the payments received in that year which the gross profit (realized or to be realized when payment is completed) bears to the total contract price." The installment method of accounting is designed to "relieve taxpayers who adopted it from having to pay an income tax in the year of sale based on the full amount of anticipated profits when in fact they had received in cash only a small portion of the sales price." *Commissioner v. South Texas Lumber Co.*, 333 U.S. 496, 503, 68 S.Ct. 695, 92 L.Ed. 831 (1948).

Prior to 1980, the installment method of accounting was available only to a taxpayer who had a "gain" from an installment sale. A taxpayer who incurred a loss from such a transaction (because the sales price was less than the property's adjusted basis) therefore could not report the loss on the installment method. *See Martin v. Commissioner*, 61 F.2d 942 (2d Cir.1932). In 1980, Congress determined that "a taxpayer should be permitted to report gain from a deferred payment sale under the installment method even if the selling price may be subject to some contingency." S.Rep. No. 96–1000, 96th Cong.2d Sess. 23 (1980–2 C.B. 494, 506). In the Installment Sales Revision Act of 1980, Pub.L. No. 96–471, § 2, 96 Stat. 2247, 2251, Congress added Internal Revenue Code Section 453(i)(2) (now Section 453(j)(2)), which directs the Secretary of the Treasury to issue "regulations providing for ratable basis recovery in transactions where the gross profit or the total contract price (or both) cannot be readily ascertained." The accompanying Senate Report explains this provision as follows:

> In cases where the sales price is indefinite and no maximum selling price can be determined but the obligation is payable over a fixed period of time, it is generally intended that [the] basis of the

property sold would be recovered ratably over that fixed period. In a case where the selling price and payment period are both indefinite, but a sale has in fact occurred it is intended that the regulations would permit ratable basis recovery over some reasonable period of time.

S.Rep. No. 96–1000, at 23–24, 1980–2 C.B. at 506.

Acting pursuant to the grant of authority provided in Section 453(i), the Department of the Treasury promulgated Temporary Treasury Regulation Section 15A.453–1(c)(3)(i), which provides in pertinent part:

> When a stated maximum selling price cannot be determined as of the close of the taxable year in which the sale or other disposition occurs, but the maximum period over which payments may be received under the contingent sale price agreement is fixed, the taxpayer's basis (inclusive of selling expenses) shall be allocated to the taxable years in which payment may be received under the agreement in equal annual increments.... If in any taxable year no payment is received or the amount of payment received (exclusive of interest) is less than the basis allocated to the taxable year, no loss shall be allowed unless the taxable year is the final payment year under the agreement or unless it is otherwise determined in accordance with the rules generally applicable to worthless debts that the future payment obligation under the agreement has become worthless. When no loss is allowed, the unrecovered portion of [the] basis allocated to the taxable year shall be carried forward to the next succeeding taxable year. If application of the foregoing rules to a particular case would substantially and inappropriately

defer or accelerate recovery of the taxpayer's basis, a special rule will apply. 26 C.F.R. § 15A.453–1(c)(3)(i).

By providing for ratable basis recovery on all contingent installment sales, Section 453 and the accompanying regulation allow a taxpayer who ultimately incurs an actual loss on such a transaction to use an installment method of accounting. The ratable basis recovery regulation thus provides a means for accounting for the basis of an asset that is recovered over a period of more than one year in a contingent sales transaction. *See ACM Partnership v. Commissioner,* 157 F.3d 231, 252 & n. 41 (3rd Cir.1998), *cert. denied,* 526 U.S. 1017, 119 S.Ct. 1251, 143 L.Ed.2d 348 (1999). The regulation, however, is not intended to create deductions not otherwise authorized by the Internal Revenue Code. *Id.*

### C. The Boca Partnership

The Internal Revenue Code broadly defines a partnership to include "a syndicate, group, pool, joint venture or other unincorporated organization through or by means of which any business, financial operation, or venture is carried on." 26 U.S.C. §§ 761(a) and 7701(a)(2). The Court should respect the partnership for tax purposes if, but only if:

> considering all the facts—the agreement, the conduct of the parties in execution of its provisions, their statements, the testimony of disinterested persons, the relationship of the parties, their respective abilities and capital contributions, the actual control of income and the purposes for which it is used, and any other facts throwing light on their true intent—the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise.

*Commissioner v. Culbertson,* 337 U.S. 733, 742, 69 S.Ct. 1210, 93 L.Ed. 1659 (1949); *see Maiatico v. Commissioner,* 183 F.2d

836, 838 (D.C.Cir.1950). To determine whether Boca was a partnership, therefore, one must determine the intent of the parties, as reflected in the agreement among them, their relationship, conduct and statements. Did they "really and truly" intend in good faith "to join together in the present conduct of the enterprise," "for the purpose of carrying on the business and sharing in the profits or losses or both." *Commissioner v. Culbertson*, 337 U.S. at 741–42, 69 S.Ct. 1210. "And their intention in this respect is a question of fact to be determined from testimony" about their agreement and their conduct. *Id.* at 741, 69 S.Ct. 1210.

■ There are a number of factors on which courts have focused in attempting to determine whether the parties truly intended to form a partnership. These factors include:

> the agreement of the parties and their conduct in executing its terms; the contributions, if any, which each party has made to the venture; the parties' control over income and capital and the right of each to make withdrawals; whether each party was a principal and coproprietor, sharing a mutual proprietary interest in the net profits and having an obligation to share losses, or whether one party was the agent or employee of the other, receiving for his services contingent compensation in the form of a percentage of income; whether business was conducted in the joint names of the parties; whether the parties filed Federal partnership returns or otherwise represented to [the Internal Revenue Service] or to persons with whom they dealt

that they were joint venturers; whether separate books of account were maintained for the venture, and whether the parties exercised mutual control over and assumed mutual responsibilities for the enterprise.

*Luna v. Commissioner*, 42 T.C. 1067, 1077–78, 1964 WL 1259 (1964). "Although each case is to be decided upon its own facts and circumstances," the Tax Court has summarized these factors by identifying "four basic attributes" that are indicative of a partnership: (i) the express or implied intent of the parties to form a partnership; (ii) the contribution of money, property and/or services; (iii) an agreement for joint proprietorship and control; and (iv) an agreement to share profits. *S & M Plumbing Co. v. Commissioner*, 55 T.C. 702, 707, 1971 WL 2607 (1971).[17]

■ Under the Internal Revenue Code, and applying the tests set forth in *Culbertson*, *Luna* and *S & M Plumbing* to the facts found in this case, the Court concludes that Boca was a partnership and should have been recognized as such for federal income tax purposes.

### 1. *Formation and Operation of the Partnership*

#### a. *AHP's Approval of the Partnership*

Based upon the evidence presented at trial and through deposition testimony, the Court finds by a preponderance of the evidence that the parties intended to and did in fact organize Boca as a partnership. All witnesses with any direct knowledge of the events in question so testified—except for Warren Matthei, whose testimony the

---

**17.** While the sharing of profits and losses has been recognized as a critical factor, the Tax Court has often pointed out that the disproportionate sharing of losses and expenses is not fatal to the existence of a partnership. *See, e.g., McDougal v. Commissioner*, 62 T.C. 720, 1974 WL 2704 (1974); *Koen v. Commis-* *sioner*, 14 T.C. 1406, 1950 WL 233 (1950); *Wheeler v. Commissioner*, 37 T.C.M. (CCH) 883 (1978); *Schmitz v. Commissioner*, 37 T.C.M. (CCH) 1323 (1978); *Halstead v. Commissioner*, 19 T.C.M. (CCH) 571 (1960), *aff'd per curiam*, 296 F.2d 61 (2d Cir.1961); Rev. Rul. 54–84, 1954–1 C.B. 284.

Court does not credit as trustworthy or reliable, *see* FOF 49, 105, 105a, 105b, 105c, 109—and all of the relevant documentary evidence supports that finding. From the outset, the intent of the parties was to organize Boca as a partnership. No other type of entity was ever contemplated, nor was any action taken by any party that was contrary to that intent. FOF 108–115.

AHP always understood that the proposal was to form and invest in a partnership that would invest in various financial instruments and that the partners would share the income and losses as well as the risks of the partnership investments in accordance with their participation in the partnership. FOF 53, 61, 62, 75, 78. There was no testimony, except the discredited testimony of Mr. Matthei, to the contrary. FOF 49.

Mr. Considine and Mr. Nee told Merrill Lynch that AHP would only enter into a partnership with a partner or partners with whom AHP would be comfortable, who had expertise with respect to the financial instruments that might be involved, and who was financially secure. According to the undisputed testimony of Mr. Considine, if the partners had not met AHP's expectations, AHP would not have agreed to enter into a partnership with them. FOF 83; Considine Tr. (9/12/00 a.m.) 43:18–24. When Mr. Considine sought authorization for the potential investment in what became Boca, a partnership was the only financial arrangement proposed and subsequently approved in an AHT.

The AHT, which specifically alerted AHP's management that the proposed investment would involve entering into a partnership "with a highly rated foreign financial institution," JEX 2, was required under AHP procedures because such a partnership investment was outside of AHP's normal investment guidelines. FOF 79. Under the AHT, AHP could not enter into any arrangement other than a partnership. The AHT and the undisputed testimony of AHP personnel about the internal approval process at AHP—which the Court credits—demonstrate that AHP's intent was to organize Boca as a partnership with all of the consequences and potential risks that investing in a partnership entailed.

b. *The Agreement to Enter a Partnership*

The testimony and documentary evidence establish that the arrangement negotiated and entered into by the parties at a meeting in Bermuda on April 19, 1990 was a partnership arrangement and that the conduct of the parties following the execution of the Partnership Agreement was in accordance with their relationship as partners. There were no side agreements or other commitments that established a different relationship. FOF 112–115, 358. To the extent that Mr. Matthei testified that there may have been an oral agreement between Mr. Considine from AHP and Mr. den Baas from ABN to establish a specific schedule for the foreign partners' withdrawal from the partnership, the Court does not credit his testimony. FOF 104, 105, 105a, 105b, 105c.

The topics discussed at the first meeting in Bermuda with respect to the Partnership Agreement included: (i) the sharing of the profits and losses resulting from Boca's transactions; (ii) the sharing of expenses; (iii) the sharing of risks among the partners; (iv) adoption of investment guidelines; and (v) partner participation in decision-making. FOF 106–108. Everyone who was present and testified about this meeting said that when negotiating the Partnership Agreement, the partners understood that the relationships were going to be that of a partnership and that the

partners were going to share in the risks and rewards of the partnership in accordance with the Partnership Agreement. FOF 108, 110. All the credible evidence at trial demonstrated that the entirety of the substantive arrangement entered into is set forth in the Partnership Agreement and is consistent with Boca being a partnership. JEX 3; FOF 112–115, 358.

### c. The Partnership Agreement

Under the Partnership Agreement, Boca was formed as a general partnership under New York law. JEX 3, at §§ 2.01 and 11.11. FOF 117. Boca and the partners were subject to the legal framework, the financial accounting requirements, and the regulatory constraints that govern partnerships. The partners were jointly and severally liable for Boca's obligations, and each partner could bind Boca and the other partners. FOF 118.

The Partnership Agreement provided that Boca was to be governed by a Partnership Committee composed of representatives of all four partners. Action by the Partnership Committee required the assent of partners "whose Partnership Percentages aggregate not less than 95%." JEX 3, at Article V. All four partners participated in decision-making, and each group of partners (the AHP partners and the foreign partners) could veto the other group's decisions. FOF 121, 122.

The Partnership Agreement provided that, except for the preferred return provisions and default loss provision, Boca's income, expenses, gains, and losses would be shared by the four partners in proportion to their Partnership Percentages as adjusted from time to time. FOF 126–128, 150. As Boca received income or gains or incurred expenses or losses—and these amounts were shared by the four partners—the Partnership Agreement provided that adjustments would be made to their Partnership capital accounts. JEX 3, at §§ 2.04, 4.03, 4.04. These capital accounts determined the new Partnership percentages that governed the allocation of subsequent earnings, expenses, gains, and losses, as well as the amounts to be paid to a partner upon withdrawal from the Partnership or upon its dissolution. FOF 125–134.

The Court concludes that the mutual intent to form a partnership in accordance with the Partnership Agreement—including the joint contributions to capital, mutual decision-making, and the sharing of income, expenses, gains, and losses—established a partnership for federal income tax purposes under the tests of *Culbertson, Luna,* and *S & M Plumbing.* All four partners shared the benefits (including interest income) and the burdens (including interest-rate risk, credit risk, default risk, and credit spread risk) of Boca's assets. FOF 299, 358; *see* Tucker Tr. (9/20/00 p.m.) 6:18–8:1. Each of the four partners had a partner's interest in Boca's assets.

### d. Operation as a Partnership

As shown on the Partnership's financial statements, the partners shared Boca's income, expenses, gains, and losses in accordance with the Partnership Agreement. FOF 207, 213, 215, 221, 243, 244, 259, 295, 299. For example, during the first fiscal period from April 19, 1990 to May 31, 1990, the end of Boca's first taxable year, Boca's net operating income was $10,055,266, including $6,883,106 of interest on the PPNs and $554 of expenses. FOF 204.[18] Under

---

18. While defendant questions plaintiffs' motive for using May 31 as the end of Boca's fiscal year, the evidence at trial demonstrated that plaintiffs did not request that date or know in advance what it would be, and that it was set pursuant to the Partnership Agreement because the majority partner's (Syringa's) fiscal year ended on May 31. FOF 120.

the Partnership Agreement, this net operating income was allocated first to AHP and AHP 10 up to the amounts of their preferred returns, and the balance then went to Syringa and Addiscombe. FOF 205. Similarly, all of Boca's operating income and expenses from June 1, 1990 through September 17, 1991, was allocated among its four partners in accordance with the Partnership Agreement. FOF 235, 236, 239, 240, 258, 259, 263, 264, 280, 281, 291, 292.

The four partners also shared losses. The LIBOR Notes decreased in value by $7,503,929 during the period they were held by the Partnership due to a decline in interest rates, and this loss was shared by the partners in accordance with the Partnership Agreement. FOF 244. AHP's and AHP 10's share of the decrease in value was $2,303,822 out of $7,503,929. Because they were partners, Syringa and Addiscombe bore the larger share of the losses, and no portion was shifted to the AHP partners. FOF 244. While Syringa and Addiscombe hedged their share of the interest-rate risk with respect to the LIBOR Notes outside the Partnership, this did not affect the sharing of such risk among the partners. FOF 371, 373, 374, 383.

The credible evidence before the Court is that the AHP partners did not hedge their interest-rate risk with respect to the LIBOR Notes and were unaware of Syringa's and Addiscombe's hedges. FOF 252, 371–378, 384. Furthermore, the AHP partners had no responsibility for Syringa's and Addiscombe's shares of the loss. Insofar as the Partnership lost money on any investment, such losses were shared in accordance with the terms of the Partnership Agreement. FOF 152, 354–359. With the hedges taken into account, Syringa and Addiscombe still had an interest in

the Partnership's investment in the LIBOR Notes and were still assured a return from Boca's investment of their capital in LIBOR Notes, although the upside potential and downside risk were reduced. FOF 372–375.

The only exception to the sharing of Boca's expenses by all four partners was Boca's treatment of the transaction costs incurred in acquiring the LIBOR Notes. FOF 217, 219–221. These transaction costs were included or embedded in Merrill Lynch's periodic valuations of the LIBOR Notes and therefore would be borne by the party that owned the LIBOR Notes when they were sold or matured. FOF 210, 217. The costs would have been shared by all of the partners if the Partnership had sold the LIBOR Notes or held them to maturity. FOF 217. Because the LIBOR Notes were distributed to the AHP partners on August 3, 1990, at a value that included the embedded transaction costs, the costs of acquiring the Notes were passed on to the AHP partners. FOF 219, 220. There was no pre-existing agreement by the AHP partners to bear these costs. FOF 219.

In sum, the evidence presented at trial proves that in operation "the parties in good faith and acting with a business purpose intended to join together in the present conduct of [an] enterprise," by sharing in the income, expenses, gains, and losses of the partnership in accordance with the Partnership Agreement. *Commissioner v. Culbertson*, 337 U.S. at 742, 69 S.Ct. 1210; *see Luna v. Commissioner*, 42 T.C. at 1077–78; *S & M Plumbing Co. v. Commissioner*, 55 T.C. at 707.

e. *Each Partner's Interest in the Partnership*

Section 704(e)(1) of the Internal Revenue Code provides that a person shall be

---

The Court therefore has no reason to question plaintiffs' assertion that the correct taxable year of the Partnership is the fiscal year ending May 31.

recognized as a partner under the Code "if he owns a capital interest in a partnership in which capital is a material income-producing factor, whether or not such interest was derived by purchase or gift from any other person." 26 U.S.C. § 704(e)(1). Based on the testimony and documentary evidence presented at trial, the Court concludes that Syringa and Addiscombe owned capital interests in Boca and were partners under Section 704(e)(1) of the Internal Revenue Code. The evidence further demonstrates that Boca was formed as an investment partnership. FOF 53, 79, 80, 125. Pursuant to the Partnership Agreement, the parties contributed $1.5 billion to Boca, with Syringa and Addiscombe contributing a total of $1.35 billion. FOF 150, 151. In the context of an investment partnership, capital was a material income-producing factor. FOF 123, 124, 150, 151. The exposure to credit risk, default risk, and credit spread risk was real and of significant concern to the foreign partners. FOF 226, 288, 312–316.

The purchases by the AHP partners of partnership interests from Syringa on July 20, 1990 and from Addiscombe on September 17, 1991, are additional evidence that Boca was a *bona fide* partnership and that Addiscombe and Syringa were legitimate partners. In both instances, the purchase price reflected (i) the selling partner's share of Boca's operating income and expenses up to that time, including interest from the PPNs, (ii) the selling partner's share of the decrease in value of the LIBOR Notes, and (iii) a premium above book value. FOF 226, 288, 310. The evidence before the Court establishes that the premiums were not based on a prior agreement, a previously agreed upon formula or a previously agreed upon amount. The premiums were negotiated at the time and served legitimate business purposes. FOF 227, 287, 290.

In the case of Syringa, Mr. Kofol testified without contradiction that there was no expectation prior to the meeting on July 20, 1990, that a premium would be paid and that there had been no discussions of a premium. Payment of the premium facilitated the purchase of Syringa's interest in Boca, helping AHP achieve the goal of investing the proceeds from Boyle-Midway in a relatively conservative portfolio with the additional upside (and risk) of an investment in volatile LIBOR Notes. AHP also understood that if certain transactions occurred, AHP had the potential for a tax benefit. FOF 227, 229. In the case of Addiscombe, the evidence before the Court is that the AHP partners paid a negotiated premium of $2.2 million because AHP wanted to use the funds in the Partnership to make a strategic acquisition of Genetics Institute and did not want Addiscombe to have an interest in Genetics Institute. FOF 290. AHP therefore determined that the payment of the premium was beneficial to AHP. FOF 283–287, 290.

On the basis of the evidence presented at trial and the facts found by the Court, the Court finds that Syringa and Addiscombe had a partner's interest in Boca's assets and concludes that they should be treated as partners for tax purposes. The parties intended to organize Boca as a partnership to share the income, expenses, gains, and losses from Boca's investments and did so. *See* FOF 299.

### 2. *Conclusions of Law Regarding the Boca Partnership*

The foregoing discussion establishes that the "four basic attributes" of a partnership identified in *S & M Plumbing Co. v. Commissioner* are present here. The record in this case establishes that (i) all four partners intended to, and did, organize Boca as an investment partnership, FOF 299; (ii) all four contributed substantial capital to the partnership, FOF 150–

151; (iii) all four participated on the Partnership Committee and jointly controlled Boca, since the agreement of owners of 95 percent of the Partnership was required in order to take action, FOF 121–122; and (iv) all four jointly shared in the income, gain, losses, and expenses from Boca's investments pursuant to the Partnership Agreement. FOF 207, 213, 215, 221, 243, 244, 259, 295, 299; *see also Luna v. Commissioner,* 42 T.C. at 1077–78. In addition, there was a legitimate business purpose for the creation of the partnership and the purchase of the PPNs, *see infra* Section II.D.1a; FOF 15–21, 75, 78–81, 90, 93, 123–125, 158–163, 167; for the sale of the PPNs and purchase of the LIBOR Notes, *see infra* Section II.D.1b and c; FOF 173–174, 182–187, 198; and for the subsequent purchases of the interests of Syringa and Addiscombe. *See infra* Section II.D.1c and d; FOF 224, 226, 227, 229, 283–290, 310.

■ Since there was a legitimate partnership and legitimate business purposes for its creation, organization and investments, and since there were legitimate business reasons for the AHP partners to buy out the interests of Syringa and Addiscombe at the prices they did, it is irrelevant if AHP was motivated in part to organize Boca as a partnership by a desire to reduce taxes. *See Gregory v. Helvering,* 293 U.S. 465, 468–69, 55 S.Ct. 266, 79 L.Ed. 596 (1935). AHP personnel testified that they were well aware of the potential tax benefits and had them firmly in mind, but, as the Supreme Court said in *Gregory,* "[t]he legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether to avoid them, by means which the law permits, cannot be doubted." *Id.* at 469, 55 S.Ct. 266. AHP's motive to obtain a tax benefit is not inconsistent with its intent to make a profit. So long as it was not motivated

solely by the former, it should be recognized as a partnership for tax purposes.

In *Chisholm v. Commissioner,* 79 F.2d 14 (2d Cir.), *cert. denied,* 296 U.S. 641, 56 S.Ct. 174, 80 L.Ed. 456 (1935), Judge Learned Hand expressly rejected the argument that a partnership "formed confessedly to escape taxation" was for that reason "not 'bona fide.' " *Id.* at 15. Relying on *Gregory,* Judge Hand wrote:

> It is important to observe just what the Supreme Court held in that case. It was solicitous to reaffirm the doctrine that a man's motive to avoid taxation will not establish his liability if the transaction does not do so without it.
>
> \* \* \* \* \* \*
>
> The question always is whether the transaction under scrutiny is in fact what it appears to be in form; … True, it is always the intent that controls; and we need not for this occasion press the difference between intent and purpose. We may assume that purpose may be the touchstone, but the purpose which counts is one which defeats or contradicts the apparent transaction, not the purpose to escape taxation which the apparent, but not the whole, transaction would realize.

79 F.2d at 15.

Since *Chisholm,* courts have consistently applied *Gregory* as Judge Hand did. *See, e.g., United Parcel Service of America v. Commissioner,* 254 F.3d 1014, 1019 (11th Cir.2001) ("A 'business purpose' does not mean a reason for a transaction that is free of tax considerations. Rather, a transaction has a 'business purpose' … as long as it figures in a bona fide, profit-seeking business."); *IES Industries v. United States,* 253 F.3d 350, 355 (8th Cir. 2001) ("A taxpayer's subjective intent to avoid taxes … will not by itself determine whether there was a business purpose to a

transaction."); *Northern Indiana Pub. Serv. Co. v. Commissioner*, 115 F.3d 506, 512 (7th Cir.1997) (*Gregory* and its progeny "do not allow the Commissioner to disregard economic transactions ... which result in actual, non-tax-related changes in economic position" regardless of "tax-avoidance motive"); *see also Estate of Strangi v. Commissioner*, 115 T.C. 478, 2000 WL 1755274 (2000); *Knight v. Commissioner*, 115 T.C. 506, 2000 WL 1755284 (2000); *Pasternak v. Commissioner*, 990 F.2d 893, 900 (6th Cir.1993); *Vanderschraaf v. Commissioner*, 74 T.C.M. (CCH) 7 (1997), *aff'd*, 2000 WL 237963, 211 F.3d 1276 (9th Cir.2000). In each case, the issue is whether there was a legitimate business purpose for what the parties did, not whether they may also have had a tax motive for doing it.

The evidence before the Court demonstrates that (i) the parties intended to form Boca as a partnership, FOF 299; (ii) the parties jointly contributed the capital to Boca that was used to purchase Boca's investments, FOF 150–151; (iii) the parties shared the benefits and burdens of owning the PPNs, including the accrual of interest income, FOF 299, 358; Tucker Tr. (9/20/00 p.m.) 6:18–8:1; (iv) the parties shared the income from the reinvestment of the cash proceeds from the sales of the PPNs, FOF 226, 232, 235, 236, 240, 241; (v) the parties shared the benefits and burdens of owning the LIBOR Notes, including the diminution in the value of the LIBOR Notes while they were owned by Boca, FOF 214, 215, 226, 232, 244; (vi) the parties shared Boca's operating costs, FOF 127, 204, 207, 221, 226, 235, 299; and (vii) the parties would have shared the costs of selling the PPNs and acquiring the LIBOR Notes if the LIBOR Notes had been sold or matured while held by Boca. FOF 217.

Based on the foregoing, the Court reaches the following conclusions of law:

1. AHP, AHP 10, Syringa, and Addiscombe intended to, and did, organize Boca as a partnership to share the income, gains, expenses, and losses from Boca's investments. The parties intended that AHP, AHP 10, Addiscombe, and Syringa be partners in Boca. All relevant indicia of a true partnership exist here.

2. Boca was a partnership for federal income tax purposes, and its partners were AHP, AHP 10, Addiscombe, and Syringa.

3. Boca was a partnership as defined in Sections 761(a) and 7701(a)(2) of the Internal Revenue Code.

4. All four partners, including AHP, AHP 10, Syringa, and Addiscombe, owned capital interests in Boca for purposes of Section 704(e)(1) of the Internal Revenue Code.

5. All four partners—AHP, AHP 10, Syringa, and Addiscombe—were partners for purposes of Section 704(e)(1) of the Internal Revenue Code.

6. The correct taxable year of the Partnership is the fiscal year ending May 31st.

7. For federal income tax purposes, Boca properly allocated its income, gains, deductions, and losses among its four partners in accordance with the Partnership Agreement.

8. The Commissioner erred when he determined that Boca Investerings should not be recognized as a partnership for federal income tax purposes on the theory that the parties did not intend to form a partnership and did not form a partnership for purposes of federal income tax (FPAA determination 1).

### D. The Boca Transactions

The sham transaction doctrine generally prevents taxpayers from claiming the tax benefits of transactions which, al-

though they may fit within the language of the Internal Revenue Code, "are not the type of transaction Congress intended to favor." *Horn v. Commissioner,* 968 F.2d 1229, 1236 (D.C.Cir.1992). "Usually, transactions that are invalidated by the doctrine are those motivated by nothing more than the taxpayer's desire to secure the attached tax benefit." *Id.* As the D.C. Circuit has put it:

> [T]he sham transaction doctrine is simply an aid to identifying tax-motivated transactions that Congress did not intend to include within the scope of a given benefit-granting statute .... [A] transaction will not be considered a sham if it is undertaken for profit or for other legitimate nontax business purposes.

*Id.* at 1238. So long as the transaction does not offend Congress' intent with respect to the Internal Revenue Code provision at issue, "[t]he legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether to avoid them, by means which the law permits, cannot be doubted." *Gregory v. Helvering,* 293 U.S. at 469, 55 S.Ct. 266.

In this case, the Commissioner determined that the transactions financing the purchase and sale of the PPNs and the LIBOR Notes should not be recognized for income tax purposes because the transactions lack economic substance, were prearranged and predetermined, and had no legitimate business purpose. JEX 326, at GOV025538–GOV025539. In short, the Commissioner determined that because the transactions related to the PPNs and the LIBOR Notes lacked "economic substance"—because they were "sham transactions"—the effect of those transactions on plaintiffs would not be recognized for federal income tax purposes.

▮ The controlling authority with respect to economic substance in this Circuit

is *Horn v. Commissioner,* 968 F.2d 1229 (D.C.Cir.1992). In *Horn,* the D.C. Circuit set forth the following test for determining whether a transaction should be considered a sham for tax purposes:

> To treat a transaction as a sham, the court must find [1] that the taxpayer was motivated by no business purpose other than obtaining tax benefits in entering the transaction, and [2] that the transaction has no economic substance because no reasonable possibility of profit exists.

*Horn v. Commissioner,* 968 F.2d at 1237 (quoting *Friedman v. C.I.R.,* 869 F.2d 785 (4th Cir.1989)). The questions to ask are whether the transaction had "a reasonable prospect, *ex ante,* for economic gain (profit)" and "whether the transaction was undertaken for a business purpose other than the tax benefits." *Id. see also ACM Partnership v. Commissioner,* 157 F.3d at 247–48. (applying same two prong test to similar transaction).

While plaintiffs presented evidence at trial attempting to demonstrate that the Boca transactions did not run afoul of either prong of this traditional two prong test of economic substance, they argued in their post-trial briefs that the Court need not apply the test to conclude that the transactions are recognizable for tax purposes in this case. They now contend that in determining whether a financial transaction is a sham for tax purposes a court need only ask "whether what was done was what the specific statutory provision in issue intended"—that is, whether the taxpayer complied with the technical requirements of the specific Internal Revenue Code provision. Pls.' Post–Trial Brief at 35. Plaintiffs contend that a court need not apply the two prong economic substance test of *Horn*—unless Congress drafted the applicable Internal Revenue

Code provision to specifically require such a showing.

Applying this theory, plaintiffs assert that the statute at issue in this case—Section 1001 of the Internal Revenue Code, which governs determinations of the amount of and recognition of gains or losses resulting from the sale or other disposition of property—does not itself require the satisfaction of the two prong economic substance test, and that what was done in this case—the purchase and sale of the PPNs—was done in the manner intended by the language of the applicable statutory provision. Plaintiffs maintain that in Section 1001 Congress intended that any transaction be recognized as a "sale," so long as the owner of the property transfers the benefits and burdens of ownership in exchange for cash or materially different property. They then argue that because plaintiffs satisfied this "benefits and burdens" test, the Court must order the Commissioner to recognize the transactions for tax purposes regardless of whether there was a nontax business purpose or a reasonable possibility of profit.

■ The Court does not agree that a transaction need have economic substance only if the relevant statute specifically and affirmatively incorporates the *Horn* requirements. Rather, *Horn* requires this Court to look both to the relevant statute and to the economic substance of the transactions at issue unless for some reason Congress has affirmatively expressed its intent in the statute to recognize for tax purposes transactions with no business purpose and/or no reasonable possibility of profit. *See Horn v. Commissioner*, 968 F.2d at 1236 (the sham transaction doctrine "cannot be used to preempt congressional intent. . . . Congress has the power to authorize [certain] transactions, whether

or not they are economic shams."). Congress has not done so in Section 1001. The Court therefore must determine whether the Boca transactions were undertaken for a valid business purpose and whether Boca and its partners had a reasonable prospect of economic gain. *Id.* at 1237.

In *Horn*, the court of appeals analyzed the Internal Revenue Code provision at issue and found that Congress unquestionably intended that the section's requirement that the transaction be entered into as part of a "trade or business" would supplant the traditional economic substance requirements of non-tax business purpose and reasonable possibility of profit. *See Horn v. Commissioner*, 968 F.2d at 1238–39. A review of Section 1001—the relevant provision in this case—makes clear that no such waiver of the economic substance requirement was intended by Congress and that no different statutory test was intended to supplant the economic substance test. Accordingly, the traditional test for economic substance/sham transactions applies here: Did the transaction have a reasonable possibility for economic gain or profit, and was the transaction undertaken for a business purpose other than for obtaining tax benefits? *Id.* at 1236. As the defendant argues—and the Court agrees—these are the relevant inquiries.

The decision in *Horn* also makes plain that a transaction is not a sham and will be recognized for tax purposes if the taxpayer satisfies *either* part of the test for economic substance—if either (1) using a subjective analysis, the transaction has a nontax business purpose, *or* (2) using an objective analysis, the transaction has a reasonable possibility of generating a profit, *ex ante*. *Horn v. Commissioner*, 968 F.2d at 1237–

38.[19] The D.C. Circuit expressly recognized that "a transaction undertaken for a nontax business purpose will not be considered an economic sham *even if* there was no objectively reasonable possibility that the transaction would produce profits." *Id.* at 1237 (emphasis in original). By the same token, a transaction that has economic consequences other than tax benefits will not be disregarded even if it was motivated by tax considerations. *See Gregory v. Helvering*, 293 U.S. at 469, 55 S.Ct. 266; *Frank Lyon Co. v. United States*, 435 U.S. 561, 580, 98 S.Ct. 1291, 55 L.Ed.2d 550 (1978); *Estate of Strangi*, 115 T.C. at 478; *Johnson v. United States*, 11 Cl.Ct. 17 (1986). Both factors are considered in applying the traditional sham transaction test, but the transaction will be recognized if either is satisfied. *Horn v. Commissioner*, 968 F.2d at 1237 ("a transaction will not be considered a sham if it is undertaken for profit *or* for other legitimate nontax business purposes").

■ In this case, plaintiffs have established by a preponderance of the evidence that the transactions financing the purchase and sale of the PPNs had economic substance because those transaction had a non-tax business purpose. Since satisfaction of either prong of the test is sufficient to demonstrate that a transaction has economic substance, the Court need not draw any conclusions regarding the second prong—whether, using an objective analysis, the transactions had a reasonable prospect of making a profit.

That said, the Court does find that the great weight of the evidence, including the expert testimony presented at trial—particularly that of Ms. Rahl and Mr. Fong—support plaintiffs' position that the transactions in this case also satisfy the second prong of the sham transaction/economic substance test. As plaintiffs' experts testified at length, there was—from an objective, *ex ante* perspective—a reasonable possibility that the transactions at issue could have turned a profit. The Court so finds by a preponderance of the evidence. *See* FOF 327–350. Indeed, they did generate a profit. FOF 330, 331, 334, 335.

## 1. Boca's Investments and Transactions

### a. Initial Investment in Boca and Purchase of PPNs

The creation of and investment in the Boca Investerings Partnership and the transactions entered by Boca, in particular the purchase and sale of PPNs, had economic substance because AHP had a non-tax business purpose, namely to make investments that would generate profit. All of the witnesses who testified on behalf of AHP and Merrill Lynch—save the discredited testimony of Merrill Lynch relationship manager Warren Matthei, *see* FOF 49, 109—testified that from the outset AHP believed the concept to be both an investment opportunity *and* a potential tax saving opportunity. FOF 50–64. As described at the initial meeting between AHP representatives and Merrill Lynch, the proposal involved (i) the investment in a partnership, (ii) the partnership's investment in capital assets that would generate

---

19. "[W]e can divine from the cases two general factors to assess in determining whether a transaction was an economic sham: (1) did the transaction have a reasonable prospect, *ex ante*, for economic gain (profit), and (2) was the transaction undertaken for a business purpose other than the tax benefits?" *Horn v. Commissioner*, 968 F.2d at 1237, citing *Sochin v. Commissioner*, 843 F.2d 351, 354 (9th Cir.) ("[C]ourts 'typically focus' on the related factors of whether the taxpayer has shown (1) a non-tax business purpose (a subjective analysis), and (2) that the transaction had 'economic substance' beyond the generation of tax benefits (an objective analysis)."), *cert. denied*, 488 U.S. 824, 109 S.Ct. 72, 102 L.Ed.2d 49 (1988).

a return satisfactory to AHP, and (iii) certain transactions which, if undertaken, could cause AHP to realize a capital loss. FOF 53. The partners were to make substantial investments in the partnership, and the partnership was to make investments that would likely generate a satisfactory return to AHP. FOF 53.

Mr. Considine testified that following the initial meeting with Merrill Lynch, he engaged in due diligence in order to evaluate the investment aspect of the proposal, meeting with Merrill Lynch in order to address concerns about the credit quality, rate of return, and risk profile of the partnership's potential investments. FOF 58–60. AHP considered (i) that the investments would be in high-grade financial instruments with commensurate risk and return, (ii) that the initial investment would be in PPNs, (iii) that the PPNs would be liquid, and (iv) that the yield on the PPNs would be 12 to 24 basis points more than AHP's non-tax-advantaged investments. FOF 62. AHP believed that it would make a profit from the partnership's investments. FOF 62, 63.

The record before the Court demonstrates that AHP would not have invested in Boca if AHP did not think it could make a profit from Boca's investments. FOF 63, 64. AHP representatives testified without contradiction that if the Treasury Department had thought that AHP would lose money on its investment in Boca, on a pre-tax basis, it would not have recommended the investment and AHP would not have made the investment. FOF 18, 64; Considine Dep. (4/12/99) 92:14–93:14; Kofol Tr. (6/21/00 a.m.) 16:5–8; Nee Dep. (4/8/99) 72:21–73:18, 88:11–90:9. While AHP's Tax Department had advised on the tax implications, it was the Treasury Department's decision to invest, based on its evaluation of the proposal solely as an investment. FOF 19, 21, 75, 81, 83, 91, 93.

While potential tax benefits were considered by AHP, it was understood that AHP was not committing to engage in all of the transactions necessary under the Merrill Lynch presentation in order to give rise to a tax loss. FOF 74. As Mr. Nee and Mr. Considine both testified, AHP did not have a timetable for any additional investment in the Partnership or any subsequent investment by the Partnership. Each proposed transaction would be evaluated separately to be sure it made economic sense on its own, and each transaction would be authorized pursuant to a separate AHT. FOF 72, 93, 184.

As the testimony at trial indicated, AHP understood that Boca would acquire all of the burdens of owning the PPNs—including the credit risk and other risks—as well as the benefits. There was no specific plan or commitment as to when the PPNs might be sold and AHP took certain steps to protect itself from these risks. FOF 155, 156. Among other things, the Partnership Agreement provided that during the period Syringa and Addiscombe owned more than 50 percent of the Partnership, Syringa and Addiscombe would be responsible for all default losses caused by bankruptcy up to the amount of their Partnership capital accounts. FOF 129, 157, 172.

### b. Sale of PPNs and Purchase of LIBOR Notes

Each of Boca's subsequent transactions, including the sales of the PPNs for cash and LIBOR Notes and the distribution of the LIBOR Notes to the AHP partners, were evaluated by AHP's Treasury Department on a pre-tax basis. FOF 18, 87, 88, 93, 184. Although tax benefits were a consideration, Mr. Considine testified that there was no commitment that any subsequent transactions would occur and that he sought authorization for each transaction

based on the potential financial benefits of the transaction. FOF 88, 184.[20]

As understood by AHP, the potential financial benefits from the sale of the PPNs for cash and LIBOR Notes were the following: (i) the volatile LIBOR Notes had the potential to generate a significant return; (ii) the reinvestment of the cash proceeds in commercial paper would provide a return commensurate with the risk associated with those investments; (iii) diversification would reduce the credit risk of the partnership portfolio; and (iv) diversification would reduce maturities and therefore improve the portfolio's liquidity. Considine Tr. (9/12/00 a.m.) 56:15–22; Kofol Tr. (6/21/00 p.m.) 3:1–4:17, 6:12–7:17; FOF 174, 183, 198.

### c. Purchase of Syringa's Interest in Boca and Acquisition of LIBOR Notes

On July 20, 1990, AHP purchased approximately 45% of Boca from Syringa for $684,292,462. The price reflected (i) Syringa's share of Boca's operating income and expenses up to that time, and (2) a premium of $2.5 million (or ⅓ of 1 percent) above book value. FOF 226. After this purchase, AHP had approximately $834 million invested in Boca of which approximately $720 million was in high grade securities and $115 million was in the more volatile LIBOR Notes. FOF 233. AHP determined that it would not hedge its interest in the volatile LIBOR Notes because it believed it had the opportunity to profit from a generally safe portfolio and also have a 55% interest in the LIBOR Notes with their potential for gain (and loss) because of their volatility. Considine

Tr. (9/12/00 p.m.) 7:21–8:11; Kofol Tr. (6/21/00 p.m.) 24:24–25:23; FOF 224, 234.

When AHP accepted the LIBOR Notes in distribution from the Partnership on August 3, 1990, it was aware that the value of the Notes had declined because of lower interest rates but it believed that there was a good chance that interest rates would rise and provide profit. It also understood that there was a potential tax benefit should AHP sell or hold the LIBOR Notes to maturity. FOF 237, 246. When the AHP partners received the LIBOR Notes, there were no plans to sell them. Considine Tr. (9/12/00 p.m.) 10:25–11:11, 18:4–13; FOF 250.

### d. Sale of LIBOR Notes and Purchase of Addiscombe's Interest in Boca

Concerned about interest rates and the volatility of the LIBOR Notes, AHP and AHP 10 sold the LIBOR Notes for approximately $196 million on November 6 and 8, 1990. FOF 268, 270–273. As it turned out, AHPs concerns were justified, as the value of the Notes declined drastically, losing $70 million in value. FOF 275.

In the summer of 1991, AHP was in the process of reviewing a potential acquisition of Genetics Institute and wanted to use the funds in Boca to make the acquisition. The acquisition of Genetics Institute was not within the stated investments allowed by the Partnership Agreement and the investment therefore required the agreement of owners of 95% of the Partnership. FOF 283, 284. Because Addiscombe was reluctant to consent to the desired use of the Partnership's funds, AHP's Treasury Department sought authorization to purchase Addiscombe's interest in Boca. AHP was willing to pay a premium of up to $3

20. On May 24, 1990, the AHP Treasury Department initiated an AHT to request authorization for Boca to sell the PPNs for cash and LIBOR Notes. An AHT was required because the proposed investment in LIBOR Notes was

outside of AHP's investment guidelines and because the Partnership was selling an asset that AHP previously had authorized it to buy. JEX 25; Considine Tr. (9/12/00 a.m.) 58:13–59:6.

million for Addiscombe's interest in Boca because the use of the funds in Boca to purchase Genetics Institute was important to AHP, AHP believed Addiscombe would not consent, and AHP did not want another partner having an interest in Genetics Institute. FOF 284–286; JEX 20. On September 17, 1991, AHP purchased Addiscombe's interest in the Partnership for $87,496,250, which included a $2.2 million premium. There was no tax benefit involved in AHP's purchase of Addiscombe's interest. FOF 288.

### 2. Conclusions of Law Regarding the Boca Transactions

As the foregoing discussion shows, the record developed at trial establishes that AHP evaluated all of the transactions in issue, including the purchase of the PPNs and the LIBOR Notes, from an investment perspective on a pre-tax basis and entered into the transactions in order to make a profit. Based on the foregoing, the Court reaches the following conclusions of law:

1. The transactions financing the purchase and sale of the PPNs had economic substance, were not prearranged and predetermined, and had a legitimate business purpose. They therefore should be recognized for federal income tax purposes.

2. Boca's sales of the PPNs for cash and LIBOR Notes were "sales" for purposes of Section 1001 of the Internal Revenue Code.

3. The capital contributions to Boca's equity by the AHP partners and the foreign partners and Boca's transactions involving the PPNs and LIBOR Notes had economic substance and must be respected for federal income tax purposes.

4. The capital contributions to Boca's equity by the AHP partners and the foreign partners and Boca's transactions involving the PPNs and LIBOR Notes had practical economic effects separate and apart from tax consequences.

5. None of the transactions involving the capital contributions to Boca's equity by the AHP partners or the foreign partners, or Boca's transactions involving the PPNs and LIBOR Notes, was prearranged or predetermined.

6. The capital contributions to Boca's equity by the AHP partners and the foreign partners and Boca's transactions involving the PPNs and LIBOR Notes had a non-tax business purpose. Although taxes were an important consideration for the AHP partners, their investment in and subsequent authorization of transactions by the Partnership were not driven solely by tax considerations.

7. The transactions entered by Boca had economic substance because, from a subjective point of view, the partners—and particularly the AHP partners—had a non-tax business purpose for entering those transactions, namely to make a profit on their investment.

8. The transactions had economic substance because, from an objective *ex ante* perspective, they have a reasonable prospect of turning a profit.

9. The Commissioner erred when he determined that the transactions financing the purchase and sale of the PPNs should not be recognized for federal income tax purposes on the theory that the transactions lacked economic substance, were prearranged and predetermined, and had no legitimate business purpose (FPAA determination 2).

### E. Alternative Determinations

In addition to the Commissioner's two primary reasons for making adjustments to plaintiffs' partnership items—namely that Boca was a sham partnership and that Boca conducted sham transactions—several other alternative positions were taken

by the Commissioner to justify the adjustments. The Commissioner concluded (1) that Syringa and Addiscombe were not partners in Boca Investerings since Syringa and Addiscombe made loans rather than capital contributions to the partnership; (2) that under the step transaction doctrine, there was no gain or loss on the sale of the PPNs; (3) that the sales of the PPNs for cash and LIBOR Notes did not qualify for installment sale reporting since the steps necessary to create a market for the LIBOR Notes were taken at the time of the issuance of the LIBOR Notes; and (4) that, even if Boca were recognized as a partnership, Addiscombe and Syringa were recognized as partners, and the sale of the PPNs for cash and LIBOR Notes were recognized as a contingent payment installment sale, the allocation of the installment gain to all four partners had no economic effect or the economic effect was not substantial. JEX 326.

### 1. *Debtor/Creditor Relationship*

██ As an alternative justification for making the administrative adjustments in plaintiffs' FPAA, the Commissioner determined that Syringa and Addiscombe were creditors of Boca or the AHP partners, not true partners. The evidence at trial, however, was all to the contrary. FOF 353–361. Neither Boca nor the AHP partners agreed to repay Syringa's and Addiscombe's capital contributions to Boca or to pay any specified return on their contributions. FOF 152, 354–359. Nor was there any agreement to reimburse the foreign partners or to protect them from any loss. FOF 152, 357–359. There simply were no agreements or commitments to establish a loan, and the foreign partners had no creditors' rights. FOF 135, 152, 354–356, 358; Tucker Tr. (9/20/00 p.m.) 6:18–8:1.

Where there is no obligation to repay another partner's capital contributions or to pay interest, there is no loan and no debtor-creditor relationship. *See, e.g., Stahl v. United States,* 441 F.2d 999, 1002 (D.C.Cir.1970) (an "absolute liability to pay ... [is the] *sine qua non* of the debtor-creditor relationship"); *Gilbert v. Commissioner,* 248 F.2d 399, 402–03 (2d Cir.1957), *cert. denied,* 359 U.S. 1002, 79 S.Ct. 1139, 3 L.Ed.2d 1030 (1959) ("The classic debt is an unqualified obligation to pay a sum certain at a reasonably close fixed maturity date along with a fixed percentage in interest payable regardless of the debtor's income or lack thereof."). *See also Geftman v. Commissioner,* 154 F.3d 61, 68 (3d Cir.1998); *Roth Steel Tube Co. v. Commissioner,* 800 F.2d 625, 631 (6th Cir.1986), *cert. denied,* 481 U.S. 1014, 107 S.Ct. 1888, 95 L.Ed.2d 496 (1987).

Particularly with respect to this issue of a debtor/creditor relationship, the facts as found by this Court from the evidence at trial in this case are materially different from the facts in *ASA Investerings Partnership* recently decided by the Tax Court and affirmed by the D.C. Circuit—a case defendant argues is strikingly similar to this one, but which in fact is quite different. In finding that ABN was a creditor of (rather than a partner in) ASA Investerings Partnership, the Tax Court in *ASA Investerings* relied on crucial facts that are not present in this case. Most importantly, the Tax Court found that AlliedSignal and ABN entered into a side agreement at the time the partnership was organized, the so-called "Bermuda Agreement," whereby a representative of AlliedSignal and a representative of ABN

agreed that AlliedSignal would pay all of the partnership's expenses and that AlliedSignal would pay ABN a return, which we refer to as ABN's "specified return," equal to ABN's funding costs (*i.e.,* approximately LIBOR) plus 75 b.p. on funds advanced to the partnership. ABN's specified return consisted of in-

come allocations, and AlliedSignal's direct payments, to ABN. In essence, the direct payments would equal the difference between the specified return and the income allocations. The precise amount of the specified return would depend on the amount of ABN funds held by the partnership and the amount of time that the partnership held such funds.

*ASA Investerings Partnership v. Commissioner,* 76 T.C.M. (CCH) 325, 328 (1998).

In addition to the "specified return" for ABN, the Tax Court also found as a fact that the Bermuda Agreement included an agreement that "ABN would not bear any loss relating to the PPN sale," *ASA Investerings Partnership v. Commissioner,* 76 T.C.M. at 328, and that "AlliedSignal was obligated to, and did in fact, pay all of ASA's expenses." *Id.* at 335. Not one of these facts—or any comparable facts—exists here. FOF 127, 152, 204–207, 221, 226, 235, 299, 357–359. Furthermore, all of the participants in the ASA Investerings Partnership, including AlliedSignal, hedged their respective interests in the partnership's LIBOR notes through swap transactions. *ASA Investerings Partnership v. Commissioner,* 76 T.C.M. at 329–30. By contrast, the AHP partners did not enter into such swaps in this case and were unaware of the foreign partners' swaps. FOF 379–385.

The evidence admitted at trial in this case demonstrates that the relationship among the parties was different from the relationship of the parties in *ASA Investerings.* The only agreement among the Boca partners was the written Partnership Agreement. FOF 112, 358. There is no credible evidence in this case of a "Bermuda Agreement," or of an agreement by the AHP partners to a specified return for the foreign partners, or an agreement that the AHP partners would bear any loss or pay all of Boca's expenses. But such agreements were crucial to the decision of the Tax Court in *ASA Investerings.* Because AHP and AHP 10 did not agree to a specified return for Syringa and Addiscombe, FOF 152, 358, the overall return of the foreign partners from their investment in Boca was dependent on the success of Boca's investments. FOF 299. This is a crucial difference between this case and *ASA Investerings.*

Based on the very different factual record before it, the Tax Court in *ASA Investerings* determined that AlliedSignal had guaranteed ABN a specified return—even to the point of making ABN whole for any loss on assets owned by the partnership. *ASA Investerings Partnership v. Commissioner,* 76 T.C.M. at 334. On appeal, the D.C. Circuit approved the Tax Court's intent-based "inquiry" under *Culbertson* and affirmed the decision of the Tax Court under the clearly erroneous standard of review. Relying on the facts found by the Tax Court, the Circuit stated that "given ABN's protection from risk, and even from the borrowing costs of providing its capital contribution, there was no clear error in the finding that its participation was formal rather than substantive." *ASA Investerings Partnership v. Commissioner,* 201 F.3d 505, 513 (D.C.Cir.2000).

The D.C. Circuit relied on four crucial factual findings by the Tax Court: (i) that the direct payments made to ABN were to compensate it merely for its funding costs; (ii) that ABN could make no profit from the LIBOR notes owned by ASA Investerings Partnership; any potential profit from the LIBOR notes would be offset by losses from the concomitant swap transactions; (iii) that at no point during the transaction did ABN assume greater than *de minimis* risk; and (iv) that none of the supposed partners had the intent to form a real partnership. *ASA Investerings Partner-*

*ship v. Commissioner,* 201 F.3d at 514–15. As discussed above, the facts in this case are materially different with respect to each of these four points.

The facts in this case establish that Syringa and Addiscombe made capital contributions to Boca's equity, not loans. There was no debtor/creditor relationship.

### 2. *Step Transaction Doctrine*

The Commissioner concluded as an alternative determination that "under the step transaction doctrine ... there is no gain or loss from the entire transaction financing the purchase and sale of the Norinchukin Bank, Sanwa Bank and PepsiCo Inc. notes." JEX 326, at GOV025539. The effect of the Commissioner's step transaction determination is to ignore Boca's ownership of the PPNs. The Court concludes on the basis of the facts before it that the Commissioner's application of the step transaction doctrine is without merit and that Boca's purchase, ownership and sale of the PPNs should be recognized for tax purposes.

■ The step transaction doctrine rests on the established principle that the substance rather than the form of a transaction governs its treatment for tax purposes. *See King Enterprises, Inc. v. United States,* 189 Ct.Cl. 466, 418 F.2d 511, 517 (1969). Under the step-transaction doctrine, a particular step in a transaction is disregarded for tax purposes if the taxpayer included the step "for no other purpose than to avoid U.S. taxes." *Del Commercial Properties, Inc. v. Commissioner,* 251 F.3d 210, 213 (D.C.Cir.2001). The courts therefore must analyze the true substance of an overall transaction by ignoring those parts or steps that are either meaningless or unnecessary or that have no real or independent economic significance. *See id.* at 213–14; *Esmark, Inc. v. Commissioner,* 90 T.C. 171, 195, 1988 WL 5887 (1988), *aff'd,* 886 F.2d 1318 (7th Cir.1989).

■ There is no authority under the step transaction doctrine for ignoring the parties' substantive ownership of assets (such as the PPNs) where, as here, the owner received the benefits of ownership (interest income) and was exposed to the burdens of ownership (interest rate and credit risks). Boca invested $1.1 billion in acquiring the PPNs from unrelated parties at arm's-length prices, possessed all of the benefits and burdens of owning the PPNs, and ultimately sold them to unrelated parties. Boca accrued $6,883,099 of interest income from the PPNs that was included in taxable income. FOF 388. Even under the broadest reading of the step transaction doctrine, Boca engaged in real transactions that cannot be ignored. In view of the economic substance of Boca's ownership of the PPNs, *see supra* Section II.D., the Court concludes that the step transaction doctrine is not applicable here.

There are three formulations of the step transaction doctrine: (i) the "binding commitment" test, (ii) the "interdependence" test, and (iii) the "end result" test. *See Penrod v. Commissioner,* 88 T.C. 1415, 1429, 1987 WL 49335 (1987). Under the binding commitment test, one or more steps of an overall transaction are disregarded if, at the time the first step is entered into, there is a binding commitment to undertake the later step. *See id.* at 1429. This test has no relevance in this case since the Court has found on the evidence before it that Boca had no binding commitment to sell the PPNs at the time they were acquired. FOF 85, 86, 88, 92, 93, 155. The purchase of the PPNs was evaluated and approved as an independent transaction without any assurance as to whether or when the PPNs would be sold. FOF 88, 92, 93, 155, 167.

The interdependence test asks whether the steps that make up a transaction are

so interdependent that the legal relations created by one transaction would be fruitless without a completion of the series. See Penrod v. Commissioner, 88 T.C. at 1430. In view of the evidence at trial, the Court concludes that Boca had all of the benefits and burdens of owning the PPNs, including the receipt of interest income. FOF 155, 169. Moreover, if one or more of the issuers of the PPNs had defaulted on its obligations or otherwise had its credit-rating downgraded, Boca would have suffered a loss on a subsequent sale of the PPNs. FOF 156, 157. There were no related parties involved in either the purchase or the sale of the PPNs, and there were no assurances given in advance regarding when, if, or to whom the partnership would later sell the LIBOR Notes. FOF 164, 188, 197. Both the purchase and the sale transactions had significant and real economic consequences.

The end result test also has no application here. The end result test applies to a situation in which a series of separate steps are in substance just prearranged parts of a single transaction intended from the outset to reach the ultimate result. See Penrod v. Commissioner, 88 T.C. at 1429. The end result test is not applied, however, merely because of the existence of an overall plan comprised of several steps. See Esmark, Inc. v. Commissioner, 90 T.C. at 195. The issue is whether each step had independent economic significance. Thus, in determining whether to apply the end result test, courts have looked to see whether a taxpayer has added a meaningless step or steps to an overall transaction in an attempt to mask the true nature of what is in substance a single transaction. See Esmark, Inc. v. Commissioner, 90 T.C. at 195. That is not what happened here. There were no meaningless steps in Boca's purchase and subsequent sale of the PPNs. The evidence establishes that both the purchase and the sale of the PPNs had significant and very real and independent economic consequences. In determining the substance of the transactions in this case, there is no justification for invoking the end result test or any other formulation of the step transaction doctrine to ignore Boca's ownership of the PPNs. Both the purchase and sale of the PPNs should be respected and given effect for tax purposes.

3. *Creation of Market for LIBOR Notes*

 The Commissioner determined in the FPAA that "the sales of the Norinchukin Bank, Sanwa Bank and PepsiCo Inc. notes do not qualify for installment sale reporting as the steps necessary to create a market for the LIBOR Notes were taken at the time of the issuance of the LIBOR Notes." JEX 236. If this determination were correct, the LIBOR Notes would be treated as payment for the PPNs, and the contingent payment, installment sale method of accounting for the sale of the PPNs under the Installment Sales Revision Act of 1980 would not be available because of Section 453(f)(4)(B) of the Internal Revenue Code. See supra Section II.B. That section provides that receipt of a bond or other evidence of indebtedness that is issued by a corporation and is "readily tradable" shall be treated as the receipt of payment for purposes of Section 453 of the Internal Revenue Code. In that event, the installment sale method of accounting under Section 453 would not be available with respect to that portion of the sales proceeds.

Section 453(f)(5) provides that, for purposes of Section 453(f)(4)(B), "readily tradable" means a bond or other evidence of indebtedness that is issued (a) in registered form (other than one in registered form which the taxpayer establishes will not be readily tradable on an established securities market), or (b) in any other form

designed to render such bond or other evidence of indebtedness readily tradable on an established securities market. The parties stipulated that the LIBOR Notes were not registered under the Securities Act of 1933, FOF 201, Stip. ¶ 54, and no issue was raised in the FPAA as to whether the LIBOR Notes were issued in registered form for purposes of Section 453(f)(5)(A). The only issue therefore is whether the LIBOR Notes were initially issued in a form "designed to render [them] readily tradable in an established securities market" within the meaning of Section 453(f)(5)(B).

Under Temporary Treasury Regulation Section 15A.453–1(e)(4)(A), an instrument is deemed to be "readily tradable" if:

> [s]teps necessary to create a market for them are taken at the time of issuance (or later, if taken pursuant to an expressed or implied agreement or understanding which existed at the time of issuance).

The evidence at trial, however, demonstrated that none of the steps necessary to create a market for the LIBOR Notes was taken at the time of issuance or that there was any agreement at the time of issuance. FOF 201, 202. Indeed, all the credible evidence was to the contrary. The Commissioner's determination therefore cannot stand.

Paragraph 5.9 of the LIBOR Notes themselves provided:

> Purchaser and Seller each agree (i) not to engage any broker or dealer to make

a market in this Agreement (or any direct or indirect interest therein), and (ii) not to offer or list this Agreement (or any direct or indirect interest herein) in an established securities market. An established securities market is (a) a national securities exchange which is registered under Section 6 of the Securities Exchange Act of 1934 (the "Exchange Act"), (b) an exchange which is exempted from registration under Section 5 of the Exchange Act because of its limited volume of transactions or (c) any over-the-counter market. An over-the-counter market includes any system of general circulation to brokers and dealers which regularly disseminates quotations of obligations by identified brokers or dealers, other than a quotation sheet prepared and distributed by a broker or dealer in the regular course of business and containing only quotations of such broker or dealer.

PEX 564, at GOV 003183. Consistent with this provision, the LIBOR Notes were not registered under the Securities Act of 1933. FOF 201. Nor did Merrill Lynch provide any guarantees that it would be able to or would sell the Notes. FOF 201.

The applicable Treasury Department regulation provides that an obligation is "treated as readily tradable if it is regularly quoted by brokers or dealers making a market in such obligation or is part of an issue a portion of which is in fact traded in an established securities market." Temp. Treas. Reg. § 15A.453–1(e)(4)(iii).[21] The

---

21. The term "established securities market" is defined as including (i) a national securities exchange which is registered under Section 6 of the Exchange Act, (ii) an exchange which is exempted from registration under Section 5 of the Exchange Act, or (iii) any over-the-counter market; it also provides that an over-the-counter market is reflected by the existence of an interdealer quotation system. Temp. Treas. Reg. § 15A.453–1(e)(4)(iv).

The term "interdealer quotation system" is defined in Temporary Treasury Regulation Section 15A.453–1(e)(4)(iv) as "any system of general circulation to brokers and dealers which regularly disseminates quotations of obligations by identified brokers or dealers, other than a quotation sheet prepared and distributed by a broker or dealer in the regular course of business and containing only quotations of such broker or dealer."

language in paragraph 5.9 of the LIBOR Notes tracks the language in this regulation, thereby confirming the parties' intent that the steps necessary to create a market not be taken for purposes of Temporary Treasury Regulation Section 15A.453–1(e)(4)(A).

Furthermore, the evidence developed at trial shows that AHP's sale of the LIBOR Notes was in no way consistent with the presence of an "established securities market" or an "over-the-counter market" for the LIBOR Notes. The evidence was that the sales were negotiated with the buyers, and there was no market to set the price. FOF 201, 274, 321, 341. As Mr. Fong and others testified, the "LIBOR Notes are very illiquid and privately negotiated instruments." Fong Tr. (9/21/00 p.m.) 12:3–4. The facts surrounding the actual sales of the LIBOR Notes disproves defendant's thesis that steps necessary to create a market were taken at the time the LIBOR Notes were issued. Had that been the case, there would have been price quotes for the LIBOR Notes, and the ultimate sales prices would not have been negotiated with the buyer. The Court concludes that the LIBOR Notes were not "readily tradable" for purposes of Section 453(f)(4)(B) of the Internal Revenue Code. The sales of the PPNs cannot be disregarded as installment sales.

### 4. *Allocation of Installment Sale Gain under Section 704(b)*

Finally, the Commissioner determined in the FPAA that even if Boca were recognized as a partnership, Addiscombe and Syringa were recognized as partners, and the sale of the PPNs for cash and LIBOR Notes were recognized as a contingent payment installment sale, the allocation of the $721,873,843 installment sale gain among the four partners had no economic effect or, alternatively, the economic effect was not substantial.

Section 704(a) of the Internal Revenue Code provides generally that a partner's distributive share of income, gain, loss, or deduction of a partnership shall be "determined by the partnership agreement." 26 U.S.C. § 704(a). Section 704(b) of the Internal Revenue Code provides that a partner's share of income, gain, loss, or deduction of a partnership "shall be determined in accordance with the partner's interest in the partnership (determined by taking into account all facts and circumstances)" if either (1) the partnership agreement is silent as to the allocation, or (2) the allocation under the agreement "does not have substantial economic effect." 26 U.S.C. § 704(b).

The Partnership Agreement allocated a gain among the partners in proportion to their Partnership Percentages on the first day of the fiscal period in which the gain was recognized. JEX 3, at § 404(a). The PPNs were sold during the Partnership's first taxable year ended May 31, 1990, and the initial Partnership Percentages were: AHP–9%; AHP 10–1%; Syringa–83%; and Addiscombe–7%. FOF 190–192; JEX 3, at Schedule B. The installment gain was allocated in accordance with the Partnership Agreement as follows:

| | | |
|---|---|---|
| AHP | 9% | $ 64,968,646 |
| AHP 10 | 1% | 7,218,738 |
| Syringa | 83% | 599,155,290 |
| Addiscombe | 7% | 50,531,169 |
| | 100% | $721,873,843 |

FOF 208. These amounts were credited to each partner's capital account maintained under the Partnership Agreement. FOF 131, 208, 362. Under Section 8.02 of the Partnership Agreement, Boca's liquidating distributions were to be made in accordance with the partners' respective capital accounts. JEX 3, at § 8.02.

The Partnership Agreement's provisions on maintaining capital accounts differed from the detailed capital account mainte-

nance requirements of Treasury Regulation § 1.704–1(b)(2)(iv) in one minor respect. Under the Partnership Agreement, Boca's assets were revalued (and the partners' capital accounts were adjusted to reflect the revaluations) more frequently than is permitted by the Treasury Regulation. JEX 3 at § 4.03(b); *see* FOF 363–364. The periodic revaluations of the partnership assets provided for under the Partnership Agreement were undertaken for non-tax business reasons and, as Ms. Case testified at trial, they had no bearing on the economic results to the partners. FOF 364–369; PEX 720, at 11. Aside from the more frequent revaluations called for in the Partnership Agreement, in all other respects Boca's partnership capital accounts satisfied the requirements of the regulations. FOF 368–369. As determined by Ms. Case, Boca's allocations were economically equivalent to the results under the three-part test in the regulations. FOF 367–370.

As for the economic effect test, the Commissioner gave no explanation in the FPAA for either the determination that the allocation had no economic effect or the alternative determination that even if it did have economic effect such effect was not substantial. Stating simply that "Syringa and Addiscombe were only transitory partners," the Commissioner allocated the entire installment gain to AHP (90%) and AHP 10(10%) "under the rules governing the partners' interest in the Partnership" as set forth in Section 704(b) of the Internal Revenue Code and the regulations thereunder. As a final alternative, the Commissioner allocated 25% of the installment gain to each of the four part-

ners purportedly in accordance with "the regulatory presumption set forth in Treas. Reg. Section 1.704–1(b)(3)(i)." JEX 326, at GOV025540.

As an initial matter, the Commissioner's reallocation fails to explain or even articulate the purported basis for reaching this alternative finding. The Commissioner cannot at the same time assume Addiscombe and Syringa are recognized as partners and justify the reallocation on the theory that they were only transitory partners—implying that they were not partners at all. Since the Commissioner is assuming for purposes of this alternative justification that all four partners in Boca were legitimate, and since the installment gain was allocated among those partners in accordance with the Partnership Agreement, the Court must reject the Commissioner's final alternative determination.[22]

### 5. *Conclusions of Law Regarding the Commissioner's Alternative Determinations*

Based on the foregoing, the Court reaches the following conclusions of law:

1. During the relevant period, Addiscombe and Syringa were partners in Boca and not creditors of Boca, AHP, or AHP 10. The economic substance of Syringa's and Addiscombe's interest was that of a partner in a partnership and not that of a lender. Syringa and Addiscombe made capital contributions, not loans, to Boca. The Commissioner erred in determining that Syringa and Addiscombe were not partners in Boca Investerings on the theory that Syringa and Addiscombe made loans rather than capital contributions to the partnership (FPAA determination 3).

**22.** Even if this were not the case and the Court were required to analyze whether the allocation of the installment gain in accordance with the Partnership Agreement had "substantial economic effect," the Court would find on the basis of the evidence and expert testimony admitted at trial that the allocation had the requisite substantial economic effect. *See* JEX 3; PEX 270, at 24; PEX 460; PEX 574; PEX 720 (direct testimony of Case) at 11, 16; FOF 129, 150, 205, 208, 362–370.

2. Boca's gain or loss on the sales of the PPNs for cash and LIBOR Notes cannot be disregarded under the step transaction doctrine. The Commissioner erred in determining that the transactions undertaken by Boca with respect to the purchase and sale of private placement notes should be collapsed so that no gain or loss is recognized for federal income tax purposes on the theory that, under the step transaction doctrine, transitory steps occurring as part of a plan may be disregarded if they add nothing of substance to the completed transaction (FPAA determination 4).

3. Boca's sales of the PPNs for cash and LIBOR Notes were installment sales for purposes of Section 453 of the Internal Revenue Code and must be accounted for under the contingent payment installment sale rules of Temporary Treasury Regulation Section 15A.453–1(c)(3). The sales of the PPNs for cash and LIBOR Notes cannot be disqualified for installment sale reporting on the grounds that steps were taken to create a market for the LIBOR Notes at the time of the issuance of the LIBOR Notes because no such steps were taken. Under the ratable recovery of basis rules of Temporary Treasury Regulation Section 15A.453–1(c)(3), Boca had an installment gain of $721,873,843 in Boca's taxable year ended May 31, 1990. Under the ratable recovery of basis rules of Temporary Treasury Regulation Section 15A.453–1(c)(3), Boca's basis in the LIBOR Notes on August 3, 1990, when the LIBOR Notes were distributed to AHP and AHP 10, was $948,756,942. The Commissioner erred in determining that Boca's sales of the private placement notes should be disqualified from installment sale reporting under 26 U.S.C. § 453 on the theory that the steps necessary to create a market for the LIBOR notes were taken at the time the notes were issued (FPAA determination 5).

4. Boca's allocation of the installment gain from the sales of the PPNs among the four partners was in accordance with the Partnership Agreement. Boca's allocation of the installment gain from the sales of the PPNs among the four partners in accordance with the Partnership Agreement was in accordance with the partners' interests in the Partnership for purposes of Section 704(b) of the Internal Revenue Code. Boca's allocation of the installment gain from the sales of the PPNs among the four partners in accordance with the Partnership Agreement was correct for federal income tax purposes. The Commissioner erred in determining that the allocation of the installment tax gain lacked substantial economic effect under 26 U.S.C. § 704(b) and should be reallocated to American Home Products (FPAA determination 6).

### III. CONCLUSION

Based on the testimony and documentary evidence admitted at trial and through deposition testimony, the Court concludes that plaintiffs have satisfied their burden of proving by a preponderance of the evidence that the Commissioner erred in adjusting Boca's partnership items in the Final Partnership Administrative Adjustment dated December 30, 1996. The Commissioner's adjustments shall be readjusted to the amounts originally reported by Boca on its partnership federal income tax returns for the period in issue, and the amounts deposited with the Secretary of the Treasury with respect to this action shall be refunded to plaintiffs, together with interest thereon. A Final Judgment consistent with this Opinion will issue this same day.

SO ORDERED.